## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE GARY S. KATZMANN, JUDGE

| | | |
|---|---|---|
| PHOENIX METAL CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Ct. No. 23-00048 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | **PUBLIC VERSION** |
| | ) | |
| and | ) | |
| | ) | |
| THE CAST IRON SOIL PIPE INSTITUTE, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## PLAINTIFF'S RULE 56.2 MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Gregory S. Menegaz
Judith L. Holdsworth
Alexandra H. Salzman
Vivien Jinghui Wang
**deKieffer & Horgan, PLLC**
Suite 1101
1156 Fifteenth St., N.W. 20005
Tel: (202) 783-6900
email: gmenegaz@dhlaw.com
*Counsel to Plaintiff*

Dated: August 9, 2023

# TABLE OF CONTENTS

I.     RULE 56.2 STATEMENT ........................................................................1

     A.    Administrative Determinations Subject to Appeal ..............................1

     B.    Issues Presented ................................................................................1

II.    STANDARD OF REVIEW .................................................................2

III.   STATEMENT OF FACTS ..................................................................4

IV.    ARGUMENT......................................................................................11

     A.    CBP's Failure to Release Documents Deprived Plaintiff of its Right to
Defend Against the Allegation of Evasion Before the Imposition of
Severe Enforcement Measures..........................................................11

           1.   Plaintiff's Private Interest .......................................................14

           2.   Risk of Erroneous Deprivation ...............................................16

           3.   Interim Measures as Temporary Measures; Judicial Review .................17

           4.   The Government's Interest ......................................................17

           5.   Procedural or Interpretive Rules Exempt from the APA's
Requirements for Proposed Rulemaking Do Not Have the Force
of Law .................................................................................19

     B.   Public Summaries of Record Documents are Not Sufficient to Allow
Effective Defense Against CBP's Allegations of Evasion ................23

     C.   CBP's Verification and Phoenix's Right of Rebuttal ......................26

           1.   CBP's Conduct of Verification at Phoenix............................26

           2.   Plaintiff's Right to Rebut New Factual Information Contained
in CBP's Verification Report..................................................34

     D.   CBP's Determinations Based on Adverse Facts Available was
Arbitrary and Capricious....................................................................37

V.     CONCLUSION...................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045 (9th Cir. 1995) ............................19

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ....................................................3

*Arnold P'ship v. Dudas*, 362 F.3d 1338 (Fed. Cir. 2004) ........................................................3,45

*Aspects Furniture Int'l, Inc. v. United States*, 2022 Ct. Intl. Trade LEXIS 131 (Nov. 22, 2022) ...................................................................................................................14

*Batterton v. Marshall*, 648 F.2d 694 (D.C. Cir. 1980) .................................................................37

*Bowen v. Am. Hosp. Asso.,* 476 U.S. 610 (1986)..........................................................................45

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) .........................2

*Brown Express, Inc. v. United States*, 607 F.2d 695 (5th Cir. 1979)...........................................20

*Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) .........................................................................................................................2

*Chemsol, LLC v. United States*, 755 F.3d 1345 (Fed. Cir. 2014) ...............................................17

*Cobbs v. Wilkie,* No. 18-4986, 2020 U.S. App. Vet. Claims LEXIS 722 (Vet. App. Apr. 23, 2020)....................................................................................................................13

*Cowan v. Bunting Glider Co.*, 159 Pa. Super. 573 (1946)...........................................................34

*CS Wind Vietnam Co. v. United States,* 832 F.3d 1367 (Fed. Cir. 2016) .....................................3

*Greene v. McElroy*, 360 U.S. 474, 496 (1959) ............................................................................34

*Hannah v. Larche*, 363 U.S. 420 (1960)......................................................................................14

*IPSCO, Inc. v. United States*, 687 F. Supp. 614 (Ct. Int'l Trade 1988)..................................20, 37

*Kisor v. Wilkie*, 139 S. Ct. 2400 (2019)......................................................................................20

*Lewis-Mota v. Secretary of Labor*, 469 F.2d 478 (2d Cir. 1972) ................................................20

*Linyi Chengen Imp. & Exp. Co. v. United States*, 433 F. Supp. 3d 1278 (Ct. Int'l Trade 2020) .........................................................................................................................39

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................ 13-14, 16, 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)............. 3, 43-44

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002)....................................*45*

*Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92 (2015) ...................................................20

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001)......................7

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296 (D.C. Cir. 2014) ...........................34

*Robbins v. U.S. R.R. Ret. Bd.*, 594 F.2d 448 (5th Cir. 1979) ..........................................7

*Royal Brush Mfg. v. United States*, 483 F. Supp. 3d 1294 (Ct. Int'l Trade 2020) ........................13

*Royal Brush Mfg. v. United States*, 545 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) .......................13

*Royal Brush Mfg. v. United States*, No. 2022-1226, 2023 U.S. App. LEXIS 19224
(Fed. Cir. July 27, 2023) ............................................ 7, 13, 18-19, 23-24, 25-26, 34-35

*Shalala* v. *Guernsey Memorial Hospital*, 514 U. S. 87 (1995) ....................................20

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388
(Ct. Int'l Trade 2021)..................................................................................15

*Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370 (Ct. Int'l Trade 2019) .......................15

*Tianjin Magnesium Int'l Co. v. United States*, 533 F. Supp. 2d 1327 (Ct. Int'l Trade
2008) ...................................................................................................17

*Tourus Records, Inc. v. DEA*, 259 F.3d 731 (D.C. Cir. 2001)........................................3

*United States v. Jin Fuey Moy*, 241 U.S. 394 (1916) ..............................................22

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ................................................7

*Utilities Solid Waste Activities Grp. v. EPA*, 236, F.3d 749 (D.C. Cir. 2001) .............................18

*USX Corp. v. United States*, 11 C.I.T. 82 (1987)........................................................39

*Vietnam Firewood Company Limited v. United States*, 466 F. Supp 3d 1273
(Ct. Int'l Trade 2020)..................................................................................17

*Ward v. U.S. Postal Serv.*, 634 F.3d 1274 (Fed. Cir. 2011)..........................................34

*Yangzhou Bestpak Gifts & Crafts v. United States*, 716 F.3d 1370 (Fed. Cir. 2013)...................45

## STATUTES

5 U.S.C. §553..................................................................................................................20, 36

5 U.S.C. § 555.......................................................................................................................22

5 U.S.C. § 555(b).....................................................................................................................2

5 U.S.C. § 704..................................................................................................................11, 17

5 U.S.C. § 706(2)(A)...............................................................................................................2

18 U.S.C. § 542.......................................................................................................................28

19 U.S.C. § 1509.....................................................................................................................21

19 U.S.C. § 1516a(c)(1) ........................................................................................................15

19 U.S.C. § 1517(b)(1)..........................................................................................................11

19 U.S.C. § 1517(c)(3)...........................................................................................................38

19 U.S.C. § 1517(e)..........................................................................................................11, 12

19 U.S.C. § 1517(g)(2) ...........................................................................................................2

19 U.S.C. § 4371.....................................................................................................................18

28 U.S.C. §1581(c) ................................................................................................................17

## REGULATIONS

19 CFR § 163.11(a) ...............................................................................................................21

19 CFR § 165.6(a)..................................................................................................................38

19 CFR § 165.15(d) ...............................................................................................................12

19 CFR § 165.15(e).................................................................................................................12

19 CFR § 165.21 .....................................................................................................................12

19 CFR § 165.23(c).................................................................................1, 35, 36, 37

19 CFR § 351.225(l)(2) ..........................................................................................................15

**ADMINISTRATIVE DECISIONS**

*Cast Iron Soil Pipe From the People's Republic of China*: Antidumping Duty Order,
86 Fed. Reg. 19,035 (Dep't Commerce May 3, 2019) ......................................................4, 6, 7, 14

*Cast Iron Soil Pipe From the People's Republic of China*: Countervailing Duty Order,
86 Fed. Reg. 19,039 (Dep't Commerce May 3, 2019) .............................................................4, 6

*Cast Iron Soil Pipe from China*, Inv. Nos. 701-TA-597 and 731-TA-1407 (Final),
USITC Publication 4879 (April 2019)..................................................................................... 42-43

**OTHER AUTHORITIES**

CBP, *Investigation of Claims of Evasion of Antidumping and Countervailing Duties,
Interim Regulations; Solicitation of Comments*, 81 Fed. Reg. 56,477, 56,479
(Aug. 22, 2016) ..............................................................................................................19, 23, 36

## I.  RULE 56.2 STATEMENT

Pursuant to Rule 56.2 (c)(1), Plaintiff Phoenix Metal Co., Ltd. ("Phoenix"), hereby states the administrative decisions subject to appeal and the issues of law presented:

### A.  Administrative Determinations Subject to Appeal

Plaintiff seeks judicial review of the following decisions that U.S. Customs and Border Protection ("CBP") issued in the underlying administrative proceeding, Enforce and Protect Act ("EAPA") Consolidated Case No. 7621: (a) CBP's Trade Remedy & Law Enforcement Directorate ("TRLED") Notice of Initiation  and Interim Measures (March 25, 2022) ("NOI"), **PV73: BC57**,[1]; (b) TRLED's Final Determination of Evasion as to Phoenix (Sept. 6, 2022) ("TRLED Det."), **PV155; BC129**; and (c) CBP's Final Results of Administrative Review issued by CBP's Office of Regulations and Rules ("ORR") (January 18, 2023) ("ORR Review Det."), **PV165; BC132**.

### B.  Issues Presented

1.  <u>Issue One</u>: Whether CBP's and the Alleger's failure to promptly release record documents deprived Plaintiff of its right to defend against the allegation of evasion before the imposition of severe enforcement measures.  Due to CBP's failure to promptly release record documents, Plaintiff was denied the opportunity to timely respond with rebuttal information as provided in 19 CFR §165.23(c).

2.  <u>Issue Two</u>: Whether public summaries of record documents are sufficient to allow effective defense against CBP's allegation.  The fundamental requirements of due process in accordance with 5 U.S.C. §555(b) require that the agency ensures that every interested party

---

[1] "PV" (Public Version) and "PD" (Public Document) refer to CBP's index of public record documents; "BC" refers to CBP's index of confidential record documents.

has an opportunity for effective legal representation, timely notice of intended agency action, and an opportunity to defend against allegations of wrongdoing. Nothing in the EAPA statute prevents CBP from establishing an administrative protective order allowing legal counsel access to confidential documents on the administrative record.

      3.    <u>Issue Three</u>: Whether Plaintiff has a right to rebut new factual information contained in CBP's verification report. In light of Plaintiff's due process right to rebut factual information that CBP put on the record and the discretionary nature of CBP's EAPA regulations, CBP should have accepted Phoenix's rebuttal information to new information contained in CBP's verification report.

      4.    <u>Issue Four</u>: Whether CBP's determinations, based on adverse inferences, were arbitrary and capricious. The record of this case does not support a rational connection between the facts found and CBP's conclusions and determinations. CBP's determinations are arbitrary and capricious.

## II.    STANDARD OF REVIEW

The EAPA statute provides for the standard of judicial review in 19 U.S.C. §1517(g)(2). Federal courts have recognized that the standard of review for international trade cases also encompasses the standards established under the APA, 5 U.S.C. §706(2)(A). *Changzhou Wujin Fine Chemical Factory Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (*citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

**Arbitrary and Capricious Standard**

"Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983 (citations omitted). Internal inconsistency and self-contradiction do not satisfy this requirement. There must be "a rational connection between facts found and choices made," *Motor Vehicle Mfrs*, at 43.

Further, the agency's rationale must address the parties' principal arguments. *See CS Wind Vietnam Co. v. United States,* 832 F.3d 1367, 1375-1381 (Fed. Cir. 2016) (analyzing in detail an agency's obligation to set forth a comprehensible and satisfactory justification for its determinations "as a reasonable implementation of statutory directives supported by substantial evidence"). In *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350-52 (D.C. Cir. 2014), the Court underscored the importance of an agency's obligation to "articulate an explanation for its action," stating that "a fundamental requirement of administrative law is that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action", referencing *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001). Finally, an abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004).

### III.    STATEMENT OF FACTS

The U.S. Department of Commerce issued antidumping and countervailing duty orders on Cast Iron Soil Pipe from China on May 3, 2019.  *See* Dep't Commerce, *Cast Iron Soil Pipe From the People's Republic of China*: Antidumping Duty Order, 86 Fed. Reg. 19,035 (May 3, 2019) ("AD Order") and Dep't Commerce, *Cast Iron Soil Pipe From the People's Republic of China*: Countervailing Duty Order, 86 Fed. Reg. 19,039 (May 3, 2019) ("CVD Order") (together: the "*Orders*").  On February 15, 2022, the Cast Iron Soil Pipe Institute ("Alleger") submitted a request to CBP to initiate an EAPA investigation against Glendale Plumbing and Fire Supply, Inc. ("GPFS") and its affiliated Company AKW Supply Co. ("AKW") alleging that they shipped Chinese cast iron soil pipe through Cambodia and thereby evaded antidumping and countervailing duty orders on *Cast Iron Soil Pipe from the People's Republic of China* ("Allegation").  The Alleger claimed that GPFX and AKW received CISP from Phoenix, who the Alleger characterized in conclusory statements, unsupported by evidence, as a Cambodian "front" company and a "shell" company.  Allegation at 4, 6, **PV167; BC134**.

Phoenix was established on May 4, 2021 in Cambodia by Ms. Linghong Li.  Phoenix started production of cast iron soil pipe in July 2021.  Ms. Li is Phoenix's owner and manager and sole shareholder.  *See* Phoenix Response to Request for Information (April 26, 2022) at 1-4 ("Phoenix RFI Rsp."), **PV116; BC104**.

Ms. Li established Phoenix as result of CBP's previous EAPA cases 7454 and 7455 that involved the importer, Lino International, which Ms. Li owned, and the manufacturer, HiCreek Plumbing Co., Ltd ("HiCreek").  *See* CBP, On-Site Verification Report Enforcement and Protect Act Case Number: 7621 (July 22, 2022) at 2 ("Verif. Rpt."), **PV145; BC128**.  At the time, Lino

International was HiCreek's customer.  Ultimately, Lino International had to close because it could not afford the AD/CVD duties it had to pay as a result of losing the EAPA case.  *Id.*  At CBP's on-site verification, Ms. Li explained that she came to Cambodia in November 2020, and visited HiCreek's production facilities.  Since HiCreek likewise ceased business as a result of the EAPA investigations, Ms. Li realized that she could use the HiCreek machines to produce CISP and get a new start.  *Id.*  In March 2021, Ms. Li began the process of establishing Phoenix and opening the factory in one of Cambodia's special economic zones (SEZ). Phoenix Metal was officially established on May 4, 2021.  *Id*; *see also* Phoenix RFI Rsp. at 1-2 & Ex. I-1, I-2 (Certificate of Incorporation and Articles of Association), **PV116, PV113; BC104, PV98**; *and* Phoenix, EAPA Cons. Case 7621: Cast Iron Soil Pipes: Submission of Written Argument (August 15, 2022) at 2-3 ("Phoenix Wr. Arg."), **PD151**.

After receiving the Alleger's evasion allegations against Phoenix, CBP initiated a secret investigation, EAPA Inv. Inv. 7708, targeting Phoenix as U.S. importer and Cambodian exporter of CISP entered into the United States.  *See* CBP, Memo to File, Initiation of Investigation for EAPA Case 7708 (February 28, 2022**), PV172; BC136**; *see also* TRLED Det. at 5[2] and n.27, **PV155; BC129**.  CBP did not inform Phoenix of the allegations against it and provided Phoenix no opportunity to defend against the allegations before it imposed interim measures on the company on or around March 25, 2022.  *See* CBP, Memo to File, Adding Information to the Administrative Record (April 22, 2022) ("CBP April 22, 2023 Documents") at Att. 8: Email from Tobias Vandall to Phoenix re: EAPA Investigation 7621 – Notice of Initiation of

---

[2] TRLED appears to have forgotten to insert page numbers in its Final Determination.  Citations to page numbers are therefore Phoenix's own insertions for ease of reference.

Investigation and Interim Measures (March 25, 2022), **PV109; BC97**. CBP's interim measures included refiling entry summaries submitted within the 300-day entry summary rejection period, requiring live entries and cash deposits of antidumping ("AD") and countervailing ("CVD") duties amounting to 250.62 percent *ad valorem*.[3] *See also* CBP, NOI at 8-9, **PV73; BC57**.

In it initiation notice, CBP also consolidated EAPA Inv. 7708 with EAPA Consol. Inv. 7621, initiated on September 3, 2021. *Id*. at 2, 9. The additional targeted importers in EAPA Consol. Inv. 7621 were Granite Plumbing Products LLC and Little Fireflies International Co., which CBP claimed were associated with Phoenix by business contracts or affiliation. *Id*. at 9. Neither Granite Plumbing nor Little Fireflies are party to this litigation.

Phoenix reacted immediately to TRLED's notice of the EAPA investigation and the interim measures imposed. *See* CBP April 22, 2023 Documents at Att. 8: Email from Linghong Li to CBP (March 28, 2022). Phoenix expressed its dismay at CBP's secret investigation, which the company referred to as a "trial" without prior notification, stating: "Phoenix Metal Co., Ltd. has not received any form of investigation documents, questionnaires or notices about the company's business from any party before this trial. . . . {S}ending us trial directly without prior investigation is not in line with common sense and violates the principle of fairness and justice. All our businesses are carried out according to law under the supervision of Cambodian officials."[4] *Id.*

---

[3] *See* AD Order, 84 Fed. Reg. at 19,036 and CVD Order, 84 Fed. Reg. at 19,040.

[4] As a lay person, it is understandable that Phoenix's owner considered CBP's EAPA to be a trial in the sense that CBP was conducting a formal proceeding to adjudicate Phoenix's innocence or guilt by collecting evidence against the company. *See* definition of "trial" from Webster's Online Dictionary: "the formal examination before a competent tribunal of the matter in issue in a civil or criminal cause in order

CBP issued an initial request for information, to which Phoenix responded on April 26, 2022, and a supplemental request for information, to which Phoenix responded on June 3, 2022. *See* Phoenix Response to Request for Information (April 26, 2022) ("RFI Rsp."), **PV113-116; BC98-104;** and Phoenix Response to Supplemental Request for Information (June 3, 2022) ("Supp. RFI Rsp."), **PV122-123; BC107-108**.

In its RFI responses, Phoenix explained that its owner, Ms. Linghong Li, also owned (or had owned) Dalian Metal I/E Co., Ltd., Dalian Metal FTZ, Chinese trading companies; Lino International, a U.S. company that ceased business in 2021, and Dalian Lino, a Chinese company that also ceased business in 2021. *See* RFI Rsp. at 4, **PV116; BC104** and Supp. RFI Rsp. at 4-5, **PV123; BC108**. Neither Dalian Metal I/E nor Dalian Metal FTZ are producers of CISP. *See* Dep't Commerce *AD Order* 86 Fed. Reg. at 19,036 (list of producers and exporters that participated in Commerce's antidumping investigation). Phoenix explained in its RFI responses that it rented its production workshop and bought machinery from HiCreek Plumbing Inc., Ltd. ("HiCreek"), a Cambodian producer of CISP. RFI Rsp. at 8-10, 27, and Exhibits II-3-1, II-3-2, II-4, & VI-1, **PV116, PV113, PV115; BC104, BC99, BC103**. HiCreek had not used its CISP

---

to determine such issue." "Trial." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/trial. Accessed 4 Aug. 2023.

The U.S. Court of Appeals for the Federal Circuit recently confirmed that EAPA investigations are adjudicatory in nature. *See Royal Brush Mfg. v. United States*, No. 2022-1226, 2023 U.S. App. LEXIS 19224, at \*13 (Fed. Cir. July 27, 2023). ("In short, the law is clear that, in adjudicative administrative proceedings, due process "includes the right to know what evidence is being used against one" citing *Robbins v. U.S. R.R. Ret. Bd*., 594 F.2d 448, 452 (5th Cir. 1979); *see also id.* at \*13 n.8: "We have held that the relatively analogous antidumping proceedings are 'relatively formal administrative procedure[s]' that adjudicate parties' rights.' *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1381 (Fed. Cir. 2001) (quoting *United States v. Mead Corp*., 533 U.S. 218, 230, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001) . . .. Evasion determinations are similarly adjudicative.")

production facility since February 2021 when CBP determined that merchandise HiCreek exported to the United States was Chinese CISP and not of Cambodian Origin.  *See* CBP, EAPA Case 7454, Notice of Determination as to Evasion (February 8, 2021) and EAPA Case 7455, Notice of Determination as to Evasion (February 8, 2021), available at https://www.cbp.gov/trade/trade-enforcement/tftea/eapa/recent-eapa-actions (last accessed August 6, 2023).  Phoenix also explained that it planned to move out of HiCreek's facility to a new production facility in February 2022.  RFI Rsp. at 9 & 27, **PV116; BC104**

Phoenix explained further that it stopped production at HiCreek's facility [

], and had no production in [                         ].  Phoenix then had a short agreement with HiCreek for production [          ] in order to accommodate CBP's verification team, who visited the factory from June 14-17, 2022.  Supp. RFI Rsp. at 6, **PV123; BC108**; *see also* CBP, On-Site Verification Report (July 22, 2022) at 5 ("Verif. Rpt."), **PV145; BC128**. Phoenix, however, began installing machinery at its new factory [                         ].  Supp. RFI Rsp. at 6, **PV123, PV122; BC108, BC107**.

CBP also put various memoranda on the record of this case in April and July 2022.  In addition to CBP's memoranda from April 20, 2022 and April 22, 2022 cited above, CBP put on the record of this case memoranda dated April 21, 2022 and July 6, 2022.  *See* CBP, Adding Information to the Administrative Records of EAPA Consolidated Case 7621 and EAPA Case 7624 (April 21, 2022) (documents pertaining to Little Fireflies, Granite Plumbing, and other companies not party to this case), **PV107; BC96**; and CBP, Adding Information to the Administrative Records of EAPA Consolidated Case 7621 (July 6, 2022) (including Cambodian import & export data, photos, and information on Camellia Castings), **PV144; BC127**.  CBP

marked most of the information included in the above-listed memoranda as business confidential, which was not disclosed to Phoenix and to which Phoenix was unable to respond in a meaningful manner in the course of the investigation.

On June 3, 2022, CBP notified Phoenix that it would verify the company's RFI responses on-site in Cambodia at Phoenix's production facilities from June 14-17, 2022. *See* CBP, Engagement Letter to Phoenix and Site Verification Agenda (June 3, 2022), **PV124; BC109**. CBP's agenda included tours of Phoenix's old and new factories and document review.

CBP's verification report presents a picture of chaos at verification. *See* Verif. Rpt. at 4, 6, 9-10, 12-13, 14, **PV145; BC128**. The overall impression of CBP's on-site visit that the Verification Report conveys is one where a single person responsible for the conduct of Phoenix's business, Ms. Li as the company's owner and manager, is overwhelmed by interrogations from a throng of unmanageable U.S. Government agents. CBP showed up at this small company with seven officers and agents – two international trade analysts, two auditors, one import specialist, a CBP Attaché, and an agent of undisclosed position from U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations. *See id*. at 4 and Attachment 1, On-Site Visit Attendance List.

CBP's Verification Report gives no indication as to the function of each one of these officers and agents and how the verifiers organized themselves. The Report does not identify who conducted the interviews with Ms. Li and factory personnel, who participated in the factory tours, who made observations and conclusions, who asked questions to ensure full understanding of the company's production process and documents, who reviewed documents, and whether different CBP officials engaged in diverse activities taking place at the same time.

Nevertheless, CBP's verification proved that Phoenix produced the CISP that it exported to the United States from the beginning of its production in July 2021 until production stopped at the end of March in 2022, and Phoenix had the necessary facilities, equipment, personnel, and raw materials to do so.  Verif. Rpt. at 4-7.

Phoenix initially submitted its written argument to CBP on August 2, 2022, which CBP rejected, claiming that certain information in Phoenix's written argument regarding particular omissions in CBP's Verification Report was "new factual information."  *See* CBP, Email re: EAPA 7621 – Phoenix Metal's Written Argument (August 11, 2022), **PD151**.  Phoenix resubmitted its Written Argument, with the offending text deleted.  *See* Phoenix, EAPA Cons. Case 7621: Cast Iron Soil Pipes: Submission of Written Argument (August 15, 2022) ("Phoenix Written Arg."), **PD151**.  The Alleger likewise submitted Written Arguments, to which Phoenix replied on August 19, 2022.  *See* EAPA Cons. Case 7621: Cast Iron Soil Pipes: Submission of Rebuttal Brief (August 19, 2022) ("Phoenix Rebuttal"), **PD154**.

CBP issued its Final Determination on September 6, 2022 finding that Phoenix evaded the AD/CVD Orders on CISP from China.  Although CBP admitted that Phoenix demonstrated at verification that it in fact produced CISP at its facility in Cambodia, CBP resorted to adverse facts available and applied a "comingling" theory, claiming that Phoenix did not cooperate to the best of its ability, and thus applying its evasion finding to all merchandise exported by Phoenix despite the Company's demonstrated production capacity. TRLED Det. at 32 & 33, **PV155; BC129**.

Phoenix filed a request for administrative review on October 19, 2022.  *See* EAPA Cons. Case 7621: Cast Iron Soil Pipes: Request for Administrative Review (October 19, 2022)

("Phoenix AR Req."), **PV156; BC130**. ORR issued its final results of the administration review on January 18, 2023, sustaining TRLED's final determination of evasion. *See* ORR Rev. Det., **PV165; BC132**. This action ensued.

## IV. ARGUMENT

### A. CBP's Failure to Release Documents Deprived Plaintiff of its Right to Defend Against the Allegation of Evasion Before the Imposition of Severe Enforcement Measures.

CBP's decision to initiate the EAPA Inv. 7621 under 19 U.S.C. §1517(b)(1) and to impose interim measures under 19 U.S.C. §1517(e) are preliminary agency determinations reviewable under 5 U.S.C. §704. Phoenix argued before the agency that CBP had not observed basic due process in its conduct of EAPA Inv. 7621. Specifically, Phoenix reacted immediately to TRLED's initiation and interim measures notice, observing that it had not received any investigation documents, questionnaires or notices about the company's business from any party up to that time. Phoenix's owner, Linghong Li, noted that a procedure and imposition of enforcement measures without participation of the targeted defendant "is not in line with common sense and violates the principle of fairness and justice." *See* CBP April 22, 2023 Documents at Att. 8: Email from Linghong Li to CBP (March 28, 2022). **PV109; BC97**. In its request for administrative review filed with CBP's Office of Regulations and Rules, Phoenix also wrote extensively of CBP's and TRLED's due process violations in its conduct of EAPA Inv. 7621. *See* Phoenix AR Req. at 9-13, **PV156; BC130**. In its final administrative review determination, ORR dealt only briefly with Phoenix's due process arguments stating that CBP acted in accordance with its statutory and regulatory requirements. Namely, the EAPA statute provides CBP 90 days after initiation to determine whether there is a reasonable suspicion of

evasion and to apply interim measures, 19 U.S.C. § 1517(e), and CBP's regulations do not require notification until five days after interim measures are taken, 19 CFR § 165.15(d). *See* ORR Rev. Det. at 16, **PV165; BC132**.

Nevertheless, the EAPA allegation and other documents filed by the Alleger and CBP prior to March 28, 2022 became part of the administrative record on February 28, 2022, when CBP initiated EAPA Inv. 7708. *See* 19 CFR § 165.15(e) ("[i]f an investigation is initiated pursuant to subpart B of this part, then the information considered by CBP prior to initiation will be part of the administrative record pursuant to §165.21."). CBP, however, did not make available to Plaintiff even the public documents and public versions of confidential documents until March 28, 2022, therefore depriving Plaintiff of its right to timely file rebuttal factual information under 165.23(c)(2).These documents include the Allegers claims of evasion as to Phoenix (February 15, 2022), **PV167; BC134**; TRLED Receipt Checklist (February 17, 2022), **PD168**; TRLED Email Receipt to Alleger re: Phoenix Metal (February 17, 2022), **PD169**; TRLED's collected NTAG import data (February 25, 2022), **PD170**, **BC135**; TRLED Initiation Checklist (February 28, 2022), **PD171**; TRLED Initiation Memo (February 28, 2022), **PV172**, **CD136**; TRLED Memo to File (March 15, 2022), PV173; BC137.

These errors significantly prejudiced Phoenix with respect to managing its overall responses to the investigation. Four of Phoenix's shipments of "covered merchandise" were entered between February 28, 2022 and March 28, 2022. *See* list of entries covered by EAPA 7621 included in TRLED's Request for Information (March 29, 2022) at App. I, **PV75, BC58**. If CBP had timely and properly served Plaintiff with the documents added to the administrative record with the initiation of EAPA Inv. 7621 on February 28, 2022, Plaintiff would have had

notice of the allegations of evasion and CBP's investigation (even from the public documents and public versions of confidential documents on record) and immediately halted all shipments in order to mitigate the harm from CBP's imposition of interim measures. CBP, however, kept the EAPA allegation and related documents secret until after it imposed interim measures, violating its own regulations regarding properly maintaining the administrative record and preventing Plaintiff from making its business decisions based on submissions properly placed on the administrative record. CBP's belated disclosure of the pre-interim measure documents also runs contrary to the Congressional intent of the EAPA statute, which is to *prevent* the evasion of AD and CVD Orders, not to entrap U.S. importers and maximize the Government's revenue.

"The basic features of due process are notice and an appropriate opportunity to be heard." *Cobbs v. Wilkie*, No. 18-4986, 2020 U.S. App. Vet. Claims LEXIS 722, at *5 (Vet. App. Apr. 23, 2020). This Court has also recognized that "an importer participating in an administrative proceeding has a procedural due process right to 'notice and a meaningful opportunity to be heard.'" *Royal Brush Mfg. v. United States*, 483 F. Supp. 3d 1294, 1305 (Ct. Int'l Trade 2020) (*Royal Brush I*). *See also Royal Brush Mfg. v. United States*, 545 F. Supp. 3d 1357, 1365 (Ct. Int'l Trade 2021) ("*Royal Brush II*"). In addition, the opportunity to be heard must occur "at a meaningful time and in a meaningful manner." *Royal Brush II* at 1365, quoting *Mathews v. Eldridge, 424 U.S. 319, 333 (1976). See also Royal Brush Mfg. v. United States*, No. 2022-1226, 2023 U.S. App. LEXIS 19224, at *11 (Fed. Cir. July 27, 2023). ("We have previously held that importers in antidumping proceedings are entitled to procedural due process.").

In *Mathews v. Eldridge*, the Supreme Court considered "the specific dictates of due process," which include three distinct factors.

{O}ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 334–35.

### 1. Phoenix's Private Interest

As the Supreme Court articulated in *Hannah v. Larche* "when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960). TRLED's imposition of interim measures was an affirmative action that affected Plaintiff's legal rights. First, Plaintiff, as an importer, has a protected interest in the proper assessment of duties on goods already imported. *Aspects Furniture Int'l, Inc. v. United States,* 2022 Ct. Intl. Trade LEXIS 131 at 31 (Internal citation omitted). Further, with no notice, Plaintiff was unable to plan for TRLED's demand for AD/CVD cash deposits amounting to 250.62% of the value of the merchandise. *See AD Order*, 84 Fed. Reg. 19,035, 19,036 (May 3, 2019). Plaintiff was unable to consult its banks or liquidate assets in time to meet CBP's demand for cash deposits. CBP's demand imposed overnight without notice, left Plaintiff unable to negotiate with its sureties the terms and conditions for customs bonds. Plaintiff had no opportunity to renegotiate contracts with their customers to cover the cost of importing or returning the goods. TRLED's interim measures therefore rendered Plaintiff liable for breach of contract damages vis-à-vis their trading partners and U.S. customers

Further, in *Shelter Forest*, an anti-circumvention case concerning the hardwood plywood orders, Commerce preliminarily found circumvention of the Orders and instructed CBP to suspend liquidation of relevant entries from "the date of initiation" as provided in 19 CFR §351.225(l)(2). In determining the effective date of initiation, the court stated:

> Under 19 C.F.R. §351.225(l)(2), "the date of initiation" cannot be the internal signature date of September 18, 2018 because the parties were not provided with adequate notice until the Initiation Notice was published in the Federal Register on September 21, 2018. . . . As Commerce cannot suspend liquidation prior to providing parties with notice and the Government provides nothing to show the parties received adequate notice prior to publication, the date of initiation in this case must refer to the date of publication in the Federal Register.

*Shelter Forest Int'l Acquisition, Inc. v. United States*, 497 F. Supp. 3d 1388, 1404 (Ct. Int'l Trade 2021). The *Shelter Forest* Court disapproved of Commerce's attempt to give ***three days'*** retroactive effect. Thus, in this instant case, TRLED's suspension of liquidation of Plaintiff's entries and demand for cash deposits and single-entry bonds could not be effective until CBP notified Plaintiff of the initiation of EAPA Inv. 7621 on March 28, 2022. Nevertheless, CBP applied its interim measures retroactively to covered merchandise entered as of its February 28, 2022 initiation in clear violation of the due process notice requirement articulated in *Shelter Forest*. *See* NOI at 8- 9, **PV73, BC57**.

As the *Sumecht* Court stated "retroactive application of the changed duty rate would affect Plaintiff's ability to make appropriate business decisions and take actions with the benefit of information required by a statutorily-mandated notice. *See* 19 U.S.C. §1516a(c)(1); . . . . The court concludes that Defendant's actions prejudiced the Plaintiff and amounted to more than harmless error." *Sumecht NA, Inc. v. United States*, 399 F. Supp. 3d 1370, 1379 (Ct. Int'l Trade 2019). In EAPA 7621, without reasonable explanation, CBP failed to consider Plaintiff's

interest in due process and timely notice of CBP's impending enforcement actions.

### 2. Risk of Erroneous Deprivation

The second factor under the *Mathews' Test* is for the Court to weigh "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews v. Eldridge*, 424 U.S. at 335. The *Mathews* Court described in detail the procedural safeguards built into the Social Security's disability insurance program. 424 U.S. at 337–340, 343–347. The Supreme Court stated expressly that "{a}n additional factor to be considered here is the fairness and reliability of the existing predetermination procedures, and the probable value, if any, of additional procedural safeguards." *Id*. at 343.

> A further safeguard against mistake is the policy of allowing the disability recipient's representative full access to all information relied upon by the state agency. In addition, prior to the cutoff of benefits the agency informs the recipient of its tentative assessment, the reasons therefor, and provides a summary of the evidence that it considers most relevant. Opportunity is then afforded the recipient to submit additional evidence or arguments, enabling him to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions.

*Id*. at 347. CBP provided *none* of these procedural safeguards in EAPA Inv. 7621.

For Plaintiff, timely notice of the allegation of evasion and CBP's initiation of EAPA Inv. 7621 would have allowed Plaintiff to mitigate its losses by immediately cancelling orders for the covered merchandise and reaching agreement with their contracting partners – suppliers and customers – on compensation. In particular, Plaintiff would have never incurred the 250.62% AD/CVD cash deposits or duties (in the event that the Court sustains CBP's determination) over the entries after February 28, 2022. With timely notice, Plaintiff would have adjusted its business model to compensate for lost business in importing covered merchandise. Plaintiff

would have had time to sufficiently collateralize its customs bonds for prior entries to prevent cancellation of its bond.

### 3.  Interim Measures as Temporary Measures; Judicial Review

As the Supreme Court stated in *Mathews v. Eldridge*, decisive is that the existing pre-enforcement procedures be fair and reliable. 424 U.S. at 343.  Second, the Administrative Procedures Act ("APA") specifically provides that a "preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. §704.  This Court has also found that: "{t}he court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination . . . .. In sum, Plaintiffs will be able to avail themselves of jurisdiction pursuant to 28 U.S.C. §1581(c) in order to challenge Customs' final determination and administrative appeal, as well as any procedural decisions merged into the same . . .." *Vietnam Firewood Company Limited v. United States*, 466 F. Supp 3d 1273, 1284 (Ct. Int'l Trade 2020), relying on *Chemsol, LLC v. United States*, 755 F.3d 1345, 1353-54 (Fed. Cir. 2014) and *Tianjin Magnesium Int'l Co. v. United States*, 533 F. Supp. 2d 1327, 1336-37, (Ct. of Int'l Trade 2008)).

In this case, the harm Plaintiff suffered due to the imposition of the interim measures without notice was significant, and also unnecessary, because Plaintiff could have mitigated such harm, had it the opportunity to do so.  Finally, the EAPA statute does not preclude judicial review of CBP's interim measures in accordance with 5 U.S.C. §704.

### 4.  The Government's Interest

On its website, CBP provides an overview of the EAPA law and states that its purpose is to ensure that U.S. entities are not harmed by anti-competitive behavior and to protect U.S.

Government revenue.  *See* CBP, Enforce and Protect Act (EAPA), available at https://www.cbp.gov/trade/trade-enforcement/tftea/eapa#:~:text=The%20Enforce%20and%20Protect%20Act,an%20on%20the%20record%20investigation; last accessed August 5, 2023.  Regarding interim measures, CBP states: "Interim measures allow CBP to require the importer(s) to pay cash deposits for AD/CVD duties on any future imports until conclusion of the investigation . . .."  *Id.*

The purpose of the EAPA law is not, however, to maximize the Government's revenue, but rather *prevent* the evasion of AD and CVD Orders.  *See* 19 U.S.C. §4371, Trade Remedy Law Enforcement Division, which "shall be dedicated – (A) to the development and administration of policies to prevent and counter evasion . . ...." 19 U.S.C. §4371(a)(3)(A).  Surely, the best way to prevent evasion is providing immediate notification to the targeted importer that it is under investigation for EAPA violations.  Whether or not the allegation ultimately proves to be true, the U.S. importer cannot afford to continue importing the covered merchandise, and the U.S. industry likely receives immediate relief from the perceived threat of the foreign imports.  Notice to Plaintiff would not have thwarted EAPA Inv. 7621.  CBP's only purpose and modus operandi in conducting a secret investigation for up to three months is to operate in the shadows and shun inconveniences like the APA and due process of law.

Finally, Plaintiff's imports of CISP did not pose an impending threat to safety, health, or the welfare of others, which otherwise might of have justified CBP's secret investigation; rather CBP's investigation was initiated to collect import duties based on U.S. international trade laws. *Utilities Solid Waste Activities Grp. v. EPA*, 236, F.3d 749, 754 (D.C. Cir. 2001) (the good cause exception should be "narrowly construed and only reluctantly countenanced.").  *See also Royal*

*Brush,* 2023 U.S. App. LEXIS 19224, at *13 n.9 (citing *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1070 (9th Cir. 1995): "'the exceptions to full disclosure are narrowly circumscribed,' and involve, for instance, state secrets and matters of national security.").  In sum, CBP had no justifiable basis to not disclose its investigative activities to Phoenix.

### 5. Procedural or Interpretive Rules Exempt from the APA's Requirements for Proposed Rulemaking Do Not Have the Force of Law

In the Preamble to its EAPA regulations, CBP claimed that the designated period after initiation of the investigation before notifying the parties of the initiation "takes into account the dual considerations of transparency and the need to provide adequate time for CBP's investigative process."  CBP, *Investigation of Claims of Evasion of Antidumping and Countervailing Duties, Interim Regulations; Solicitation of Comments*, 81 Fed. Reg. 56,477, 56,480 ("EAPA Regs., Preamble").  CBP does not explain why secrecy during its investigative phase is necessary or even reasonable.  CBP's EAPA investigation concerns covered merchandise that was already produced, shipped, entered into the United States, and distributed to customers.  The documentation to prove its country-of-origin was already written and generated, and the documentation on the country-of-origin follows the covered merchandise on its shipment from the country-of-origin to the United States.

The EAPA statute itself includes no such delayed deadlines for giving notice to interested parties of the initiation of an EAPA investigation or notice of CBP enforcement actions after the fact.  Further, CBP issued its regulations as procedural or interpretive rules.  EAPA Regs., Preamble at 56,481 ("The substantive provisions of the EAPA have been established by Congress, and these regulations set forth the procedures for implementing the statute and do not include substantive requirements.").  CBP therefore did not follow the APA's requirements in 5

U.S.C. §553 for proposed rulemaking and publication of the final rule at least 30 days before the regulations go into effect. 5 U.S.C. §553(b)(3)(A) & 553(d)(2). According to the APA, the exemption applies to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. §553(b)(3)(A). CBP itself refers to its EAPA regulations as an exempt "rule of procedure." This Court has defined such exempt procedural rules as "internal house-keeping measures organizing agency activities." *IPSCO, Inc. v. United States*, 687 F. Supp. 614, 626-27 (1988). But regardless of whether CBP's EAPA regulations are intended to interpret the EAPA statute or regulate CBP internal house-keeping, "the label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." *Brown Express, Inc. v. United States*, 607 F.2d 695, 700 (5th Cir. 1979) citing *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481 (2d Cir. 1972).

According to the U.S. Supreme Court, "{t}he absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price: Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) citing *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995). *See also Kisor v. Wilkie*, 139 S. Ct. 2400, 2420 (2019). (Agencies may rely upon only legislative rules, not interpretive rules, for enforcement actions.)

Further, "{t}he exemption of section 553(b)(A) from the duty to provide notice by publication does not extend to those procedural rules that depart from existing practice and have a substantial impact on those regulated." *Brown Express*, 607 F.2d 695 at 702. Therefore,

because CBP's EAPA regulations both depart from past practice and have a substantial impact on those regulated, CBP should have promulgated its regulations in accordance with the APA's proposed rulemaking procedures.  Namely, CBP's EAPA procedures do not comport with CBP's own traditional investigative procedures nor the AD/CVD law it is meant to enforce.  Rather, the professed purpose of CBP's EAPA enforcement actions is to circumvent the legal restrictions of the AD/CVD law and its own Customs' laws.  CBP avers: "{f}or years, CBP's enforcement actions against antidumping evasion schemes were stymied by legal restrictions, but after the passage of the Enforce and Protect Act of 2015, everything changed." https://www.cbp.gov/frontline/hanging-tough (last accessed August 5, 2023).

CBP investigations or inquiries initiated for the same purpose as the enforcement of AD/CVD duties, *i.e.*, "conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for insuring compliance with the laws of the United States administered by the United States Customs Service," are governed by 19 U.S.C. §1509 which compels CBP to give reasonable notice before it examines books and records or questions witnesses or undertakes any enforcement actions.  *Id*.  In particular, CBP must provide notice of the audit, telephonically and in writing, to the person to be audited (19 U.S.C. §1509(b)(1); 19 CFR §163.11(a)(1)); inform the person to be audited of the subject of the audit and the person's right to an entrance conference (19 U.S.C. §1509(b)(2); 19 CFR §163.11(a)(2)); and schedule a closing conference to explain the preliminary results of the audit (19 U.S.C. §1509(b)(2); 19 CFR §163.11(a)(4)).

Accordingly, CBP's EAPA regulation have substantively changed the rights and

obligations of the U.S. importers that are targeted by an EAPA allegation. As a consequence, either CBP's EAPA regulations are invalid because CBP did not follow the APA's rule-making procedures or CBP's regulations are non-binding and cannot provide a basis for CBP's enforcement activities. A statute "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916). CBP must therefore ensure that it administers the EAPA law in such a manner as to not violate due process rights guaranteed by 5 U.S.C. §555 or the U.S. Constitution. In light of the procedural deficiencies pervading EAPA Inv. 7621 and the legal constraints on applying any undisclosed information against Plaintiff, this Court should find that TRLED's imposition of interim measures before notification to Plaintiff in this case is invalid and unlawful.

Plaintiff's request here for basic due process safeguards is not a ploy for Plaintiff to gain an unwarranted advantage in EAPA proceedings. On the contrary, the allegers of evasion generally, have as much to gain as the targeted importers and foreign producers and exporters in ensuring fair and transparent EAPA proceedings. Providing a minimum amount of procedural protection therefore furthers CBP's interest in protecting the U.S. industry against unfair traded imports or imports that enter the United States through evasion as much as it protects Plaintiff's interests. No legitimate conflicting United States Government interest exists here.

Accordingly, CBP's refusal to timely provide record documents to Plaintiff in EAPA Inv. 7621 was unreasonable.

### B. Public Summaries of Record Documents are Not Sufficient to Allow Effective Defense Against CBP's Allegations of Evasion.

Plaintiff's proper and timely defense against TRLED's interim measures includes legal counsel's access to confidential information. As indicated above, even after TRLED disclosed the allegations and information that CBP collected allegedly supporting a reasonable suspicion of evasion, TRLED made only public versions of these materials available to the parties. Thus, a timely notice of the initiation of the investigation and engagement of legal counsel would not have sufficed for effective rebuttal and defense against the allegations throughout CBP's EAPA Inv. 7621.

As with the time for notice to the parties of the allegations and initiation of an investigation, the EAPA statute is also silent on a procedure for allowing access to confidential information under an administrative protective order or "APO." In its explanatory comments to its regulations, CBP explained that because the EAPA statute did not require the release of confidential information under an APO, it did not provide for any such procedure. EAPA Regs, Preamble at 56,479. CBP's explanation for precluding the parties' access to confidential information under an APO is unconvincing since CBP did not hesitate to fill the statute's gap in specifying notification times despite the EAPA statute's silence on notification requirements.

Indeed, the U.S. Court of Appeals for the Federal Circuit ("CAFC") recently found that "{t}he EAPA statute and associated regulations do not bar protective orders." *Royal Brush Mfg. v. United States*, No. 2022-1226, 2023 U.S. App. LEXIS 19224, at *19 (Fed. Cir. July 27, 2023). Further, "{g}iven the well-established practice of utilizing protective orders in litigation and the absence of any statutory or regulatory prohibition of such orders, we have no doubt that CBP has inherent authority to provide protective orders in EAPA proceedings before the agency." *Id.* at

*20.

The *Royal Brush* Court found not only that CBP has *the authority* to provide parties with

confidential information that it used in its determinations, but has *the obligation* under the due

process clause of the Fifth Amendment of the U.S. Constitution. "The right to due process does

not depend on whether statutes and regulations provide what is required by the constitution."

*Royal Brush* 2023 U.S. App. LEXIS 19224, at *18. The CAFC reasoned as follows:

> One "relatively immutable" principle of due process is that "where governmental
> action seriously injures an individual, and the reasonableness of the action
> depends on fact findings, the evidence used to prove the [g]overnment's case must
> be disclosed to the individual so that he has an opportunity to show that it is
> untrue." *Greene v. McElroy*, 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377
> (1959). This immutable principle applies to cases where facts have been withheld
> from an entity during an administrative proceeding. Id. at 497 (gathering cases);
> *Ramirez v. Dep't of Homeland Sec.*, 975 F.3d 1342, 1349-53 (Fed. Cir. 2020);
> *Doty v. United States*, 53 F.3d 1244, 1251 (Fed. Cir. 1995) ("The agency's . . .
> withholding of the evidence on which [it] purported to rely . . . w[as] . . .
> egregiously removed from the fairness required of an agency in its administrative
> responsibilities . . . .").[7]
>
> . . . ..
>
> In short, the law is clear that, in adjudicative administrative proceedings, due
> process "includes the right to know what evidence is being used against one."
> *Robbins v. U.S. R.R. Ret. Bd.*, 594 F.2d 448, 452 (5th Cir. 1979). We are aware of
> no court holding that confidential business information is exempt from this
> constitutional requirement of disclosure to regulated parties in administrative
> proceedings brought against them.[8] The government cites none.[9] There is no
> legitimate government interest here in refusing [*14] to provide confidential
> business information to Royal Brush when all government concerns about the
> necessity of secrecy can be alleviated by issuing a protective order, as discussed
> below.

*Royal Brush Mfg. v. United States*, No. 2022-1226, 2023 U.S. App. LEXIS 19224, at *12, *13-

14 (Fed. Cir. July 27, 2023).

As in *Royal Brush*, CBP relied on factual information not supplied to Phoenix to support

its determinations of evasion in EAPA 7621.  *See id*. at *14.  For instance, Phoenix is unable to

decipher purported evidence that CBP used in TRLED's speculation on Phoenix's relation to

HiCreek in its determination of evasion: "Lino appeared to have had factories and machinery in

China that it then [ EVENT DESCRIPTION ] in 2019. Although Lino stated that it "has never owned

any portion of HiCreek," Lino's tax return may allude to Lino's [ EVENT DESCRIPTION ]."

TRLED Det. at 23, **PV155**.  In particular, TRLED's analysis on pages 26-30 of its determination

is incomprehensible to Phoenix.  TRLED challenges first HiCreek's raw material purchases and

production documents, to which Phoenix had no access.  *Id*. 26 & 27.  TRLED also challenges

Phoenix's own raw material purchases in detail, with no way to understand which documents

and which raw materials TRLED is challenging.  *Id*. at 27-30.  ORR's final administrative

determination also includes confidential information upon which it relied and that was not

disclosed to Plaintiff, in particular in ORR's analysis of why it believes Phoenix did not have the

production capacity to produce the CISP it exported to the United States.  *See* ORR Review Det.

at 9-11, **PV165**.  Accordingly, as in *Royal Brush*, CBP relied on factual information that was not

provided to Phoenix to determine that Phoenix had evaded duties.  "This, in and of itself, is a

clear violation of due process."  *Royal Brush*, 2023 U.S. App. LEXIS 19224, at *16.

Finally, the Government cannot argue in its defense that Phoenix failed to show that lack

of access to confidential business information caused prejudice or would have changed the

ultimate outcome of EAPA 7621.  The CAFC rejected this argument in *Royal Brush*:

> {W}hen a due process violation has occurred because of a denial of access to new
> and material information upon which an agency relied, no additional showing of
> prejudice is required. *See Stone v. F.D.I.C.*, 179 F.3d 1368, 1377 (Fed. Cir. 1999)
> ("[W]hen a procedural due process violation has occurred because of ex parte
> communications, such a violation is not subject to the harmless error test."); see
> also *Ramirez*, 975 F.3d at 1352-53. This is not a situation in which the evidence

"played a negligible role" in the agency's final decision. *See Tennessee Secondary School Athletic Ass'n v. Brentwood Academy*, 551 U.S. 291, 303 n.4, 127 S. Ct. 2489, 168 L. Ed. 2d 166 (2007). In any event, on its face, the denial of access to the redacted information here was prejudicial because it denied access to information on which the agency relied in reaching its decision.

There is no basis for CBP to violate Royal Brush's due process rights by failing to provide the information on which it relied to Royal Brush.

*Royal Brush*, 2023 U.S. App. LEXIS 19224, at *21.

Accordingly, this Court should remand this case to CBP with instruction for CBP to provide to Plaintiff full record information and the opportunity for rebuttal. *See id*. at *23.

## C. CBP's Verification and Phoenix's Right of Rebuttal

### 1. CBP's Conduct of Verification at Phoenix

On June 3, 2022, CBP notified that Phoenix that it would conduct an on-site audit to verify Phoenix's RFI responses on-site in Cambodia at Phoenix's production facilities from June 14-17, 2022. *See* CBP, Engagement Letter to Phoenix and Site Verification Agenda (June 3, 2022), **PV125, BC109**. CBP's agenda included tours of Phoenix's old and new factories and document review. *Id*. The verification was conducted by CBP's Regulatory Audit and Agency Advisory Services ("RAAAS"), which "compared the observations made on-site with the responses to the RFIs to verify information placed on the Administrative Record and confirm the foreign manufacturer's capability to produce sufficient quantities of CISP for export to the United States." Verif. Rpt. at 2, **PV145; BC128.**

The overall impression of CBP's on-site visit that RAAAS's Verification Report conveys is one where a single person responsible for the conduct of Phoenix's business, Ms. Li as the company's owner and manager, is overwhelmed by interrogations from a throng of U.S. Government agents. *See* Verif. Rpt. at 4, 6, 9-10, 12-13, 14. First, CBP showed up at this small

company with seven officers and agents – two international trade analysts, two auditors, one import specialist, a CBP Attaché, and an agent of undisclosed position from U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations.  *See id*. at 4 and Attachment 1, On-Site Visit Attendance List.  CBP's Verification Report gives no indication as to the function of each one of these officers and agents.  The Report does not identify who conducted the interviews with Ms. Li and factory personnel, who participated in the factory tours, who made observations and conclusions, who asked questions to ensure full understanding of the company's production process and documents, who reviewed documents, and whether different CBP officials engaged in diverse activities taking place at the same time.

Nevertheless, CBP's verification proved that Phoenix produced the CISP that it exported to the United States from the beginning of its production in July 2021 until production stopped at the end of March in 2022, and Phoenix had the necessary facilities, equipment, personnel, and raw materials to do so.  Verif. Rpt. at 4-7.

CBP was aware from the outset of verification that Phoenix was in production until [

] and had no production of CISP in [                                    ], after CBP notified the company of its initiation of EAPA 7621, Phoenix. Supp. RFI Rsp at 6, **PV123; BC108**.  Phoenix also informed CBP at verification that it restarted production again in June 2022 upon receiving CBP's announcement of its intended verification of the company from June 14-17, 2022.  *See* Verif. Rpt. at 5, **PV145; BC128**; *see also* Phoenix Written Arg. at 3-4, **PD151**.

The atmosphere of the verification as conveyed in the report is one of mistrust and Phoenix's owner, Ms. Li, was afraid of CBP's ultimate intentions.  *See*, e.g., Verif. Rpt. at 4; Phoenix Rebuttal Br. at 2, **PD154**.  Ms. Li had every right to be cautious.  One of the verifiers is

identified as an HSI agent on CBP's attendance list. Verif. Rpt. at Attachment I. U.S. Immigration and Customs Enforcement ("ICE") explains on its website the function of Homeland Security Investigations, or "HSI." HSI is tasked with investigating transnational crime and threats, international criminal organizations, and terrorism. HSI special agents gather evidence to identify and build criminal cases against transnational criminal and terrorist networks that threaten the United States and have the authority to take actions designed to disrupt and dismantle criminal organizations operating around the world. Information regarding HIS is available at https://www.ice.gov/about-ice/homeland-security-investigations#:~:text=HSI%20is%20the%20principal%20investigative,trade%2C%20travel%20and%20finance%20move (last accessed August 4, 2023). Indeed, the Alleger even included in its allegation the recommendation that CBP conduct a criminal investigation of Phoenix ("we urge CBP to refer the matter to U.S. Immigration and Customs Enforcement (ICE) for a possible civil and criminal investigation under 18 U.S.C. § 542."). *See* Allegation at 10, **PV167; BC134**. Ms. Li's cautious stance vis-à-vis the verifiers was justified.

CBP's verification report reflects that some of CBP's document collection activities at Phoenix were spontaneous and went beyond verifying information already on the record. *See, e.g.*, Verif. Rpt. at 9-10 regarding production worksheets that CBP officials saw and requested during their facility tour. Specifically, during its tour of Phoenix's production facility, one of the verifiers "noticed a clipboard on a shelf with an uncompleted sheet of paper titled 'Phoenix Metal Co., Ltd' and 'Daily Report of Material.'" Verif. Rpt. at 5. When asked to view the clipboard: "Ms. Li's assistant removed it." *Id*. Upon request, Phoenix then provided CBP's verifiers with the completed papers for the most recent production during March 2022. *Id*. at 5.

In this case, where a verifier spontaneously grabbed papers from the factory area, Ms. Li's conduct was not "uncooperative" but rather absolutely professional. She had every right and reason to insist that she or one of her staff first review documents for accuracy, completeness, and relevance before presenting such documents to CBP. Otherwise, she and her staff would have no idea what the verifiers were viewing and verifying or the basis for CBP's conclusions. In another account of this incident on pages 9-10 of CBP's verification report, CBP states that it asked for production spreadsheets for the entire period of investigation. *Id*. at 9-10. Phoenix showed the production worksheets in question to CBP to verify its production quantities but was unwilling to hand over copies for CBP's use beyond the purposes of verification. Ms. Li's caution appears to be appropriate in light of the atmosphere of mistrust between CBP and Phoenix personnel, which CBP's verifiers evidently did nothing to alleviate. Nevertheless, after verification, Phoenix offered these sheets to CBP along with other verification exhibits. At that time, CBP refused to accept Phoenix's production documents. *See* Email from CBP re: Verification Exhibits (June 28, 2022), **PD136**.

Ms. Li was understandably overwhelmed and frustrated by the task of overseeing and responding to seven CBP officials, each following its own agenda according to its specialty department (international trade analysts, auditors, import specialist, CBP Attaché, and ICE agent). CBP stated in its final determination that Phoenix should not have been surprised that seven CBP officials showed up for verification because CBP had announced that Phoenix should be prepared to accommodate up to eight officers on CBP's verification team. TRLED Final Det. at 33, **PV155; BC129**; CBP, Phoenix Metal Engagement Letter (June 3, 2022), **PV124; BC109**. CBP's prior announcement, however, does not relieve Phoenix's consternation at the size of

CBP's verification team.  If Phoenix had objected, and asked for only two verifiers, would CBP have acceded to the request?

In addition, the function at verification of the various CBP officials is unclear from the verification report, despite the titles included in the attendee list.  *See* Verif. Rpt. at Attachment I. Many of CBP's comments in the report appear to be random, with no identification of the observer, why such observation was made, what explanation was sought, and what meaningful conclusion CBP intended to draw from the observations.  For instance, CBP observed that "{t}he volume of garbage bags was not in the April 2022 photos, so appear to have been added after that date."  Verif. Rpt. at 5.  Perhaps Phoenix found its garbage bags not so photogenic for its April 2022 photos?  Or more likely, in the process of moving its facilities, Phoenix was disposing of trash?  *See* Supp. RFI Rsp at 6, **PV116; BC104**; Verif. Rpt. at 7, **PV145; BC128** ("We also toured Phoenix Metal's facility currently under construction.").

CBP observed further: "{t}he production process, detailed in the supplemental RFI, Exhibit S-IV-2, was written in different fonts, indicating that information was added or changed." Verif. Rpt. at 5.  *See* Supp RFI Rsp at Ex. S-IV-2, **PV122; BC107**.  Perhaps Phoenix made notes to Exhibit S-IV-2 for reference during verification?  In any event, CPB does not itemize what parts of Exhibit S-IV-2 changed or whether such changes were substantive and relevant.

Further, CBP states: "{w}e did not see any packing supplies at this facility."  Verif. Rpt. at 5.  Phoenix stated in its RFI response that it had produced no CISP for two months at its HiCreek production facility and was in the process of moving to a new production site.  Supp. RFI Rsp. at 6, **PV116; BC104**.  When CBP toured Phoenix's new production facility, the

verifiers observed packing materials, including cardboard pieces, metal wire, plastic, and stencil used to mark the finished pipes.  Verif. Rpt. at 7.

CBP also observed that "{i}n our second visit to the facility on June 16, 2022, we noted what appeared to be about the same amount of pig iron, [ DESCRIPTION ] in the containers as we saw on the first visit (June 14, 2022)."  Verif. Rpt. at 5.  CBP also reported that during its factory tour, the verifiers observed the electric furnace melting of pig iron into liquid iron.  *Id*. Perhaps the pig iron stored in the container near the furnaces are for feeding the furnaces during the day, and enough pig iron must be kept for at least one day's workload per production schedule, and must be replenished every day before starting the production?  CBP also reported that it viewed the pig iron stored in the new facility.  *Id.* at 7.

CBP also noted when it reviewed Phoenix's production manager's employment agreement that "{t}he date of our factory visit was outside of his employment agreement." *Id*. at 6.  As Phoenix explained in its Supp. RFI Rsp., the company had stopped production at the end of March 2022.  The ongoing production during June 2022 at the old facility was reestablished for CBP's verification, and presumably, none of Phoenix's personnel would have continuing employment agreements again until Phoenix's new factory was able to produce CISP for commercial sales.  Verif. Rpt. at 5.

Further, CBP provides certain impressions in its verification report that could indicate that CBP itself was confused or misunderstood the information Phoenix provided.  For instance, CBP claims "Ms. Li then admitted that she was not completely innocent involving the previous EAPA case."  *Id*. at 2.  Such a statement requires a direct quote in context or else is inappropriate to include in Phoenix's report.  Indeed, Phoenix explained in its written argument that this "was

not what Ms. Li said. Ms. Li didn't judge anything about Hicreek. The thing Ms. Li said was, that Lino International bought pipes from HiCreek, which was a mistake, and Lino international paid the price for the mistake." Phoenix Wr. Arg. at 5, **PD151**. Ms. Li reported a plain fact, not an admission.

CBP also appears to have misunderstood information regarding payments from an investor. *Id*. at 3. Hereby CBP "noted" a payment from the investor, who is also a customer of Phoenix, in Phoenix's bank statement and "noted" other identifying information. *Id*. What CBP did not "note" is whether it asked Phoenix whether the credit found on the bank statement was a payment for purchased goods from the customer, as it appears to be, or actually an investment amount.

In other instances, where CBP adds comments such as "Ms. Li acted confused" and "Ms. Li could not provide a straight answer" point as much to CBP's own confusion and misunderstandings as much as any response from Ms. Li. Verif. Rpt. at 9 & 13. As Phoenix commented in its written argument: "regarding Ms. Li's reaction and sentiment during the verification, it's normal that people show that kind of feelings under such pressure, and reporting literally of it changes nothing of the facts but only cast the report with a negative impression to the readers, and might draw the readers' attention more to the feelings instead of the facts. It would be much appreciated if the report could be presented facts oriented and with more neutral expression." Phoenix Written Arg. at 6.

CBP's interrogation of Phoenix employees also highlights the tense atmosphere at verification. CBP evidently did not pre-arrange interview times or personnel to be interviewed, but rather randomly pulled the employees from their work. Verif. Rpt. at 6-7. CBP did not

prepare an interview situation in which the employees felt safe. CBP did not confer with Ms. Li beforehand. CBP describes one interviewee as "timid, scared, and nervous during the interview and stopped making eye contact half way through the interview." *Id*. at 6. Phoenix summarized the conditions that CBP set during these interviews:

> Ms. Li's concerns were then further hjghlighted by the fact, as acknowledged in the verification report, that CBP's translator was not correctly translating the worker's responses. CBP has not denied this allegation. In sum, we have CBP mis-translating data, examining company employees in a fashion to cause them concern, a significantly larger number of verifiers than ordinary, including a person with a secret government position. Ms. Li, legitimately, had concerns, and in fact in light of the foregoing, her cooperation was extraordinary.

Phoenix Rebuttal Brief at 3, **PD154**.

Nevertheless, in the end, CBP confirmed all record information on Phoenix's production process and employment. Verif. Rpt. at 6-7.

Finally, on June 16, 2022, CBP visited the Cambodian Ministry of Commerce office located at the entrance of the Cambodian special economic zone ("SEZ") where Phoenix is located. Verif. Rpt. at 15. The Ministry of Commerce inspects the companies located in the SEZ, including Phoenix, and monitors the companies' production and origin of finished merchandise produced in the zone. The Ministry also reviews the companies' documentation that proves production, and, in particular, audits raw material purchases imported from foreign countries in order to determine country of origin. *Id*. at 15 and Verification Exhibit 6, **PV132 &PV141; BC116 & BC124.** In other words, Cambodia's Ministry of Commerce audited and monitored Phoenix's raw material purchases and production of CISP at every step. CBP's verification of the Ministry and the documents the Ministry provided constitute unshakeable and substantial evidence of Phoenix's raw material purchases and production of CISP.

### 2. Plaintiff's Right to Rebut New Factual Information Contained in CBP's Verification Report

Overall, CBP's verification report appears to be unreliable and does not represent an accurate documentation of the verification process. This is truly a case such as that depicted in *Cowan v. Bunting Glider Co.*, 159 Pa. Super. 573, 576 (1946): "{w}hen the arbiter becomes a witness without testifying, the purpose of the view is prostituted. . . ."

CBP's verification report contains much new information, including the verifiers' comments on the condition of Phoenix's old and new production facilities, including machinery, equipment, and production reports. All of the information on the verifiers' interviews with Phoenix staff and workers was also new factual information not previously on the administrative record of EAPA 7621. CBP's verifiers also added their impressions and conclusions in its report: "{o}n the last day of the on-site verification Ms. Li was upset . . ..."; "Ms. Li became irritated . . .."; a factory worker was "timid, scared, and nervous during the interview and stopped making eye contact half way through the interview"; "Ms. Li acted confused"; Ms. Li became agitated and angry"; "Ms. Li could not provide a straight answer." Verif. Rpt. at 4, 6, 9 & 13. The circumstances that gave rise to these comments and conclusions consisted of new factual information that CBP added to the record of EAPA 7621. Further, CBP used this information to find evasion in its final determinations. *See, in particular*, TRLED Det. at 25-27, 29, 31-32, **PV155; BC129**; ORR Review Det. at 9-10, 11-14, **PV165; BC132**.

In its *Royal Brush* decision, the CAFC stated that it is clear: "the right to rebut has constitutional dimensions." *Royal Brush Mfg. v. United States*, No. 2022-1226, 2023 U.S. App. LEXIS 19224, at *21-22 (Fed. Cir. July 27, 2023), citing *Greene v. McElroy*, 360 U.S. 474, 496

(1959); *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 319, 411 U.S. App. D.C. 105 (D.C. Cir. 2014), and *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1279 (Fed. Cir. 2011) (requiring an "opportunity to respond" where a "deciding official received new and material information by means of ex parte communications").  In *Royal Brush*, the Court found that CBP's EAPA regulations provided the right to rebut new factual information.  *Royal Brush* at *21, citing to 19 CFR § 165.23(c)(1):

> If CBP places new factual information on the administrative record on or after the 200th calendar day after the initiation of the investigation (or if such information is placed on the record at CBP's request), the parties to the investigation will have ten calendar days to provide rebuttal information to the new factual information.

The Court therefore found that because CBP's verification report contained new factual information, and CBP used that information in its evasion determinations, CBP was required to allow Royal Brush to rebut CBP's new factual information.  *Royal Brush* at *22-23.

In EAPA Inv. 7621, Phoenix tried twice to submit new factual information to rebut CBP's on-site verification and verification report.  As mentioned above, shortly after the conclusion of verification and before CBP released its verification report, on June 24, 2022, Phoenix submitted daily production reports that CBP requested during verification.  CBP rejected these documents as untimely new factual information because Phoenix provided some, but not all, of these reports *during* verification.  *See* CBP Email re: Verification Exhibits (June 28, 2022), **PD136**.  After Phoenix received CBP's verification report on July 22, 2022, Phoenix rebutted several aspects of CBP's report in its written argument submitted August 2, 2022, *eleven* days after CBP released the new factual information in its report.  CBP rejected Phoenix's written argument, but allowed it to delete the portions of its brief that CBP considered to be unsolicited new factual information.  *See* CBP Email to Phoenix re: Written Argument (August

11, 2022), **PD150**.  Phoenix resubmitted its written argument on August 15, 2022 with the offending sections of its brief deleted.  Phoenix Written Arg., **PD151**.

Despite Phoenix's one-day late submission of rebuttal to CBP's new factual information in its verification report, several factors weigh for a decision to allow Phoenix to submit such rebuttal argument and information.

First, CBP has regularly argued that 19 CFR § 165.23(c)(1) is inapplicable for parties' new factual submissions after verification.  Indeed, in its rejection letter, CBP states the deadline for submission of new factual information in EAPA Inv. 7621 was June 8, 2022, i.e., before CBP's verification of Phoenix during June 14-17, 2022 even took place.  *See* CBP Email re: Written Argument, **PD150**.

Second, an attempt by Phoenix to submit rebuttal information within the ten-day period allowed in 19 CFR § 165.23(c)(1) would have presumably been futile because CBP has in the past argued that its verification reports rely on only previously provided data, even when this is not true.  *See Royal Brush* at *22.

Third, as the *Royal Brush* Court found, the right to rebut "has constitutional dimensions" that override statutes and regulations.  *Royal Brush* at *18, 21 ("The right to due process does not depend on whether statutes and regulations provide what is required by the constitution.").

Fourth, as discussed above, CBP issued its EAPA regulations as procedural rules and did not follow the  APA's requirements in 5 U.S.C. §553 for proposed rulemaking and publication of the final rule at least 30 days before the regulations go into effect.  5 U.S.C. §553(b)(3)(A) & 553(d)(2).  EAPA Regs Preamble at 56,481.  Indeed, "APA rulemaking requirements generally

do not apply to *non-binding* agency actions -- statements of an agency's interpretation, policy or internal practice or procedure which 'express the agency's intended course of action, its tentative view of the meaning of a particular statutory term, or internal house-keeping measures organizing agency activities.'" *IPSCO, Inc. v. United States*, 12 Ct. Int'l Trade 359, 373, 687 F. Supp. 614, 626-27 (1988) {emphasis added}, citing *Batterton v. Marshall*, 648 F.2d 694, 701-02 (D.C. Cir. 1980). The IPSCO case concerned a "Subsides Appendix" that Commerce used as a guide for examining loans, grants, guarantees, and equity in countervailing duty cases. The *IPSCO* Court stated: "to the extent that they {methodologies} express the ITA's tentative views and interpretations, which are not applied as binding or authoritative statements, they fall outside of the scope of APA's rulemaking procedures." *IPSCO*, 687 F. Supp. at 627. The distinction that the *IPSCO* Court makes is that procedural rules exempt from the APA's rulemaking procedures of notice and comment may not limit the agency's exercise of discretion in making decisions on a case-by-case basis in contrast to selecting particular methodologies as binding, promulgated in accordance with formal rulemaking procedures. *IPSCO*, 687 F. Supp. at 629.

Accordingly, in light of the futility of Phoenix submitting rebuttal information to CBP within the ten-day period allowed by 19 CFR § 165.23(c)(1), Plaintiff's due process right to rebut factual information that CBP put on the record, and the discretionary nature of CBP's regulation, CBP should have accepted Phoenix's rebuttal information to new information that CBP put on record in its verification report.

### D. CBP's Determinations Based on Adverse Facts Available were Arbitrary and Capricious.

From the moment CBP informed Phoenix of the EAPA investigation that CBP initiated against the company, Phoenix was in constant contact with CBP. During the relatively short

time from CBP's Notice of Initiation on March 28, 2022 through rebuttal written arguments submitted on August 19, 2022 – less than five months - Phoenix maintained contact with CBP through email correspondence, responded in detail to two CBP requests for information, hosted seven CBP officials for four days at its office and factory premises in Cambodia, and submitted written argument and rebuttal arguments. Nevertheless, CBP applied adverse inferences as to Phoenix. *See* 19 U.S.C. § 1517(c)(3), 19 CFR § 165.6(a). *See* TRLED Det. at 32-33, **PV155; BC129**; ORR Review Det. at 15-16, **PV165; BC132**.

In each instance in which CBP alleges that Phoenix was uncooperative, the Company either complied with CBP's request or explained why it was unable to fully comply. For instance, CBP complains that Phoenix did not provide bank statements showing customer payments for CISP from Lino International, Inc. ("Lino"), which ceased business in 2021, before initiation of EAPA Inv. 7621 against Phoenix. TRLED Det. at 22 & n.180 (citing to a December 1, 2021 Memorandum, again, before CBP initiated its investigation against Phoenix), **PV155; BC129**. CBP relates again in its final determination that "Phoenix Metal did not provide the bank statements for Lino Metal's bank account, which it admittedly and repeatedly used to receive payment from its customers." *Id.* at 25 & n.220. Phoenix provided, however, all of the wire transfers for payment from Phoenix's customers to its still operating company, Lino Metal Corp. *See* Phoenix Supp. RFI Rsp. at Ex. S-II-1, **PV122; BC107**. Phoenix also provided its own bank statements regarding payments it received from Lino Metal Corp, Phoenix RFI Rsp at Ex. II-2, **PV113; BC98**; Phoenix Supp. RFI Rsp. at Ex. S-II-1, **PV122; BC107**. CBP does not explain why Phoenix's customers' payments documented by wire transfer statements are not sufficient proof to confirm that Phoenix's customers paid for the delivered CISP in the quantities

and for the values shown on Phoenix's invoices. Although CBP also cites to Phoenix's verification report, the report gives no indication that CBP's verifiers requested bank statements for Lino Metal Corp. or Lino International, Inc.

For its part, ORR insists that CBP requires bank statements from Phoenix's affiliates to confirm that Phoenix owned the machinery that it purchased from HiCreek. ORR Review Det. at 13-14, **PV165; BC132**. Yet, CBP's verifiers confirmed that Phoenix had a leasing agreement with HiCreek for use of its facilities, and the verifiers spent four days at HiCreek's facilities confirming that Phoenix was in possession of machinery and raw materials for CISP production. Verif Rpt. at 4-6, **PV145; BC128**.

The U.S. Court of International Trade has also rejected claims by the U.S. Department of Commerce that it requires multiple cross-checks to verify respondent documentation:

> Commerce cites no authority to specifically support its imposition of the third-party confirmation requirement. There does not appear to be a legal basis for requiring that Linyi Chengen must confirm its log consumption by an independent third-party source, and thus the court concludes that Commerce's requirement on this issue is contrary to the law.

*Linyi Chengen Imp. & Exp. Co. v. United States*, 433 F. Supp. 3d 1278, 1286 (Ct. Int'l Trade 2020). In Phoenix's case, CBP relied on isolated, and ultimately immaterial, tidbits of the record that Phoenix did not submit bank statements from Lino to make a finding that is not consistent with the substantial evidence that Phoenix documented payments from its customers. *See USX Corp. v. United States*, 11 C.I.T. 82, 84 (1987) (the agency's determination cannot be based on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence."). CBP's conclusions and determinations were not based on a rational assessment of the whole record and are therefore arbitrary and capricious.

CBP also claims that Phoenix's Chinese affiliates, Dalian I/E Co., Ltd. and Dalian Metal FTZ (together: "Dalian Metal") produced CISP.  TRLED Det. at 10-11 & 22-23, **PV155; BC129**.  CBP bases this statement on website promotions.  *Id*.  From this premise, CBP goes on to speculate that Ms. Li may have owned HiCreek's facilities and machinery all along.  *Id*. at 22.  ORR argues in its review determination that Phoenix's owner had advertised that she owned a company that produced CISP in China, and, at any rate, had connections in China that show that "Phoenix could have easily evaded the Orders, regardless of whether one of the Lino/Dalian companies or another Chinese company produced the CISP at issue."  ORR Rev. Det. at 14-15, **PV165; BC132**.  The problem with this statement is that presumably any random bad actor could set up a transfer station in Cambodia to transship CISP from China through Cambodia into the United States.  CBP's evidence is simply too general to provide substantial evidence for CBP's conclusions as to Phoenix.

Further, CBP expends considerable effort in speculating that the raw materials that Phoenix imported from China may have actually been CISP and CISP fittings due to the descriptions on the invoices.  TRLED Det. at 27-28, **PV155; BC129**.

First, CBP refers to Phoenix's imports of merchandise under Harmonized Tariff Schedule[5] [        ], suggesting that these imports were actually of covered merchandise and not, as Phoenix described in its submissions, steel pipe used as a raw material.  TRLED Det. at 27 & 27 n.232, citing to CBP April 22, 2022 Memo at Att. 1 (Cambodian import and export statistics, **PV109; BC97;** Phoenix RFI Rsp. at 22 and Ex. II-4, p.4 (pictures of steel pipe raw

---

[5] For ease of reference, Phoenix refers here to the six-digit HTS Nos. because the tariff numbers and definitions are harmonized and the same for both the HTSUS and Cambodian HTS

material, **PV113; BC98**); Ex. III-1, p.11 (breakdown of raw material costs, **PV114; BC99**); Ex.

IV-3, pp 1, 11, 18-19, 28, 40 (raw materials purchase documents, **PV115; BC102**); and Ex. V-4,

p.4 (raw materials finished goods reconciliation, **PV115; BC103**). CBP's reliance on

Cambodian import statistics and tariff numbers to prove that Phoenix's imported steel raw

material is the same as CISP is unavailing. CISP is classified under HTS 7303.00 as "Tubes,

pipes and hollow profiles, of cast iron." The tariff classification of Phoenix's raw materials to

which CBP refers is HTS [       ] and covers [


                                                      ] In other words, this classification is distinct

from any pipe or tube of cast iron.

   Second, Phoenix's references to its purchases and consumption of steel pipe as a raw

material in its CISP production are absolutely consistent. *See* CBP's references to Phoenix's RFI

submissions detailed above in TRLED Det. at 27, n.232. Regardless of findings and conclusions

as to HiCreek in EAPA Inv. 7454, to which Phoenix was not a party, or of the English translation

of Phoenix's business purpose in its Articles of Association, CBP verified that Phoenix was

producing CISP and not [                                          ]. *See* TRLED Det. at 27-28

(regarding CBP's understanding of "steel pipe" in HiCreek's case) and *id*. at 28 (regarding the

English translation of Phoenix's business purpose in the company's Articles of Association).

   Third, CBP maintains that Phoenix's purchases of steel pipe at $[    ] per metric ton is

indicative that the merchandise is in reality CISP. *Id*. at 28. This conclusion is not supported by

the record of this case. Phoenix's cost for steel pipe per ton is completely in line with the price it

paid for other solid raw materials, including casting, iron pieces, pig iron, and round steel

punching. *See* Phoenix RFI Rsp. At Ex. IV-3, p.1, **PV105; BC102**.

Fourth, CBP claims that imports from China under HTS [          ] were cast iron soil pipe fittings. CISP fittings are not covered merchandise in EAPA 7621. Rather, the CISP fittings covered by separate AD & CVD orders are classified under HTS 7307.11: "Tube or pipe fittings (for example, couplings, elbows, sleeves), of iron or steel: Cast fittings: Of nonmalleable cast iron." HTS [          ], on the other hand, covers "[


]" CBP should not confuse a commodity made with stainless steel with one consisting of nonmalleable cast iron.

CBP may not hypothesize in a vacuum but must take into consideration all record evidence, which includes the pictures of raw materials Phoenix purchased included in its questionnaire response. *See* RFI Rsp at Exhibit II-4, showing pictures of thin pipes, small pipe parts, and various forms of scrap iron and steel labelled as "Furnace Casting Materials" and "Steel Pipe and Threaded Pipe." **PV113; BC98**. As Phoenix explained, such furnace casting materials are waste or low-grade products of other furnace companies and the other iron and steel materials that include steel scrap in any form, including pipe and round steel pouching. *See* RFI Rsp. at 20, **PV116; BC104**, and Supp. RFI at 22-25 & Exhibit S-IV-2, **PV123 & PV 122; BC108 & 107**. Most significantly, CBP's verifiers saw for themselves that the steel pipe Phoenix used as a raw material was a completely different commodity than finished CISP. CBP describe the beginning of its factory tour of Phoenix by stating: "The tour began at the [     ] electric furnaces where pig iron, [                                              ] are melted into liquid iron." Verif. Rpt. at 5. The U.S. International Trade Commission ("ITC")

also described the use of steel scrap as a raw material in CISP production. In its concurrent injury investigation, the ITC began its description of the CISP manufacturing processes by stating: "CISP is manufactured by melting scrap iron, *steel scrap*, and alloys in a cupola furnace and casting the metal into the desire shapes." USITC Publication 4879, *Cast Iron Soil Pipe from China*, Inv. Nos. 701-TA-597 and 731-TA-1407 (Final) (April 2019) at I-13 to I-14. The "steel pipe" with which CBP is concerned is the steel scrap that is melted together with other raw materials as described by the ITC and confirmed by CBP's verifiers.

Finally, CBP's comments on Phoenix's production capacity are misleading at best. CBP claims that Phoenix failed to thoroughly document its production and capacity to produce CISP in the volume exported to the United States. TRLED Det. at 31. Yet, CBP rejected Phoenix's capacity documentation and production capacity calculation for each production step because "{*d}ue to the significant incentive for bias*, machinery production figures are unreliable when they originate from company personnel estimates and lack substantiating evidence." *Id*. at 31. CBP did not consider the calculations in connection with the actual machinery that CBP verified and took pictures of at verification. *See* Verif. Rpt. at Att. 3. CBP's pictures corroborate the photos that Phoenix submitted to CBP. *See* Phoenix RFI Rsp. at 9-10 & Exhibit II-4, **PV116 & PV113; BC104 & BC99**. CBP never pointed out exactly what feature of the machines led CBP to believe that the companies' capacity calculations were off the mark.

There is a general problem with CBP's rejection of Phoenix's production capacity assessments. CBP's theory is that anything the respondent submits to rebut the allegation of evasion is necessarily flawed. That is the essence of arbitrary and capricious prejudgment of the record. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 56 (1983)

(finding "the agency has failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary-and-capricious standard."). Why issue questionnaires to any respondent when the very fact that they respond with an interest to clear their name fatally undermines their factual submissions? That is unreasonable. The responses establish baseline facts. It is up to the alleger or CBP to rebut them and shift the burden back to the respondent. CBP did nothing of the kind here. It is unreasonable for CBP to reject out of hand Phoenix's documents and assessment, which CBP asked for, just *because* the respondent has an interest in proving the allegation of evasion false.

CBP's narrative regarding production capacity is misleading and does not take into account that Phoenix stated that the actual commercial production capacity of the installed equipment should be about [      ] tons per month. RFI Rsp. at 9-10, **PV116; BC104**. Due to a lack of raw materials and skilled workers, however, Phoenix's production never reached anywhere near full capacity. *Id.; see also* TRLED Det. at 34. Namely, Phoenix's production and exports ranged from [                                                    ]. *See, e.g.,* Supp. RFI Rsp. at Exhibit S-IV-1, **PV122; BC107**. Thus, CBP had no reason to verify a full production capacity of 300 tons/month, when the actual, documented production was considerably less than the facilities' theoretical capacity. In addition, Phoenix had no incentive whatsoever to provide erroneous production and capacity figures. As noted, Phoenix produced considerably less than its theoretical production capacity, and Phoenix expected CBP to audit its data during an on-site verification in Cambodia.

In conclusion, CBP does not deny that Phoenix had the facilities, equipment, raw materials, and technical knowhow to manufacture CISP. CBP must instead rely on adverse inferences and its entirely speculative "comingling" theory as a basis for finding evasion. TRLED Det.at 33. Here, CBP speculates: "Phoenix Metal's ability to produce soil pipe during verification does not indicate that it did not concurrently engage in evasion through comingling subject and non-subject merchandise." *Id*. The record of this case does not support a rational connection between the verified fact of Phoenix's actual production of CISP and CBP's conjectural conclusion that Phoenix transshipped CISP from China through Cambodia to the United States. CBP's determinations are arbitrary and capricious. An abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are unsupported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors. *Arnold P'ship v. Dudas*, 362 F.3d 1338, 1340 (Fed. Cir. 2004). In *Novosteel SA v. United States*, 284 F.3d 1261, 1276 (Fed. Cir. 2002), the CAFC stated: "As the Supreme Court noted in *Bowen v. American Hospital Ass'n*, 'agency deference has not come so far that agency action is upheld whenever it is possible to conceive a basis for administrative action.'" *Id., citing to Bowen v. Am. Hosp. Asso.,* 476 U.S. 610, 626 (1986); *see also, e.g., Yangzhou Bestpak Gifts & Crafts v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013) (noting that Commerce determinations cannot be based on "mere conjecture or supposition").

## V.     CONCLUSION AND PRAYER FOR RELIEF

In light of the foregoing, Plaintiff respectfully requests that the Court remand this case to CBP with instructions to lift all current enforcement measures and, if necessary, re-commence its

EAPA investigation against Plaintiff providing Plaintiff with timely notification of CBP's initiation of an EAPA investigation before re-imposing interim measures, providing legal counsel with unredacted record documents under an APO, and allowing Plaintiff to rebut new factual information that CBP puts on the record. In particular, the Court should instruct CBP to lift suspension and liquidate all entries prior to *proper* notification without regard to antidumping and countervailing duties so that the importer has adequate notice of the pendency and effect of the severe enforcement measures on future entries.

Respectfully submitted,

/s/ Gregory S. Menegaz
Gregory S. Menegaz
Alexandra H. Salzman
Vivien Jinghui Wang[**]
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth St., N.W. 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: gmenegaz@dhlaw.com

Date: August 9, 2023                                  *Counsel to Plaintiff*

---

[**] Admitted to New Mexico Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that his brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains **13,738** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Gregory S. Menegaz

Gregory S. Menegaz
**DEKIEFFER & HORGAN, PLLC**
Suite 1101
1156 Fifteenth St., N.W.  20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  gmenegaz@dhlaw.com
*Counsel to Plaintiff*