## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE

| | |
|---|---|
| PHOENIX METAL CO., LTD., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Court No. 23-00048 |
| | ) |
| UNITED STATES, | ) **PUBLIC VERSION** |
| | ) |
| Defendant, | ) |
| and | ) |
| | ) |
| THE CAST IRON SOIL PIPE INSTITUTE, | ) |
| | ) |
| Defendant-Intervenor. | ) |

## DEFENDANT'S RESPONSE IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney
General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

NICOLAS A. MORALES
CHELSEA A. REYES
Attorneys
Office of Chief Counsel
U.S. Customs and Border Protection

February 16, 2024

LIRIDONA SINANI
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:    (202) 353-2188
Facsimile:    (202) 307-0972
Email:        Liridona.Sinani@usdoj.gov
*Attorneys for Defendant*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT PURSUANT TO RULE 56.2 ...........................................................1

    I.     Administrative Determination Under Review ......................................1

    II.    Issues Presented For Review ...........................................................2

STATEMENT OF FACTS ...............................................................................3

    I.     Enforce And Protect Act ................................................................3

    II.    The Investigation ........................................................................5

           A.     The Pertinent Antidumping And Countervailing Duty Orders .................5

           B.     Phoenix's Ties To Companies That CBP Previously Determined To Have Engaged In A Transshipment Scheme ......................................................5

           C.     Investigation Of Phoenix And TRLED's Initial Determination ...............7

           D.     Review Determination ...........................................................10

SUMMARY OF THE ARGUMENT .................................................................13

ARGUMENT ..........................................................................................14

    I.     Standard Of Review ....................................................................14

    II.    The Court Should Sustain The Final Determination Of Evasion ........................14

           A.     CBP Lawfully Imposed Interim Measures ...........................................15

                  1.     The Constitution Does Not Entitle Phoenix To Procedural Due Process Before CBP Takes Interim Measures Pursuant To The EAPA ...................................................................... 16

                  2.     CBP's Regulations Promulgated To Implement The EAPA Are Valid And Do Not Violate the APA ...........................................24

B.    Phoenix Concedes That If The Court Is Unpersuaded By Phoenix's Other Arguments, Any Remand To Require The Agency To Disclose Confidential Information Would Be Futile ................................................ 28

C.    CBP Lawfully And Appropriately Conducted The Verification ............. 30

D.    Due To Its Failure To Exhaust Its Administrative Remedies, Phoenix Has Waived Its Argument That It Has A Right To Rebut New Factual Information; In Any Event, Phoenix's Arguments Lack Merit ............... 34

E.    CBP Did Not Act Arbitrarily Or Capriciously Or Abuse Its Discretion In Determining That Phoenix Failed To Comply With Its Investigation And Its Decision Is Supported By Substantial Evidence ................................ 42

CONCLUSION ...................................................................................................................... 45

**Cases**                                                                                               **Page(s)**

*A Classic Time v. United States,*
   123 F.3d 1475 (Fed. Cir. 1997)..........................................................................................20

*AIMCOR v. United States,*
   141 F.3d 1098 (Fed. Cir. 1998)..........................................................................................34

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States,*
   751 F.2d 1239 (Fed. Cir. 1985)................................................................................. 16, 20

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40 (1999) .............................................................................................. 16, 26, 27

*Am. Pac. Plywood, Inc. & LB Wood Cambodia Co., Ltd.,*
   No. 20-03914, 2023 WL 4288346 (Ct. Int'l Trade June 22, 2023) ...................... 19, 20, 26, 43

*Arnett v. Kennedy,*
   416 U.S. 134 (1974) ..........................................................................................................16

*Aspects Furniture Int'l, Inc. v. United States,*
   607 F. Supp. 3d 1246 (Ct. Int'l Trade 2022) ...........................................................19

*Board of Regents v. Roth,*
   408 U.S. 564 (1972)...........................................................................................................16

*CEK Grp. LLC v. United States,*
   633 F. Supp. 3d 1369 (Ct. Int'l Trade 2023) .........................................................43

*Corus Staal BV v. United States,*
   502 F.3d 1370 (Fed. Cir. 2007)..........................................................................................35

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ......................................................................................................15

*Diamond Tools Tech. LLC v. United States,*
   545 F. Supp. 3d 1324 (Ct. Int'l Trade 2021) ...................................................... 19, 20, 21, 22

*Domka v. Portage County,*
   *Wisc.*, 523 F.3d 776 (7th Cir. 2008)..................................................................................29

*Dorbest Ltd. v. United States,*
   604 F.3d 1363 (Fed. Cir. 2010)..........................................................................................35

*Echjay Forgings Priv. Ltd. v. United States*,
　　475 F. Supp. 3d 1350 (Ct Int'l Trade 2020) ................................................................23, 42

*Essar Steel Ltd. v. United States*,
　　678 F.3d 1268 (Fed. Cir. 2012) ................................................................................................41

*Ewing v. Mytinger & Casselberry*,
　　339 U.S. 594 (1950) ......................................................................................................17, 22

*Ford Motor Co. v. United States*,
　　286 F.3d 1335 (Fed. Cir. 2002) ................................................................................................31

*FPC v. Transcon. Gas Pipe Line Corp.*,
　　423 U.S. 326 (1976) ......................................................................................................41

*Gilda Indus., Inc. v. United States*,
　　446 F.3d 1271 (Fed. Cir. 2006) ................................................................................................23

*Goodluck India Ltd. v. United States*,
　　No. 22-00024, 2023 WL 8078148 (Ct. Int'l Trade Nov. 21, 2023) ...........................................29

*Hannah v. Larche*,
　　363 U.S. 420 (1960) ......................................................................................................17

*Home Prods. Int', Inc. v. United States*,
　　837 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) .........................................................................24

*Int'l Custom Prods., Inc. v. United States*,
　　791 F.3d 1329 (Fed. Cir. 2015) ................................................................................................20

*Int'l Trading Co. v. United States*,
　　24 C.I.T. 596 (2000) ......................................................................................................16

*IPSCO, Inc. v. United States*,
　　687 F. Supp. 614 (Ct. Int'l Trade 1988) ..........................................................................25, 27

*James V. Hurson Assocs., Inc. v. Glickman*,
　　229 F.3d 277 (D.C. Cir. 2000) ................................................................................................26

*Jazz Photo Corp. v. United States*,
　　439 F.3d 1344 (Fed. Cir. 2006) ................................................................................................31

*Mathews v. Eldridge*,
　　424 U.S. 319 (1976) ......................................................................................... 19, 21, 22

iv

*Micron Tech., Inc. v. United States*,
117 F.3d 1386 (Fed. Cir. 1997)........................................................................24

*MidContinent Nail Corp. v. United States*,
949 F. Supp. 2d 1247 (Ct. Int'l Trade 2013) ...................................................24

*Mittal Steel Point Lisas Ltd. v. United States*,
548 F.3d 1375 (Fed. Cir. 2008)..................................................................34, 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).............................................................................................15

*Norwegian Nitrogen Prods. v. United States*,
288 U.S. 294 (1933)...........................................................................................20

*Paralyzed Veterans of Am. v. West*,
138 F.3d 1434 (Fed. Cir. 1998)........................................................................25

*PSC VSMPO-Avisma Corp. v. United States*,
688 F.3d 751 (Fed. Cir. 2012) .........................................................................41

*Royal Brush Manufacturing, Inc. v. United States*,
75 F.4th 1250 (Fed. Cir. 2023) ..................................................................passim

*Sandvik Steel Co. v. United States*,
164 F.3d 596 (Fed. Cir. 1998) .........................................................................34

*Star Fruits S.N.C. v. United States*,
393 F.3d 1277 (Fed. Cir. 2005).......................................................................15

*Tenn. Secondary Sch. Athletic Ass'n v. Brentwood,*
*Acad.*, 551 U.S. 291 (2007) ..............................................................................28

*Time Warner Cable Inc. v. F.C.C.*,
729 F.3d 137 (2d Cir. 2013) .......................................................................25, 27

*United States v. Johnson*,
954 F.3d 1106 (8th Cir. 2020) .........................................................................31

*Xi'an Metals & Mins. Imp. & Exp. Co. v.United States*,
50 F.4th 98 (Fed. Cir. 2022) ............................................................................25

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978)...........................................................................................23

*Ward v. U.S. Postal Serv.*,
    634 F.3d 1274 (Fed. Cir. 2011)........................................................................38

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998)........................................................................14

*Xi'an Metals & Mins. Imp. & Exp. Co. v.United States*,
    50 F.4th 98 (Fed. Cir. 2022)............................................................................25

## Statutes

5 U.S.C. § 551(4)............................................................................................24
5 U.S.C. § 553(b)............................................................................................25
5 U.S.C. § 553(b)(a)........................................................................................25
5 U.S.C. § 704................................................................................................22
19 U.S.C. § 1504(c)...........................................................................................3
19 U.S.C. § 1509..............................................................................................26
19 U.S.C. § 1517................................................................................................3
19 U.S.C. § 1517(b)(1)....................................................................................3, 27
19 U.S.C. § 1517(c)......................................................................................2, 18, 30
19 U.S.C. § 1517(c)(1)(A)..................................................................................4
19 U.S.C. § 1517(c)(1)(B)..................................................................................4
19 U.S.C. § 1517(c)(2)........................................................................4, 26, 30, 41
19 U.S.C. § 1517(c)(3)(A)................................................................................43
19 U.S.C. § 1517(e)...................................................................................passim
19 U.S.C. § 1517(e)(2)..................................................................................20, 30
19 U.S.C. § 1517(f)........................................................................................5, 18
19 U.S.C. § 1517(g)(1)....................................................................................5, 30
19 U.S.C. § 1517(g)(2)......................................................................................14
21 U.S.C. § 334............................................................................................17, 18
Pub. L. No. 114-125...........................................................................................3

## Regulations

19 C.F.R. § 165.15(d)(1)............................................................................4, 18, 24
19 C.F.R. § 165.21.............................................................................................4
19 C.F.R. § 165.22.............................................................................................4
19 C.F.R. § 165.23.........................................................................................4, 18
19 C.F.R. § 165.23(a).........................................................................................4
19 C.F.R. § 165.23(c)(1)..............................................................................36, 37, 40
19 C.F.R. § 165.23(c)(2)................................................................................36, 40
19 C.F.R. § 165.24(c)...................................................................................4, 18, 24
19 C.F.R. § 165.25(a)........................................................................................36
19 C.F.R. § 165.25(b)....................................................................................36, 37
19 C.F.R. § 165.26........................................................................................4, 18
19 C.F.R. § 165.41(f)(5)....................................................................................35

19 C.F.R. § 165.44 ...................................................................................................35

19 C.F.R. § 351.225(l)(2) .........................................................................................20

19 C.F.R. §§ 165.25 .................................................................................................40

19 C.F.R. §§ 165.41 .................................................................................................18

84 Fed. Reg. 19035 (Dep't Commerce May 3, 2019) ...........................................5, 6

**Other Authorities**

*Cast Iron Soil Pipe from the People's Republic of China: Antidumping Duty Order,* 84 Fed. Reg. 19,035 (Dep't Commerce May 3, 2019) ................................................................5

*Cast Iron Soil Pipe from the People's Republic of China: Countervailing Duty Orde*r, 84 Fed. Reg. 19,039 (Dep't Commerce May 3, 2019) .........................................................5

*Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 56,477 (CBP Aug. 22, 2016). ..........................................................................25, 26

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:     THE HONORABLE GARY S. KATZMANN, JUDGE

———————————————————————

|  |  |  |
|---|---|---|
| PHOENIX METAL CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Court No. 23-00048 |
| | ) | |
| UNITED STATES, | ) | **PUBLIC VERSION** |
| | ) | |
| Defendant, | ) | |
| and | ) | |
| | ) | |
| THE CAST IRON SOIL PIPE INSTITUTE, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |
| | ) | |

———————————————————————

**DEFENDANT'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the

motion for judgment on the agency record filed by plaintiff, Phoenix Metal Co., Ltd. (Phoenix).

As demonstrated below, U.S. Customs and Border Protection (CBP) lawfully conducted

its investigation, and the affirmative evasion determination is supported by substantial evidence

and is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the

law.  Accordingly, we respectfully request that the Court deny Phoenix's motion, and sustain

CBP's evasion determination.

**STATEMENT PURSUANT TO RULE 56.2**

**I.     Administrative Determination Under Review**

Phoenix challenges CBP's administrative review of the final determination as to evasion

by CBP's Office of Trade, Regulations & Rulings Directorate (ORR) in Enforce and Protect Act

(EAPA) Consolidated Case No. 7621 (Jan. 18, 2023), C.R. 132, P.R. 165  (Review Det.), which

affirmed the determination of evasion under 19 U.S.C. § 1517(c) by Customs, Trade Remedy & Law Enforcement Directorate (TRLED), Notice of Final Determination as to Evasion (Sep. 6, 2022), C.R. 129, P.R. 155 (Final Det.).[1]

## II.    Issues Presented For Review

1.    Whether the United States Constitution entitled Phoenix to procedural due process before CBP imposed interim measures pursuant to 19 U.S.C. § 1517(e);

2.    Whether CBP violated the Administrative Procedure Act when it promulgated its EAPA regulations;

3.    Whether the decision of the United States Court of Appeals for the Federal Circuit in in *Royal Brush Manufacturing, Inc. v. United States*, 75 F.4th 1250 (Fed. Cir. 2023) warrants remand in this case;

4.    Whether CBP's decision to reject Phoenix's submissions containing new factual information was supported by substantial evidence and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; and

5.    Whether CBP's application of an adverse inference due to Phoenix's failure to cooperate in the investigation to the best of its ability was supported by substantial evidence and was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

---

[1]   "C.R. __" refers to the document number in the Confidential Administrative Record, ECF Nos. 20-1—20-21, 20-24; "P.R. __" refers to the document number in the Public Administrative Record, ECF Nos. 19-1—19-20.  Citations to specific pages are to the confidential version unless only a public version is available.

## STATEMENT OF FACTS

### I.    Enforce And Protect Act

In 2016, the President signed into law The Trade Facilitation and Trade Enforcement Act of 2015 (TFTEA), Pub. L. No. 114-125, 130 Stat. 122 (2016).  Title IV, Section 421 of TFTEA, commonly referred to as the "Enforce and Protect Act" or "EAPA," established a new CBP administrative procedure for investigating allegations of evasion of antidumping and countervailing duty orders as part of the United States' efforts to ensure a level playing field for domestic industries.  *See generally* 19 U.S.C. § 1517.  Upon receiving an allegation from an interested party, the statute mandates a formal investigation process and statutorily mandated investigation timeline.  CBP's regulations establish additional deadlines and procedures governing the investigation, which facilitate CBP's compliance with its statutorily required deadlines.

Generally, the investigation of an EAPA allegation proceeds as follows:  Within 15 calendar days of receiving an allegation, if CBP determines that the allegation reasonably suggests that covered merchandise has been entered through evasion, CBP must initiate an investigation.  19 U.S.C. § 1517(b)(1).  Within 90 calendar days, CBP must make its initial determination of reasonable suspicion of evasion and, if it determines so, must issue interim measures, which includes the suspension and extension of certain liquidated entries, 19 U.S.C. § 1517(e).[2]  The EAPA statute is silent as to a time frame for when CBP must provide notice of initiation of an investigation or interim measures.  However, in accordance with its regulations,

---

[2]  With respect to suspension of liquidation, 19 U.S.C. § 1504(c) provides that "{i}f the liquidation of any entry is suspended, the Secretary shall by regulation require that notice of the suspension be provided, in such manner as the Secretary considers appropriate, to the importer of record or drawback claimant, as the case may be, and to any authorized agent and surety of such importer of record or drawback claimant."

3

"CBP will issue notification of its decision to initiate an investigation to all parties to the investigation no later than 95 calendar days after the decision has been made," and "no later than five business days after interim measures are taken." 19 C.F.R. § 165.15(d)(1); *see also* 19 C.F.R. § 165.24(c) (regarding interim measures).

The EAPA statute grants CBP broad discretion to determine the scope and means of the investigation, including authority to collect and verify any information it deems necessary to make its evasion determination. 19 U.S.C. § 1517(c)(2). CBP's regulations set forth the types of and requirements for the submission of factual information by parties. 19 C.F.R. § 165.23. For example, parties to the investigation may voluntarily submit information to CBP or may provide information in response to requests by CBP. *Id.* Parties to the investigation have 200 days from the date of the initiation of the investigation to submit factual information on the record, and 230 calendar days to submit written arguments. *Id.*; 19 C.F.R. § 165.26. Parties to the investigation have 15 calendar days to submit responses to other parties' written arguments. 19 C.F.R. § 165.26. Interested parties who are not parties to the investigation may also provide information in response to requests by CBP. 19 C.F.R. § 165.23(a).

During the investigation, CBP maintains an administrative record of material obtained and considered during the investigation. 19 U.S.C. § 1517(c)(2); 19 C.F.R. § 165.21. No later than 300 calendar days after the initiation of the investigation, CBP is normally required to make a determination as to whether substantial evidence exists based on the administrative record to find evasion.[3] 19 U.S.C. § 1517(c)(1)(A); 19 C.F.R. § 165.22. A person determined to have entered covered merchandise through evasion or an interested party that filed an allegation which

---

[3] CBP may issue notice of an extension of time of not more than 60 calendar days, provided certain requirements are met, to render its determination. 19 U.S.C. § 1517(c)(1)(B).

resulted in the initiation of an investigation is permitted to request a review of an initial determination, and CBP must complete the review and issue a final administrative determination no later than 60 days after such a request. 19 U.S.C. § 1517(f). EAPA permits for judicial review in this Court of CBP's final administrative determination and the original determination as to evasion. 19 U.S.C. § 1517(g)(1).

## II. The Investigation

### A. The Pertinent Antidumping And Countervailing Duty Orders

On May 3, 2019, the Department of Commerce (Commerce) issued antidumping and countervailing duty (AD/CVD) orders on cast iron soil pipe (soil pipe) from the People's Republic of China (China). *Cast Iron Soil Pipe from the People's Republic of China: Antidumping Duty Order,* 84 Fed. Reg. 19,035 (Dep't Commerce May 3, 2019); *Cast Iron Soil Pipe from the People's Republic of China: Countervailing Duty Orde*r, 84 Fed. Reg. 19,039 (Dep't Commerce May 3, 2019) (collectively, the AD/CVD Orders).

### B. Phoenix's Ties To Companies That CBP Previously Determined To Have Engaged In A Transshipment Scheme

Although this case concerns judicial review of CBP's determination of evasion as to Phoenix only, Phoenix's owner, Linghong Li (Ms. Li), owns or is affiliated with several other companies implicated in a transshipment scheme, which CBP has determined engaged in evasion of the AD/CVD Orders. For context, we provide a brief factual background of those companies and CBP's investigations of them.

Most pertinent here, the following companies, are owned by Ms. Li or founded by her employees or family members: Dalian Metal I/E Co., Ltd. (Dalian Metal), which Ms. Li founded; Lino International Inc. (Lino), of which Ms. Li is founder and President; Lino Metal Corp. (Lino Metal); DLNL Trading Inc. (DLNL); Little Fireflies International Co. (Little

Fireflies); and Camellia Casting, Inc. (Camellia Casting).  Final Det. at CR12434-12437; Review

Det. at CR12516; Mem. Re: Adding Info. to the Admin. R. in EAPA Consol. Case 7621 (Dec. 1,

2021), Attach. 3, C.R. 7, P.R. 9 (EAPA 7454).  Dalian Metal is a Chinese company that was a

respondent in Commerce's AD/CVD proceedings that resulted in the AD/CVD Orders in May

2019.  *See* AD/CVD Orders, 84 Fed. Reg. 19035, 84 Fed. Reg. 19039.

On April 7, 2020, CBP initiated an EAPA investigation, consolidated case number 7454,

to investigate whether Lino was importing Chinese origin soil pipe transshipped through a

Cambodian exporter, HiCreek Plumbing Co., Ltd (HiCreek).  EAPA 7454 at CR00176-196.  On

July 13, 2020, CBP notified Lino that it was under an EAPA investigation and that CBP had

imposed interim measures against its imports from HiCreek.  *Id.* at CR00179.  Less than a month

and a half later, on August 21, 2020, a Lino Metal employee established DLNL, which then

began receiving shipments from HiCreek in September 2020.  *Id.*

On February 8, 2021, CBP issued its determination that Lino imported Chinese-origin

soil pipe transshipped through Cambodia from HiCreek.  *Id.* at CR00195.  CBP found that Lino

set up DLNL as a front company to evade CBP's interim measures.  *Id.* at CR00193.  CBP also

found that Lino made "misleading statements to" another importer, made contradictory

statements concerning its ownership of factories, and "withheld its banking statements from

CBP."  *Id.* at CR00193.  As for HiCreek, CBP found that HiCreek had likely been set up in

Cambodia by another Chinese exporter of soil pipe shortly after the AD/CVD orders to aid in

evasion.  *Id.* at CR00185.  HiCreek had begun exporting soil pipe to the United States before it

imported machinery and equipment essential for soil pipe production from China.  *Id.* at

CR00187.  CBP also noted that Dalian Metal played a "coordinating role" in Lino's transshipped

imports from HiCreek  *Id.* at CR00192.

On September 3, 2021, CBP initiated an investigation toto whether Little Fireflies International Co. (Little Fireflies) and its U.S. customer, Granite Plumbing Products LLC (Granite Plumbing), were evading the AD/CVD Orders by importing soil pipe from China that was transshipped through Cambodia. Final Det. at CR12429. CBP found that Little Fireflies was another company set up by Ms. Li/Lino (this time in Cambodia) to serve as part of continued efforts to transship Chinese-origin soil pipes. *Id.* at CR12434-CR12445. CBP learned that shortly after CBP placed a memorandum publicly naming DLNL onto EAPA 7454's case records on December 9, 2020, Lino became aware that CBP detected its use of DLNL and transitioned its business operations to Little Fireflies instead. *Id.* at CR12436- CR12437. CBP noted that "it appears likely that the use of Little Fireflies' then-unknown name as the importer and/or manufacturer of the merchandise was intended to avoid CBP's interim measures and later its EAPA determination associated with Lino, Dalian Metal, and HiCreek." *Id.* at CR12441. Moreover, evidence again showed the Dalian Metal was coordinating Lino's and Little Fireflies' shipments through China. *Id.* at CR12437.

## C.    Investigation Of Phoenix And TLRED's Final Determination

On February 15, 2022, during CBP's investigation of Little Fireflies, the Cast Iron Soil Pipe Institute (CISPI), a trade association of domestic producers of soil pipe, submitted an allegation to CBP that Phoenix was evading the AD/CVD Orders by importing Chinese origin soil pipe transshipped through Cambodia. Final Det. at CR12431. CBP determined that the information in the allegation reasonably suggested that Phoenix entered soil pipe covered by the AD/CVD Orders into the customs territory of the United States through evasion; thus, on February 28, 2022, CBP initiated a formal EAPA investigation of Phoenix. Final Det. at CR12432; Initiation of Investigation for EAPA Case 7708 (Feb. 28, 2022), C.R. 136, P.R. 172.

After evaluating the information on the record, CBP further determined that reasonable suspicion existed that Phoenix imported Chinese origin soil pipe into the United States that was transshipped through Cambodia.  Final Det. at CR12432.  In particular, the information on the record revealed that Phoenix's owner, Ms. Li, had previously formed Lino and LDNL, two entities that were implicated in a transshipment scheme in EAPA 7454.  Phoenix listed the same address as that of HiCreek's Cambodian facility in its August 2021 bills of lading.  *Id.*  This, coupled with Ms. Li's ties to Lino and DLNL, provided a reasonable suspicion that Ms. Li may have formed Phoenix as a front company to continue to transship Chinese origin soil pipe through HiCreek in Cambodia.  *Id.*

Consequently, on March 28, 2022—28 days after initiating the investigation of Phoenix—CBP issued a Notice of Initiation to Phoenix and CISPI, notifying them of CBP's commencement of a formal investigation of Phoenix and imposition of interim measures.  Notice of Initiation of Investigation and Interim Measures – EAPA Consol. Case 7621 (Mar. 28, 2022), C.R. 57, P.R. 73 (NOI).  Based on Phoenix's relationship to Little Fireflies, the same covered merchandise and AD/CVD Orders, and overlap in time periods of the entries, CBP consolidated Phoenix's investigation (7708) into its investigation of Little Fireflies (7621).  NOI at CR02166.

To further investigate the claim of evasion, CBP issued an initial request for information (RFI) to Phoenix on March 29, 2022, and a supplemental RFI on May 13, 2022. Final Det. at CR12433 & n.33.  Phoenix responded to those requests on April 26, 2022, and June 3, 2022, respectively.  *Id.* at CR12433 & n.37.

On June 3, 2022, CBP issued a letter to Phoenix, notifying it that CBP would conduct verification on June 14-17, 2022 at Phoenix's Cambodian facilities.  Letter from CBP to Linghong Li (June 3, 2022), C.R. 109, P.R. 124 (Verif. Letter).  CBP notified Phoenix to be

prepared to provide copies of production records during the verification visit.  *Id.* at CR11769-CR11770.  CBP also notified Phoenix to expect "eight CBP officials."  *Id.* at CR11768.

During the verification visit, Ms. Li "admitted that she was not completely innocent involving the previous EAPA case."  Verification Report (July 22, 2022), C.R. 128, P.R. 145 (Verif. Report).  Ms. Li also admitted that the production then occurring at Phoenix's Cambodian facility was set up temporarily just for the verification team to see.  *Id.* at CR12364.  Ms. Li presented hostility toward the verification team: she accused them of being "spies," extensively shouted at them, became upset that the team had information Ms. Li herself had submitted in Phoenix's RFI responses, and became irate when CBP tried to interview employees other than those Ms. Li selected.  *See id.* at CR12363, CR12364.  Ms. Li refused to show the verifiers certain paperwork when asked and at one point became "agitated and angry," stating that CBP would use the documents against her.  *Id.* at CR12364, CR12368-CR12369.

Following verification, Phoenix attempted to place on the record several exhibits that it did not provide to CBP during the verification.  CBP Email to Phoenix (June 28, 2022), P.R. 136 (June 28, 2022 Email).  Because those documents were not provided to or reviewed by the verification team during verification (despite CBP having requested that such documents be made available), CBP rejected them from the administrative record.  *Id.*; Review Det. at CR12514.

On September 6, 2022, TRLED concluded that substantial evidence demonstrates that Phoenix made entries of Chinese-origin soil pipe into the United States that were covered by the AD/CVD Orders by falsely declaring them to be of Cambodian origin.  Final Det. at CR12445-CR12462.  TRLED also applied adverse inferences against Phoenix, but stated that "enough evidence exists on the record to determine that there is evasion without its use."  *Id.* at CR12460.

### D.    <u>Review Determination</u>

Phoenix appealed TRLED's determination to ORR.  Upon *de novo* administrative review,
ORR affirmed TRLED's finding of evasion.  Review Det.

ORR determined that Phoenix did not have the production capacity or capability at its
Cambodia facility to make all of the soil pipes it imported into the United States.  Review Det. at
CR12519.  The evidence was particularly strong as to the lack of production capability with
respect to [█] soil pipe (Phoenix entered [██████████] soil pipe), as there was no evidence
in the record that Phoenix can produce [█] soil pipe, and, in fact, record evidence showed
Phoenix did not have the equipment for such production.  *Id.* at CR12511-12512, CR12519.

ORR also determined that Phoenix's production capacity was unverifiable.  *Id.* at
CR12513.  ORR explained that, in its first RFI, TRLED had requested production capacity
information on Phoenix's machines, and Phoenix had provided same; however, despite the fact
that CBP informed Phoenix that CBP required copies of production records to be provided
during verification, Phoenix refused to provide the requested documents.  *Id.* When CBP
attempted to verify production capacity through other means—such as by comparing Phoenix's
electricity usage with its reported monthly production or by reviewing spreadsheets that showed
production by product—Ms. Li refused to provide all the requested documents.  *Id.*

Additionally, ORR considered that Phoenix's bills of lading showed that Phoenix
purchased and imported orders of "steel pipe" in unknown sizes from China into Cambodia.  *Id.*
at CR12512.  ORR noted, as had TRLED, that "steel pipe" can mean "finished soil pipe" in
Khmer, a translation that Phoenix did not dispute.  *Id.*; *see also* Final Det. at 12454-12455.
Phoenix's only customers are in the United States; therefore, any soil pipe that Phoenix imported
from China and exported from Cambodia would have been sold to the United States.  Review

Det. at CR12512, CR12519.  Thus, ORR reasonably concluded that, given Phoenix's failure to demonstrate production capability taken together with the fact that Phoenix imported steel pipe from China, and Ms. Li's significant ties to China, the true origin of the steel pipe was from China and transshipped through Cambodia and entered into the United States.

During the verification, CBP met with the Cambodian Ministry of Commerce (Ministry). The Ministry purports to review companies in Cambodia and ultimately signs certificates of origin. The Ministry provided documentation regarding Phoenix's operations, including certificates of origin.  Verif. Report CR12374.  ORR considered these documents  and concluded there was insufficient information to rely on the Ministry's documents as proof of Phoenix's production capabilities.  For example, the Ministry did not detail, and the documents did not demonstrate, the Ministry's verification process, including how the Ministry inspects Phoenix. Thus, ORR determined that documents provided by the Ministry did not constitute substantial evidence of Phoenix's raw purchases. *Id.* at CR12513; *see also* Verif. Report at CR12374.[4]

Next, ORR explained that although TRLED had requested bank statements, Phoenix did not provide them, which rendered CBP unable to corroborate that Phoenix purchased the machinery it purportedly used to produce the soil pipe it imported into the United States. Review Det. at CR12515.  Although Phoenix had supplied balance sheets, those were documents created by Phoenix "and they {were} not an objective metric for showing all of Phoenix's transactions that occurred in a given time period, as items may {have} easily be{en} omitted or amounts adjusted."  *Id.*  Moreover, Phoenix's refusal to provide the bank records also resulted in insufficient evidence to determine the timing or parameters of Phoenix's ownership of the

---

[4] Documents provided by the Ministry only raised additional concerns, because information contained therein demonstrated that Phoenix had not provided full responses in its RFI's to CBP and made sales that it had not reported to CBP.  Verif. Report at CR12375.

production machinery, which Phoenix claimed it purchased from HiCreek, or the manufacturing

facility, which Phoenix claimed it rented from HiCreek.  *Id.* There was also insufficient evidence

to find that Ms. Li did not own HiCreek's facilities before starting Phoenix because Phoenix

reported only paying for the [█████████████████] for the facilities, rather than rental

payments.  *Id.* at CR12516.

Further, ORR explained that CBP was unable to verify Phoenix's raw material purchases.

*Id.* at CR12514.  Ms. Li was in control of what information is entered into Phoenix's general

ledger and accounting system, and CBP could not trace purchases and transactions in the general

ledgers for 2021 and 2022, or the accompanying raw material inventory.  *Id.*

Moreover, ORR also determined that Phoenix had made a material omission in its

submissions to CBP, which omission contributed to the finding of evasion.  *Id.* at CR12516.

Specifically, Phoenix did not disclose a relationship with a company, Camellia Casting, at any

point in the investigation, despite being asked about its business relationships in the initial RFI.

*Id.*  Evidence on the record indicated that, following CBP's imposition of interim measures on

Phoenix, Camellia Casting took over Phoenix's entries to avoid the interim measures.  *Id.*  In

particular, the Ministry provided documents to CBP for soil pipe orders Phoenix was processing

prior to CBP's March 28, 2022 notice to Phoenix of interim measures.  *Id.*  Information in those

documents matched Camellia Casting entries into the United States after March 28, 2022.  *Id.*

The last entries into the United States listing Phoenix as the importer were on [██████], 2022,

before Phoenix was notified of the interim measures.  *Id.*  One of the Camellia Casting shipments

matching documents provided by the Ministry for Phoenix soil pipe orders entered the United

States after the interim measures and prior to Phoenix's April 26, 2022 RFI response, which

omitted the business relationship.  *Id.*  Further, Camellia Casting's first six entries were recorded

in Phoenix's general ledger, demonstrating that all six began as Phoenix entries and were later changed to Camellia Casting entries. *Id.* Phoenix did not dispute or even address its relationship with Camellia Casting, which ORR explained constituted a material omission. *Id.*

Finally, ORR determined that Phoenix had failed to cooperate to the best of its ability when it: refused to provide requested production and bank documents; failed to disclose its relationship to Camellia Casting; falsely claimed that the "finished soil pipe" that was imported from China to Cambodia was not the same soil pipe that Phoenix entered into the United States without paying AD/CVD duties. Review Det. at CR12511, CR12514, CR12514, CR12517, CR12519. Thus, ORR found the application of adverse inferences proper for CBP to conclude that all soil pipe that Phoenix entered into the United States was subject to the AD/CVD Orders. *Id.* at CR12517.

Ultimately, ORR conclude that "the record supports a finding of evasion." Review Det. at CR12519. ORR reiterated that even without the application of adverse inferences, substantial evidence of evasion exists. *Id.* at CR12518.

This action followed.

## SUMMARY OF THE ARGUMENT

First, Phoenix's challenges to the process leading up to the implementation of interim measures on due process grounds, whether found in the Constitution or the Administrative Procedure Act (APA), are specious. Although importers are entitled to procedural due process in EAPA proceedings before CBP reaches its evasion determination, no such right exists before the implementation of interim measures. Further, the APA's notice-and-comment requirements do not apply to an agency's rules of procedure, which the EAPA regulations are.

Second, considering Phoenix's opposition to our previously requested voluntary remand, Phoenix appears to concede that if the Court is unpersuaded by its other arguments, any remand to require the agency to disclose confidential information would be futile.

Third, Phoenix's protestations that CBP inappropriately conducted the verification by creating an atmosphere of fear and "chaos" are unfounded accusations, and are wholly insufficient to overcome the presumption that CBP officers properly discharged their official duties.  Moreover, due to its failure to exhaust administrative remedies, Phoenix has waived its arguments that CBP's verification report contains new factual information and that Phoenix was entitled to rebut that information. In any event, those arguments are without merit.  Finally, Phoenix fails to engage with the actual analysis supporting ORR's finding that Phoenix failed to cooperate to the best of its ability to comply with requests for information.  In any event, CBP determined that even without the application of adverse inferences, substantial evidence of evasion exists, and Phoenix fails to demonstrate otherwise.

## **ARGUMENT**

### I. **Standard Of Review**

In reviewing CBP's evasion determinations, this Court determines whether CBP complied with procedures under the EAPA statute and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  19 U.S.C. § 1517(g)(2).

"Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion." *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).  The scope of the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that

of the agency.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983).  The Court "determine{s} only whether the {agency} examined 'the relevant

data' and articulated 'a satisfactory explanation' for {its} decision, 'including a rational

connection between the facts found and the choice made.'"  *Dep't of Com. v. New York*, 139 S.

Ct. 2551, 2569 (2019) (quoting *Motor Vehicle*, 463 U.S. at 43).  "An abuse of discretion occurs

where the decision is based on an erroneous interpretation of the law, on factual findings that are

not supported by substantial evidence, or represent an unreasonable judgment in weighing

relevant factors."  *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).

## II.    The Court Should Sustain The Final Determination Of Evasion

CBP issued the final determination after a robust administrative process that included

information gathering, onsite verification, and full participation and comments from interested

parties.  CBP's finding that Phoenix entered merchandise into the United States by means of

evasion is supported by substantial evidence and is in accordance with law.  Moreover, CBP's

finding is not arbitrary, capricious, or an abuse of discretion.  In response, Phoenix makes

numerous arguments that are without merit and which we address each in turn.

### A.    CBP Lawfully Imposed Interim Measures

Phoenix challenges the process leading up to the implementation of interim measures on

due process grounds – whether found in the Constitution or the APA.  *See generally* Pl.'s Rule

56.2 Mem. in Supp. of Mot. For J. Upon the Admin. R. Br. at 11-22, ECF No. 30 (Pl.'s Br.).

First, Phoenix argues that CBP violated Phoenix's constitutional due process when it issued the

notification of interim measures 28 days after it initiated the investigation without giving

Phoenix prior notice and opportunity to defend against the imposition of the interim measures.

*Id.* at 11-22.  Second, Phoenix challenges the validity of the EAPA regulations—presumably

15

those setting forth the timing of notice—by essentially arguing that: (1) the regulations are "substantive" rules and CBP violated the APA by promulgating them without notice and opportunity to comment; and, alternatively, (2) if the regulations are "procedural," then they "do not have the force and effect of law." *See id.* at 19-22. Phoenix's arguments are specious.

### 1. The Constitution Does Not Entitle Phoenix To Procedural Due Process Before CBP Takes Interim Measures Pursuant To The EAPA

The Fifth Amendment to the Constitution prohibits the deprivation "of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, in every due process challenge, the first inquiry "is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). "A protectable interest must be more than a unilateral expectation." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1250 (Fed. Cir. 1985) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 571 (1972)). "Those seeking constitutional protection under the due process clause must point to a 'legitimate claim of entitlement' prior to any consideration of the Government's constitutional obligations." *Id.* (quoting *Arnett v. Kennedy*, 416 U.S. 134, 167 (1974)). If a protected interest exists, the court then determines "what procedures are necessary to protect that interest." *Int'l Trading Co. v. United States*, 24 C.I.T. 596, 609 (2000), *aff'd*, 281 F.3d 1268 (Fed. Cir. 2002).

Phoenix's constitutional due process claim fails because Phoenix does not establish that a legitimate property interest exists in the context of interim measures. Phoenix observes that the Federal Circuit has held that importers participating in an administrative proceeding enjoy procedural due process rights, but spends no time explaining how the cited case establishes that a legitimate property interest exists in the specific context of interim measures. Pl.'s Br. at 13 (citing, *e.g.*, *Royal Brush*, 75 F.4th at 1259 n.8). It does not.

16

First, the case that Phoenix relies on, *Royal Brush*, did not address the same issue. In *Royal Brush*, the Federal Circuit held that importers in adjudicative EAPA proceedings enjoy rights to procedural due process. 75 F.4th at 1257-1258 & n.8. However, the Court's specific holding related to the agency disclosing "what evidence is being used against" the defendant. *Id.* at 1258. The Court did not, however, address entitlement to due process before the imposition of interim measures.

As the Supreme Court has explained:

> Due process is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Thus, when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process. On the other hand, when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used.

*Hannah v. Larche*, 363 U.S. 420, 442 (1960). Consistent with this principle, the Supreme Court has repeatedly held that where a preliminary decision by an agency is a step in an administrative proceeding, due process does not require an opportunity to be heard at the preliminary stage, as long as that opportunity is provided before the final administrative decision becomes effective. *See Ewing v. Mytinger & Casselberry,* 339 U.S. 594, 598 (1950) (listing cases). In *Ewig*, for example, the Supreme Court rejected an argument that 21 U.S.C. § 334—which permits the Federal Drug Administration to seize misbranded articles based on "probable cause to believe from facts found, without a hearing" that the misbranded articles are dangerous, misleading, or fraudulently labeled—violated the due process, reasoning that "the administrative finding of probable cause . . . is merely the statutory prerequisite to the bringing of lawsuit," in which the

owner has an opportunity to appear and have full hearing before the court.  *Id.*  This hearing, the

Court concluded, "satisfies the requirements of due process."  *Id.*

Similarly here, although importers are entitled to procedural due process in EAPA

proceedings before CBP reaches its evasion determination, no such right exists before imposition

of interim measures.  Congress explicitly called for CBP to conduct "investigation{s}" and

impose interim measures during the first 90 days of an investigation upon a finding of

"reasonable suspicion" of evasion.  19 U.S.C. § 1517(e).  CBP's regulations provide that CBP

will issue notification of its decision to issue interim measures "no later than five business days

*after* interim measures are taken."  19 C.F.R. § 165.15(d)(1) (emphasis added); 19 C.F.R.

§ 165.24(c).  After CBP imposes interim measures, the EAPA regulations provide parties to the

investigation with a number of opportunities to submit information and arguments.  *See* 19

C.F.R. § 165.23 (procedures for voluntary submission of information); 19 C.F.R. § 165.26

(procedures for submission of written arguments).  And after CBP makes an initial determination

of evasion under 19 U.S.C. § 1517(c), the statute and regulations allow a party who is not

satisfied to request a *de novo* administrative review and allow other interested parties to respond.

19 U.S.C. § 1517(f); 19 C.F.R. §§ 165.41, 165.42.  Consistent with these procedures, Phoenix

submitted (1) written arguments to TRLED, Phoenix Written Arg. to TRLED (Aug. 15, 2022),

P.R. 151 (Phoenix TRLED Arg.); (2) a response to CISPI's written arguments to TRLED,

Phoenix Rebuttal Br. (Aug. 19, 2022), P.R. 154; and (3) written arguments to ORR, Phoenix

ORR Review Req. (Oct. 19, 2022) C.R. 130, P.R. 157 (ORR Review Req.). Therefore, even if

Phoenix had a protected interest (and it does not), the robust statutory and regulatory procedures

provided Phoenix with notice and an opportunity to be heard.

Indeed, this Court has thrice examined whether a due process right exists prior to the imposition of interim measures in ERAPA cases, and has held each time that importers have not stated a legitimate property interest in the interim measure context, in part, because they are temporary. *Diamond Tools Tech. LLC v. United States*, 545 F. Supp. 3d 1324, 1341-42 (Ct. Int'l Trade 2021); *Aspects Furniture Int'l, Inc. v. United States*, 607 F. Supp. 3d 1246, 1273 (Ct. Int'l Trade 2022); *Am. Pac. Plywood, Inc. & LB Wood Cambodia Co., Ltd.*, No. 20-03914, 2023 WL 4288346, at *7-8 (Ct. Int'l Trade June 22, 2023).

In *Diamond Tools*, the Court explained that interim measures are temporary; CBP can extend them only upon a final determination of evasion. *Diamond Tools*, 545 F. Supp. 3d at 1341. The Court reiterated that if CBP found "that no evasion exists, any measures taken in the interim, such as suspension of liquidation or collection of cash deposits, will be lifted and any additional duties or cash deposits paid will be reimbursed to the importer with interest." *Id.* The Court then held that the plaintiff "fail{ed} to state with any particularity that a legitimate property interest exists in the specific context of interim measures." *Id.* The Court did note that "a protected interest may exist" but the plaintiff in *Diamond Tools* failed to identify it. *Id.*

Phoenix attempts to establish due process rights in the interim measures context by relying on *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976), which identifies a three-factor balancing test for determining "whether the administrative procedures provided {in a given case} are constitutionally sufficient," *id.* at 335; however, its attempts are unavailing.

As to the first *Mathews* factor—"the private interest that will be affected by official action," 424 U.S. at 335—Phoenix seems to contend that the mere imposition of interim measures affects its legal and financial rights and, therefore, affords it a protected interest, *see* Pl.'s Br. at 14. It is well-established, however, that a company does not have a constitutionally

protected property interest in any rate of duty, an importation, or even engaging in international trade. *See Int'l Custom Prods., Inc. v. United States*, 791 F.3d 1329, 1337 (Fed. Cir. 2015) (citing, *e.g., Norwegian Nitrogen Prods. v. United States*, 288 U.S. 294, 318 (1933); *A Classic Time v. United States*, 123 F.3d 1475, 1476 (Fed. Cir. 1997); *Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp.*, 751 F.2d at 1250)).

Phoenix also wrongly attempts to impose restrictions on CBP's EAPA authority by applying the rules for Department of Commerce circumvention determinations to CBP's evasion determinations. *See* Pl.'s Br. at 15. Specifically, relying on case law regarding Commerce's regulation (19 C.F.R. § 351.225(l)(2)), Phoenix contends that CBP improperly applied the interim measures "retroactively" to merchandise entered 28 days before the notification of interim measures "in clear violation of the due process notice requirement." *See* Pl.'s Br. at 15. However, the EAPA statute explicitly authorizes CBP to impose interim measures on entries that have entered one year prior to the initiation of the EAPA investigation. 19 U.S.C. § 1517(e)(2) (authorizing CBP to "extend the period for liquidating each unliquidated entry of such covered merchandise that entered before the date of the initiation of the investigation"). Moreover, this Court has rejected the notion that CBP's enforcement authority under the EAPA statute is somehow limited by Commerce's circumvention proceeding. *Diamond Tools*, 545 F. Supp. 3d at 1350-51; *Am. Pac. Plywood*, 2023 WL 4288346, at *7.

Recognizing that "{t}he purpose of the EAPA was to empower the U.S. Government and its agencies with the tools to identify proactively and thwart evasion at earlier stages to improve enforcement of U.S. trade laws, including by ensuring full collection of AD and CVD duties and, thereby, preventing a loss in revenue," the Court in *Diamond Tools* found that requiring CBP to be bound by Commerce's later circumvention timeline "would be contrary to the congressional

intent underlying the EAPA statute and Customs' ability to exercise its statutory authority."
*Diamond Tools*, 545 F. Supp. 3d at 1351.  Imposing rules applicable to Commerce's circumvention proceedings onto CBP's EAPA investigations, as Phoenix advocates, would similarly contravene the purpose of the EAPA.

As to the second *Mathews* factor—"the risk of erroneous deprivation of such interest through the procedures used," 424 U.S. at 335—Phoenix contends that timely notice of the EAPA allegation against it would have allowed Phoenix to mitigate its losses and not incur the cash deposits required pursuant to the interim measures taken.  Pl.'s Br. at 16.  Phoenix's argument fails, because the existing agency procedures sufficiently protect Phoenix's interest (assuming it has one, which it has not shown).  The following context helps put Phoenix's claims into perspective.  Here, Phoenix is complaining about the imposition of temporary, interim measures in the form of cash deposits (which would have been refunded had CBP found no evasion), and notice of such measures within 28 days of CBP's initiation of investigation of Phoenix.  Importantly, the EAPA statute is silent on when CBP must give notice of allegations of evasion filed with the agency, of CBP's decision to initiate an EAPA investigation, and of CBP's imposition of interim measures.  For Constitutional purposes, it suffices that Phoenix have an opportunity to be heard *at some stage* before the determination of evasion regardless of the temporary harm.

As the Supreme Court has aptly stated:

> Take the case of the grand jury. It returns an indictment against a
> man without a hearing.  It does not determine his guilt; it only
> determines whether there is probable cause to believe he is guilty.
> But that determination is conclusive on the issue of probable cause.
> As a result the defendant can be arrested and held for trial. . . . The
> impact of an indictment is on the reputation or liberty of a man. . . .
> The harm to property and business can also be incalculable by the
> mere institution of proceedings. . . . Discretion of any official may

> be abused.  Yet it is not a requirement of due process that there be
> judicial inquiry before discretion can be exercised. . . . *It is*
> *sufficient, where only property rights are concerned, that there is*
> *at some stage an opportunity for a hearing and a judicial*
> *determination*.

*Ewig*, 339 U.S. at 600 (emphasis added) (internal quotation marks and citations omitted).  By the

same logic, as long as Phoenix had an opportunity to be heard at some stage before the evasion

determination—which it did, before the TRLED and the ORR—the requirements of due process

were satisfied.[5]

As to the third *Mathews* factor—"the Government's interest," 424 U.S. at 335—Phoenix

argues that the purpose of EAPA is to "prevent the evasion of AD and CVD Orders," not "to

maximize the Government's revenue" and that "CBP has no justifiable basis not to disclose its

investigative activities to Phoenix, Pl.'s Br. at 19.  Phoenix is yet again wrong.  The EAPA

statute authorizes CBP, as a law enforcement agency, to take aggressive and early action by

imposing interim measures based upon a reasonable suspicion of evasion. 19 U.S.C. § 1517(e).

CBP's responsibility is to protect the revenue so that, as the administrative processes continue,

the Government is not left with uncollectable bills.  Thus, collecting cash deposits and

suspending liquidation – both temporary measures – protect the revenue while the administrative

process proceeds before CBP.

---

[5]  In another apparent attempt to demonstrate a due process right, Phoenix argues that CBP's imposition of interim measures is judicially reviewable pursuant to 5 U.S.C. § 704.  It is unclear how this aids Phoenix's argument to a right to due process, but nevertheless, we acknowledge that this Court has found it possesses jurisdiction to review a challenge to the imposition of interim measures *after the final determination had been issued* because the decision to take interim measures was subsumed into the final determination, which was judicially reviewable. *Am. Pac. Plywood,* 2023 WL 288346, at *5 (citing *Diamond Tools*, 545 F. Supp. 3d at 1331). However, to the extent that Phoenix's argument may be construed as averring that an interim measures decision by CBP is reviewable *prior to* a final determination as to evasion, the Court should reject it as without basis in law.

Although Phoenix may wish to have known about the impending interim measures before imposition, as we demonstrate above, there is no constitutional or statutory requirement that CBP provide such notice. In fact, notice may have very well thwarted the investigation. Indeed, as discussed in the background section, Ms. Li and her companies had a history of engaging in a transshipment scheme, and every time they detected that CBP had imposed interim measures against them, they used corporate shells in an attempt to evade them.[6] *See* Background Section II.B. Ms. Li continued her pattern in the current investigation when, following CBP's imposition of interim measures on Phoenix, another front company, Camellia Casting took over Phoenix's entries to avoid the interim measures. Review Det. at CR12516.

In summary, without establishing a constitutionally protected interest, Phoenix cannot claim that it is entitled to a particular form of procedure. Instead, Phoenix is entitled to only what the EAPA statute or regulations prescribe only. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978); *Gilda Indus., Inc. v. United States*, 446 F.3d 1271, 1283 (Fed. Cir. 2006). Phoenix does not contend that either the statue or regulations require the extra-statutory procedures that it urges the Court to impose. Nor does Phoenix contend that CBP violated any statute or regulation when it imposed the interim measures. Thus, to the extent Phoenix has any such arguments, it has waived them. *Echjay Forgings Priv. Ltd. v. United States*, 475 F. Supp. 3d 1350, 1371 n.7 (Ct Int'l Trade 2020). In any event, as we explained above, and Phoenix itself recognizes, Pl.'s Br. at 37-38, Phoenix did have an opportunity to be heard, and availed itself of that opportunity, before the TRLED and the ORR.

And finally, without establishing any due process right, the Court should decline

---

[6] Lino and Little Fireflies never sought administrative review of CBP's evasion determinations concerning these companies.

Phoenix's invitation to limit CBP's discretion in investigating EAPA allegations. *See, e.g., MidContinent Nail Corp. v. United States*, 949 F. Supp. 2d 1247, 1278 (Ct. Int'l Trade 2013) ("{A}gencies with statutory enforcement responsibilities . . . enjoy broad discretion in allocating investigative and enforcement resources."); *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1394-95 (Fed. Cir. 1997) (explaining Commerce maintains "discretionary authority to determine the extent of investigation and information it needs").

### 2. CBP's Regulations Promulgated To Implement The EAPA Are Valid And Do Not Violate the APA

Phoenix wrongfully contends that (1) CBP's regulations are "invalid" because CBP promulgated them without using the notice-and-comment procedures that the APA mandates; and, alternatively, (2) the regulations are non-binding. *See* Pl.'s Br. at 19-22.

As an initial matter, in making these arguments, Phoenix does not identify any specific provisions that it believes are invalid or non-binding, rendering our ability to respond challenging.[7]  Nevertheless, from reading its arguments in the broader context, we understand Phoenix's arguments to center on the regulations concerning notice of the initiation of the investigation and of the decision to take interim measures. *See generally*, Pl.'s Br. at 19-22; 19 C.F.R. § 165.15(d)(1); 19 C.F.R. § 165.24(c).  To the extent Phoenix is actually challenging any other provisions, then the Court should deem those challenges waived due to Phoenix's failure to develop them. *See Home Prods. Int', Inc. v. United States*, 837 F. Supp. 2d 1294, 1301 (Ct. Int'l Trade 2012) ("{I}ssues adverted to in a perfunctory manner, unaccompanied by some effort at

---

[7]  For example, the APA defines "rule" to mean, in pertinent part, "the whole or a part of an agency statement of general or particular applicability . . . describing the . . .procedure{} or practice requirements{.}" 5 U.S.C. § 551(4).  Thus, it is unclear whether Phoenix is challenging the entirety of the EAPA regulations or specific provisions.  The distinction matters to the analysis.

developed argumentation, are deemed waived. It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (internal quotation marks and citation omitted).

The APA generally requires public notice and opportunity to comment on proposed rule making. 5 U.S.C. § 553(b),(c). However, the statute expressly excludes from this requirement "rules of agency organization, procedure, or practice." *Id.* § 553(b)(4)(A). Courts examining § 553 of the APA refer to rules requiring notice and comment as "substantive rules," which are generally defined as rules "that effect a change in existing law or policy or which affect individual rights and obligations." *Paralyzed Veterans of Am. v. West*, 138 F.3d 1434, 1436 (Fed. Cir. 1998) (citation omitted). Stated differently, "{s}ubstantive rules create new laws, rights, or duties, in what amounts to a legislative act." *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 168 (2d Cir. 2013) (internal quotation marks and citation omitted); *see also Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 50 F.4th 98, 106 (Fed. Cir. 2022) (referring to substantive rules as "legislative rules"); *IPSCO, Inc. v. United States*, 687 F. Supp. 614, 627 (Ct. Int'l Trade 1988) (same). In contrast, procedural rules do not "alter the rights or interests of parties, although {they} may alter the manner in which the parties present themselves or their viewpoints to the agency." *Time Warner*, 729 F.3d at 168 (internal quotation marks and citations omitted). Procedural Rules may also "express the agency's intended course of action . . . or internal house-keeping measures organizing agency activities." *IPSCO, Inc.*, 687 F. Supp. at 627.

Here, CBP published its interim regulations in the Federal Register on August 22, 2016. *Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 56,477, 56,479 (CBP Aug. 22, 2016). Therein, CBP explained that, pursuant to 5 U.S.C.

§ 553(b)(a), the notice and comment procedures of the APA were not required because "{t}he substantive provisions of the EAPA have been established by Congress, and these regulations set forth the procedures for implementing the statute and do not include substantive requirements." *Id.* at 56,481.[8]  On this basis, and rejecting the very arguments that Phoenix advances, this Court has previously held that CBP's regulations are valid, explaining that they are procedural and therefore exempt from the APA notice-and-comment requirements.  *Am. Pac. Plywood,* 2023 WL 4288346, at *6.  The Court further explained that "an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties."  *Id.* (quoting *James V. Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000) (cleaned up)).

In an apparent attempt to rebut that point, Phoenix claims that the EAPA regulations "depart from past practice and have a substantial impact on those regulated."  Pl.'s Br. at 20-21.  Phoenix compares CBP's actions here to CBP's investigations under 19 U.S.C. § 1509, and to Commerce's and the U.S. International Trade Commissions' actions in investigations under the AD/CVD law.  *Id.*  Phoenix's analogy, however, is misplaced given that the EAPA statute is silent on the methods governing notice, thereby leaving considerable discretion to CBP in investigating EAPA allegations.  *See* 19 U.S.C. § 1517(c)(2) (broadly authorizing CBP to "collect such additional information as is necessary to make the determination through such methods {CBP} considers appropriate").

Phoenix also claims that the "EAPA statute itself includes *no such delayed deadlines* for

---

[8]  Although it was not required to, CBP did request public comments to be submitted by October 21, 2016, 81 Fed. Reg. at 56,477, and later extended this deadline to December 20, 2016, *Investigation of Claims of Evasion of Antidumping and Countervailing Duties*, 81 Fed. Reg. 72,6921 (CBP Oct. 21, 2016).  CBP did not issue a final rule addressing any comments it may have received; nevertheless, it was not required to under the APA.

giving notice to interested parties of the initiation" of investigation or decision to take interim measures. Pl.'s Br. at 19 (emphasis added). Yet, Phoenix fails to identify any provision in the EAPA entitling it to such notice at any particular time. Phoenix cannot, because none exists. Simply stated, the EAPA regulations do not affect a change in existing law. The EAPA statute requires CBP to (1) initiate an investigation within 15 calendar days if CBP determines that information reasonably suggests that covered merchandise has been entered into the United States through evasion, and (2) within 90 calendar days after initiating an investigation, make an initial determination of reasonable suspicion of evasion and, if determines so, issue interim measures. 19 U.S.C. § 1517(b)(1),(e). The statute does not guarantee notice of either action to the target of the investigation at any particular time. Nor does the statute excuse the target from fulfilling its obligations to comply with the interim measures - i.e., to post a cash deposit – unless the target received notice at a particular time. CBP explained when promulgating the regulations that its notification timeframes "take{} into account the dual considerations of transparency and the need to provide adequate time for CBP's investigatory process." *Id.* at 81 Fed. Reg. at 56,480. Phoenix simply fails to establish that CBP's EAPA regulations concerning the notice timeframes in these investigatory steps are substantive. *See IPSCO, Inc.*, 687 F. Supp. at 627 (procedural rules "express the agency's intended course of action," i.e., when it will provide notice); *Time Warner*, 729 F.3d at 168 (procedural rules "may alter the manner in which the parties present themselves or their viewpoints to the agency.").

Phoenix alternatively argues that if the EAPA regulations are not substantive, then they are not binding. Pl.'s Br. at 20, 22. This argument is puzzling because what Phoenix advocates is for the Court to hold that CBP's regulations (aimed at establishing time frames for providing notice of the initiation of investigation and of the decision to impose interim measures) are non-

binding.  It is unclear how this benefits Phoenix, considering that neither the Constitution nor the EAPA entitle it to notice of either action at any earlier time, as we established above.  To the extent Phoenix is complaining about actually having to comply with the interim measures, then that is a requirement under the statute.  19 U.S.C. § 1517(e).

### B.    Phoenix Concedes That If The Court Is Unpersuaded By Phoenix's Other Arguments, Any Remand To Require The Agency To Disclose Confidential Information Would Be Futile

Phoenix argues that it was deprived of due process by the lack of access to confidential business upon which CBP relied to support its determination as to evasion.  Pl.'s Br. at 23-26.  Specifically, Phoenix relies on *Royal Brush* to argue that it has a constitutional right to access certain confidential information during the administrative proceedings.  *Id.* at 24-25.  Phoenix suggests but does not argue that access to such information would have impacted its actions during the administration proceeding and thus requests that the Court remand with instruction to CBP to provide the full record to Phoenix.  *See id.* at 25.

In *Royal Brush*, the Federal Circuit held that in EAPA proceedings, "due process includes the right to know what evidence is being used against one."  75 F.4th at 1258 (internal quotation marks and citation omitted).  Further, the Court held that a violation of this procedural due process right is not subject to a harmless analysis.  *Id.* at 1262.  However, the Court left room for exceptions.  *Id.* (citing *Tenn. Secondary Sch. Athletic Ass'n v. Brentwood Acad.*, 551 U.S. 291, 303 n.4 (2007)).

Earlier in this litigation, the Government moved for voluntary remand, arguing in part that certain business confidential information was not provided to Phoenix during the course of the administrative proceeding and, thus, under the holding in *Royal Brush* that "due process includes the right to know what evidence is being used against it," 75 4th 1258, a remand was

appropriate to provide that information to Phoenix, Def.'s Partial Consent Mot. For A Vol. Remand at 3, ECF No. 32.  Notably, by the time our motion for voluntary remand was filed, Phoenix had access to the business confidential information that it previously did not.  Phoenix opposed our motion for voluntary remand, arguing that, even after Phoenix's counsel had reviewed the confidential information, it would be futile to remand.  Pl.'s Resp. to Def.'s Mot. For A Vol. Remand at 2, ECF No. 35 ("This is a hollow request . . . ."); *id.* at 3 (arguing the government's remand request was "frivolous"); *id.* (arguing that there is no need for remand, which would only unnecessarily delay proceedings).  Specifically, Phoenix contended that the alleged due process violation would exist without regard to whether the case was remanded, and the request was futile because Phoenix already had obtained the relevant documents during the present litigation.  *Id.* at 3.  Thus, unlike in *Royal Brush* where the party argued that it could not meaningfully defend itself against the allegations of evasion without access to those documents at the administrative level, it is clear here that Phoenix's asserted "due process" claim is divorced from actual access to the information.

Accordingly, Phoenix appears to have waived its argument and to concede that if the Court is unpersuaded by all other arguments Phoenix raises, a remand merely to provide it access to confidential information would be an exercise in futility.  *See, e.g. Domka v. Portage County, Wisc.*, 523 F.3d 776, 781 (7th Cir. 2008) ("It is without question that an individual may waiver his or her procedural due process rights."); *Cf. Goodluck India Ltd. v. United States*, No. 22-00024, 2023 WL 8078148, at *20 n.17 (Ct. Int'l Trade Nov. 21, 2023) (explaining "any due process violation was harmless" and would not have affected the ultimate determination, and finding the alleged due process violation distinguishable from *Royal Brush*).

C.     **CBP Lawfully And Appropriately Conducted The Verification**

Despite stating in its written arguments to TRLED that Phoenix "was impressed by and appreciated . . . all the officers' professionalism and endurance" during the verification, Phoenix TRLED Arg. at PR06240, Phoenix now spends considerable time in its opening brief trying to blame CBP for purportedly creating an atmosphere of "chaos," fear, and mistrust during the verification, *see* Pl.'s Br. at 9, 20-28. These are unfounded accusations and do not entitle Phoenix to relief here. CBP lawfully and appropriately conducted its verification of Phoenix.

In pertinent part, the EAPA empowers this Court to determine whether CBP's evasion "determination and review is conducted in accordance with subsections (c) and (f)." 19 U.S.C. § 1517(g)(1). Subsection (c)(2) grants CBP broad discretion to determine the scope and means of the investigation, including authority to collect and verify any information it deems necessary to make its evasion determination. 19 U.S.C. § 1517(c)(2). It explicitly provides that "the Commissioner {of CBP} may collect such additional information as is necessary to make the determination through such methods as the Commissioner considers appropriate, including by . . . conducting verifications, including on-site verifications, of any relevant information." *Id.* Phoenix fails to demonstrate that CBP violated 19 U.S.C. § 1517(c) in its verification of Phoenix, and presents no concrete evidence to support its assertion that CBP inappropriately conducted the verification visit and failed to accurately record its observations or conversations with Ms. Li in the verification report.

First, subsection (c)(2) places no bounds on CBP as to how many verifiers it may bring to an on-site verification, whether it has to identify the function of each verifier to the target of the investigation, whether it has to arrange its interviews of factory employees in any particular way, or whether it has to identify by name in the verification report which verifier did what, as

Phoenix seems to suggest.  *See* Pl.'s Br. at 27, 30, 32.

Second, "{i}n the absence of clear evidence to the contrary," CBP officers are presumed to "have properly discharged their official duties."  *Jazz Photo Corp. v. United States*, 439 F.3d 1344, 1351 (Fed. Cir. 2006); *Ford Motor Co. v. United States*, 286 F.3d 1335, 1340 (Fed. Cir. 2002).  Phoenix's subjective claims—that Ms. Li "was afraid of CBP's ultimate intentions" and "had every right to be cautious" because one of the verifiers on CBP's attendance list was an agent of Homeland Security Investigations, which is "tasked with investigating transnational crime"—do not overcome this presumption.  Pl.'s Br. at 27-28.  To the contrary, they may only suggest that Ms. Li harbored some guilty conscience.  *Cf. United States v. Johnson*, 954 F.3d 1106 (8th Cir. 2020) (evidence that defendant was nervous when questioned by county sheriff's deputy during traffic stop and expressed reservations about deputy searching the van was an indication of a guilty conscience that he knew there was cocaine in the van's spare tire).

Likewise, Phoenix's complaints about the number of verifiers present at verification is unjustified given that CBP notified Phoenix in advance that it should expect up to eight CBP officials at the verification, and CBP is not limited in this regard by statute, regulation, or otherwise.  Review Det. at CR12514; Verif. Letter at CR11768.  Moreover, Phoenix's claims that CBP "did not prepare an interview situation in which the employees felt safe," Pl.'s Br. at 32-33, is false.  At verification, Ms. Li accused CBP's verification team of being spies, was "agitated and angry," refused to provide documents to CBP, interrupted CBP's interview of a factory worker, and spent "an hour shouting" at the verification team on one day.  *See* Verif. Report at CR12363, CR12365, CR12368.  Given their employer's irate and suspicious attitude, it is reasonable that Ms. Li's employees were afraid to answer CBP's questions in front of her.  *See* Review Det. at CR12515 (observing that Ms. Li's behavior "may have contributed to the

employees' observed unease").

Third, CBP's documentation requests to Phoenix during the verification were entirely reasonable and necessary to verify Phoenix's production capacity. *See* Verif. Letter. Phoenix avers that CBP's collection efforts were "spontaneous and went beyond identifying information already on the record" and identifies two instances when the verification team: (1) "noticed a clipboard on a shelf with an uncompleted sheet of paper titled 'Phoenix Metal Co., Ltd' and 'Daily Report of Material,'" which it requested to review but "Ms. Li's assistant removed it," Pl.'s Br. at 28 (quoting Verif. Report at 5); and (2) requested daily spreadsheets of pipes produced for the EAPA scope period, *id.* at 29 (citing Verif. Report at CR12368-CR12369).

Regarding the clipboard, the verification report explains that CBP was unable to compute Phoenix production capabilities because Phoenix did not provide it the pertinent production documents, such as bill of materials to confirm the adequacy of the raw materials, even though Phoenix had stated in its RFI responses that it maintains those documents. Verif. Repoort at CR12368. A factory worker confirmed to CBP that production records are maintained by stating that he records daily production of pipes at the end of his shift. *Id.* The blank spreadsheet on the clipboard that CBP had observed was titled "Daily Report of Material," which, after CBP received a copy, confirmed daily recording of raw material usage. *Id.* at CR12364, CR12368.

Regarding the spreadsheets, the verification report further explains that the verification team "informed Ms. Li of the importance of the production records and she eventually showed {them} a file which included daily spreadsheets of pipes produced, weight per pipe, and total weight for the day." *Id.* at CR12368. However, when the team requested the spreadsheet for the EAPA scope period, Ms. Li "became agitated and angry, and refused to provide {them} with the spreadsheets, saying {CBP} would use the spreadsheets against her." *Id.* at CR12368-CR12369.

Despite "several more requests for documents" and explanations to Phoenix that the verification team was "unable to compute production with the documents provided thus far," Ms. Li still refused to give them the production spreadsheets. *Id.* at CR12369. In its brief, Phoenix avers that "Ms. Li's caution appears to be appropriate in light of the atmosphere of mistrust between CBP and Phoenix personnel . . . Nevertheless, *after verification* Phoenix offered these sheets to CBP along with other verification exhibits," but "at that time CBP refused to accept {them}." Pl.'s Br. at 29 (emphasis added). Apparently, Ms. Li's "mistrust" that CBP "would use the spreadsheets against her" was alleviated after she had nearly two weeks outside the presence of CBP personnel to decide to produce them. *See id.* (citing June 28, 2022 Email).

Fourth, contrary to Phoenix's claims, CBP was not able to verify Phoenix's production capability. *See* Verif. Report at CR12361-CR12375; Review Det. at CR12511-CR12516. In a bold, conclusory assertion that is flatly contradicted by the very document which it cites, Phoenix contends that "in the end, CBP confirmed all record information on Phoenix's production process and employment." Pl.'s Br. at 33 (citing Verif. Report at CR12365-CR12366); *see also id.* at 27 (citing Verif. Report at CR12363-CR12366). The cited pages of the verification report reveal the contrary. For example, CBP could not verify that Phoenix purchased the production machinery it claimed it used to produce the soil pipe. Verif. Report at CR12363; *see also* Review Det. at CR12515 & n.120. And, when interviewing Phoenix's "Production Manager," the verification team learned that he lives in China and "comes to the Phoenix Metal facilities one week every half year." Verif. Report at CR12365. Moreover, the employment agreement for this Production Manager [██████████████████████████████████████

██████████████████████████████████████████████████████

████████]. *Id.*; *see also* Pl.'s Br. at 31.

In the same realm, Phoenix also argues that the documents provided by the Ministry during CBP's verification visit "constitute unshakeable and substantial evidence of Phoenix's raw material purchases and production of {soil pipe}." Pl.'s Br. at 33. ORR squarely addressed this point. *See* Review Det. at CR12513. ORR explained that the Ministry did not detail, and the documents did not demonstrate, the Ministry's verification process for CBP to accept the documents as proof of Phoenix's production capacity. *Id.* at CR12513; *see also* Verif. Report at CR12374. Indeed, as the verification report explains, the Ministry's documents only raised further concerns because they showed that Phoenix had not provided full RFI responses to CBP and had made sales that it had not reported to CBP. Verif. Report at CR12375.

In conclusion, CBP lawfully and properly conducted its verification of Phoenix, and Phoenix offers nothing but baseless, self-serving assertions in an attempt to rebut this fact.

### D. Due To Its Failure To Exhaust Its Administrative Remedies, Phoenix Has Waived Its Argument That It Has A Right To Rebut New Factual Information; In Any Event, Phoenix's Arguments Lack Merit

Phoenix argues that (1) CBP's verification report contains new factual information; and, accordingly, (2) Phoenix was entitled to rebut that information. Pl.'s Br. at 34-37. As an initial matter, Phoenix has failed to exhaust its administrative remedies with respect to these arguments, and has therefore waived them. Even if the Court were to entertain them, which it should not, these arguments lack merit.

"{N}o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998)); *accord AIMCOR v. United States*, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998) ("A party is required to exhaust administrative remedies before seeking judicial

action."). "Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred *against objection made at the time appropriate under its practice*." *Mittal Steel*, 548 F.3d at 1383-84 (emphasis in original, citation omitted). The Federal Circuit has emphasized that parties must exhaust their arguments in accordance with agency regulations on pain of waiver. *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (discussing Commerce's regulations, 19 C.F.R. § 351.309(c)(2)); *Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) (same).

The EAPA regulations require that "each request for review must set forth the . . . argument expressing clearly and accurately the points of fact and of law presented and citing the authorities and statutes relied on." 19 C.F.R. § 165.41(f)(5). However, Phoenix did not make its arguments about a right to rebut purportedly new factual information at the appropriate time before ORR. *See* ORR Review Req. at CR12472- CR12498. Phoenix cannot challenge the final determination by ORR based upon arguments that it never made to that administrative body. *See, e.g.*, *Mittal Steel*, 548 F.3d at 1383-84; *Corus Staal*, 502 F.3d at 1379. The EAPA regulations provide that CBP "may request additional written information from the parties to the investigation at any time during the review process." 19 C.F.R. § 165.44. If Phoenix had exhausted its administrative remedies before the ORR and if ORR did agree with Phoenix, then ORR could have requested that Phoenix re-submit the rejected submission. *See* 19 C.F.R. § 165.44.

Even if the Court were to entertain Phoenix's arguments, which it should not, they nevertheless lack merit. According to Phoenix, the verification report contains new factual information because it includes: the verifiers' observations on the condition of Phoenix's

factories, information obtained from interviews with Phoenix employees, and observations

concerning Ms. Li's demeanor (i.e., she was "agitated and angry, and refused to provide us with

the spreadsheets, saying we would use the spreadsheets against her.").  Also, according to

Phoenix, it tried twice to submit rebuttal information, but CBP rejected it.  Pl.'s Br. at 35-36.

Phoenix reasons that it should be allowed to place rebuttal information on the record because: (1)

it has a due process right to do so; (2) the deadline set forth in 19 C.F.R. § 165.23(c)(2) for

voluntary submission of information was inapplicable here because that deadline passed before

the verification took place[9]; (3) any attempt by Phoenix to comply with 19 C.F.R.

§ 165.23(c)(1)—which permits parties 10 calendar days to provide rebuttal information when

CBP "places new factual information on the administrative record"—futile; and (4) CBP's

EAPA regulations on time limits for submission of information are not binding.  *Id.* 34-37.  We

address each contention in turn.

        Phoenix's interpretation of "new factual information" as set forth in 19 C.F.R.

§ 165.23(c)(1) would render superfluous 19 C.F.R. § 165.25(b), the regulation governing placing

verification information on the administrative record.  Pursuant to 19 C.F.R. § 165.25(a), "CBP

may in its discretion verify information in the United States or foreign countries collected under

§ 165.23 as is necessary to make its determination" and, pursuant to 19 C.F.R. § 165.25(b), CBP

is authorized to "place any relevant information on the administrative record{.}"  Based on a

plain reading, 19 C.F.R. § 165.25(b) governs information related to the verification such as the

verification report.  The information that Phoenix would have this Court deem "new factual

---

[9] Phoenix cites 19 C.F.R. § 165.23(c)(1); however, that provision concerns response to CBP's requests for factual information, not voluntary submission of factual information.  That Phoenix means to cite 19 C.F.R. § 165.23(c)(2) is evident by the email that it cites, CBP Email to Phoenix (Aug. 11, 2022), P.R. 150) (setting forth the June 8, 2022 deadline), and the document upon which the email relied, CBP Email to Parties (May 31, 2022), P.R. 121 (May 31, 2022 Email).

information" under 19 C.F.R. § 165.23(c)(1) is the same verification report that CBP placed on the record pursuant to 19 C.F.R. § 165.25(b). This is demonstrated by the fact that, according to Phoenix, any observation made during verification and included in the verification report is new factual information. In essence, Phoenix asks this Court to create a bright line rule that anytime CBP conducts a verification, all observations in the report constitute new factual information. This includes observations concerning discrepancies in the documentation or RFI responses. This is unreasonable.

To "verify' means "{t}o prove to be true; to confirm or establish the truth or truthfulness of; to authenticate." VERIFY, Black's Law Dictionary (11th ed. 2019). And to "authenticate" means "{t}o prove the genuineness of (a thing); to show (something) to be true or real." AUTHENTICATE, Black's Law Dictionary (11th ed. 2019). CBP observing the functionality of Phoenix's machines, interviewing Phoenix's Production Manager, and requesting production documents (which its owner refused to provide)—all aimed at verifying that Phoenix has the production capabilities to produce the soil pipes it claimed it produces, while all along noting discrepancies in Phoenix's RFI responses and documentation—fall plainly within those definitions. Thus, the resulting information recorded in the verification report does not constitute new factual information.

Phoenix's reliance on *Royal Brush* is misplaced because Phoenix ignores that, in *Royal Brush*, CBP expressly stated that its evasion determination was based on "*information obtained at verification*." 75 F.4th at 1263 (emphasis in original). In other words, CBP relied on new factual information in making its evasion determination. *Id.* In contrast, here, CBP did not rely on any new numerical data or otherwise new factual information obtained at verification. CBP relied on the results of the verification itself, i.e., inability to confirm the truthfulness of

Phoenix's RFI responses that it actually can and does produce all the soil pipes it claims it did. *See, e.g.*, Review Det. at CR12511-CR12516.

Phoenix's additional citations in its brief further demonstrate that CBP did not rely on new factual information as contemplated in *Royal Brush*. In particular, Phoenix relies on case law (cited in *Royal Brush*) that prohibits *ex parte* communication, but confusingly, Phoenix does not elaborate how CBP's communication *with Phoenix's owner and employees* amounts to "*ex parte*" communication. Pl.'s Br. at 35 (citing *Ward v. U.S. Postal Serv.*, 634 F.3d 1274, 1279 (Fed. Cir. 2011) for the proposition that there must be "opportunity to respond" where a "deciding official received new and material information by means of ex parte communications").

Phoenix misleadingly argues that it "tried twice to submit new factual information to rebut CBP's on-site verification and verification report." Pl.'s Br. at 35. Phoenix's first attempt was not rebuttal information but information it explicitly refused to provide at verification. Phoenix admits that it tried to "submit{} daily production reports *that CBP requested during verification*." *Id.* (emphasis added); *see also id.* at 29. To be clear, the "daily production reports" that Phoenix is referencing were the spreadsheets that CBP repeatedly requested Ms. Li to provide during verification, but she adamantly refused "saying {CBP} would use the spreadsheets against her." Verif. Report at CR12368-CR12369. As the verification report explains, despite "several more requests for documents" and explanations to Phoenix that the verification team was "unable to compute production with the documents provided thus far," Ms. Li still refused to give them the production spreadsheets. *Id.* at CR12369. In rejecting Phoenix's belated submission, CBP reasonably explained that because it did not review the documents at verification, it was removing them from the administrative record. June 28, 2022

Email.  Phoenix makes no attempt whatsoever to establish that this belated submission was lawful.  Again, Phoenix is requesting a bright line rule that any time a target of an investigation adamantly refuses to cooperate during a verification and CBP notes those observations in the verification report, the target should have carte blanche ability to submit new factual information that it deliberately withheld during verification.  This would only encourage non-cooperation and frustrate CBP's ability to conduct verifications and timely complete investigations.

As to Phoenix's second attempt— the written argument it attempted to submit to TRLED on August 11, 2022, but which TRLED rejected and removed from the record—Phoenix heavily implies in its brief that its submission focused on rebutting CBP's observations with respect to Ms. Li and the verification of Phoenix's old and new production facilities, including machinery, equipment, and production reports.  *See* Pl.'s Br. at 34 (defining what it claims "new information"); *id.* at 35-36.  However, the rejected submission challenges no such items.  *See* Ex. B (rejected submission);[10] CBP Email to Phoenix (Aug. 11, 2022), P.R. 150 (Aug. 11, 2022 Email) (a reference list on what items were struck from the submission as new factual information).  Instead, it contained largely irrelevant information that, even if accepted, likely would not have resulted in any meaningful difference.  *See Aspects Furniture*, 607 F. Supp. 3d at (sustaining CBP's rejection from the record of two untimely affidavits in part because "the facts in the affidavits do not appear to be the type of information that, if considered, likely would have resulted in the agency reaching a different conclusion").

Finally, each of the justifications provided by Phoenix as to why it is entitled to provide

---

[10]  Because CBP rejected this submission, it did not place it on the record.  To assist the Court in evaluating this argument, we are providing the rejected submission as Exhibit B to this brief, with an accompanying declaration as Exhibit A.

rebuttal information fails.  First, as we explained above, *Royal Brush* is inapposite here.  In any

event, Phoenix misleadingly argues that the court in *Royal Brush* found, in the context of a right

to rebut new factual information, that the right "has constitutional dimensions."  Pl.'s Br. at 36

(quoting *Royal Brush*, 75 F. 4th at 1263).  To the contrary, Royal Brush specifically stated,

"{w}e need not reach the constitutional question of a right to rebuttal because we conclude that

the regulations themselves provide the right to rebut because CBP relied on new factual

information." 75 F. 4th at 1262.  Here, as also explained above, Phoenix was not entitled under

the regulations to provide the purported rebuttal information.  Second, it is true that the deadline

set forth in 19 U.S.C. § 165.23(c)(2) for voluntary submission of information had passed before

the verification took place.[11]  May 31, 2022 Email.  There is good reason for that.  The point of

verification is to verify information "collected under § 165.23," which includes RFI responses

and new factual information.  19 C.F.R. §§ 165.25, 165.23.  That the deadline for voluntary

information had already passed only underscores why Phoenix's voluntary submission was

untimely.

　　　　Third, 19 C.F.R. § 165.23(c)(1) does not apply because, as we established above, CBP

did not place new factual information on the record, which Phoenix had the right to rebut.  In any

event, even if the regulation applied, Phoenix admits that its submission was late and seeks

forgiveness from the Court because attempting to comply with the regulation's deadline "would

have presumably been futile."  Pl.'s Br. at 36.  That is not a valid basis.  If Phoenix made a

calculated decision during the administrative proceedings, it should be bound by it.

---

[11] Pursuant to 19 C.F.R. § 165.23(c)(2), the standard deadline for parties to submit voluntary new factual information is 200 days from the initiation of an EAPA investigation.  On March 21, CBP extended the deadline for the submission of voluntary new factual information in these consolidated investigations to June 8, 2022.  May 31, 2022 Email.

Nevertheless, CBP was forgiving because it did allow Phoenix to submit its written argument, despite it being a day late.  *See* Aug. 11, 2022 Email.

Fourth, Phoenix's argument that the EAPA regulations establishing time limits for submission of information are not binding is unavailing.  Phoenix advocates that it should be the parties to the investigation, rather than CBP, that choose how or when to submit information. That is contrary to the EAPA's mandate and common sense.  *See* 19 U.S.C. § 1517(c)(2).  When reviewing determinations by CBP, "absent constitutional constraints or extremely compelling circumstances," this Court "will defer to the judgment of an agency regarding the development of the agency record."  *See PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 760 (Fed. Cir. 2012) (explaining the Court's role in reviewing Commerce's antidumping duty administrative determinations).  "To do otherwise would 'run the risk of propelling the courts into the domain which Congress has set aside exclusively for the administrative agency.'"  *Id.* (quoting *FPC v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)); *see also Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) (reversing order instructing Commerce to consider extra-record information because "the trial court's order usurps agency power, undermines Commerce's ability to administer the statute entrusted to it, contradicts important principles of finality, and discourages compliance").  Additionally, CBP is under strict statutory deadlines to initiate and resolve EAPA investigations.  Adopting Phoenix's position would be preposterous – the agency would have no control over or ability to fulfill its statutorily imposed deadlines while still accepting information from parties at any time the parties so decide to submit, no matter how late in the administrative process.  Thus, the Court should not disregard the judgment of the agency to appease Phoenix's own non-cooperation during the investigation.

41

E.    **CBP Did Not Act Arbitrarily Or Capriciously Or Abuse Its Discretion In Determining That Phoenix Failed To Comply With Its Investigation And Its Decision Is Supported By Substantial Evidence**

Phoenix contests CBP's determination to apply an inference that all of Phoenix's entries subject to this EAPA investigation contained soil pipe from China.  Pl.'s Br. at 34-45; *see also* Review Det. at CR12519.  However, Phoenix fails to explain that, in doing so, CBP acted arbitrarily or capriciously, abused its discretion, or made a decision that was unsupported  by substantial evidence.

As a preliminary matter, it is important to note that, "even without the application of an adverse inference," CBP determined, and the record supports, that "substantial evidence of evasion exists."  Review Det. at CR12517-12518.  For example, a critical piece of evidence upon which CBP relied to make its evasion determination is the undisputed relationship between Phoenix and Camellia Casting, whom Phoenix used as a front company in attempt to evade the interim measures issued against Phoenix.  Review Det. at CR12516.  Phoenix does not even mention, let alone, challenge CBP's finding.  *See* Review Det. at CR12511-CR12517.  Thus, to the extent Phoenix has such challenges to make, it has waived them.  *Echjay*, 475 F. Supp. 3d at 1371 n.7.

Additionally, Phoenix fails to engage with the actual analysis supporting ORR's finding that Phoenix failed to cooperate to the best of its ability to comply with requests for information.  ORR conducted a *de novo* administrative review in this case and concluded that Phoenix failed to cooperate to the best of its ability when it: it refused to provide requested production and bank documents; failed to disclose its relationship to Camellia Casting; falsely claimed that the "finished soil pipe" that was imported from China to Cambodia was not the same soil pipe that Phoenix entered into the United States without paying AD/CVD duties.  Review Det. at

CR12511, CR12514, CR12514, CR12517, CR12519.  Although Phoenix's arguments touch on

some of these points, they largely amount to disagreements with how CBP weighed the evidence,

and that is an insufficient basis for remand.  *See, e.g.,* Am. Pac. Plywood, 2023 WL 4288346, at

*9 ("Plaintiffs . . . have not established that Customs had to review the evidence in the way they

would prefer.").

CBP may apply an adverse inference against a party that "has failed to cooperate by not

acting to the best of the party or person's ability to comply with a request for information."  19

U.S.C. § 1517(c)(3)(A).  While not disputing that it failed to provide specific document requests,

Phoenix spends a portion of its brief questioning the relevance of CBP's requests and averring

that the documents that Phoenix did submit should have been sufficient.  *See* Pl.'s Br. at 38-39.

However, it is not up to Phoenix "to decide which information and questions are necessary to the

investigation."  *CEK Grp. LLC v. United States*, 633 F. Supp. 3d 1369, 1379 (Ct. Int'l Trade

2023).

Regarding failure to provide bank records, as both TRLED and ORR explained, the

reason underlying the request for bank statements was to both demonstrate that Phoenix's

customers paid for the soil pipe and that Phoenix actually owned the HiCreek machinery that it

claimed it had purchased.  Review Det. at CR12515- CR12516; Final Det. at CR12449.  Phoenix

claims that no such substantiating documentation was necessary for the machinery because "CBP

spent four days at HiCreek's facilities confirming that Phoenix was in possession of machinery

and raw materials for {soil pipe} production."  Pl.'s Br. at 39.  However, the fact that the

verifiers observed machines in operation at the time of the visit does not obviate the need for

credible, substantiating documentation to show when the machinery was purchased and whether

it was in operation at the time of the period of investigation.  Final Det. at CR12458.  Further, as

ORR explained, there was "also insufficient evidence to find that Phoenix did not own HiCreek's machinery . . . {and} facilities prior to starting Phoenix{.}" Review Det. at CR12516. As a reminder to the Court, CBP had already determined that HiCreek was evading the AD/CVD Orders, an issue that is undisputed. EAPA 7454 at CR00185; Final Det. at CR12431.

Grasping at straws, Phoenix argues that this Court does not require "multiple cross checks" and does not condone an agency's reliance on "isolated, and ultimately immaterial, tidbits of the record." Pl.'s Br. at 39. Again, Phoenix misses the point because the sole issue is not whether Phoenix's customers paid Phoenix, but includes whether Phoenix had the processing capacity during the period of investigation to produce the amount and size of soil pipe that it claimed to have produced.

Regarding the "finished soil pipe," Phoenix next argues that CBP's speculates that the raw materials imported by Phoenix from China may have been soil pipe and soil pipe fittings due to the descriptions on the invoices. Pl.'s Br. at 40. Phoenix provided bills of lading showing that it purchased and imported orders of "steel pipe" of unknown sizes from China into Cambodia. TRLED and ORR noted that "steel pipe" can mean "finished soil pipe" in Khmer, and Phoenix did not dispute this. Final Det. at CR12454- CR12455; Review Det. at CR12512. Instead, it unpersuasively argued that the pictures of scrap iron it provided was the imported steel pipe rather than soil pipe. *Id.* As ORR noted, Phoenix failed to link the pictures of this "scrap" or various pieces of pipe, to bills of lading or any other materials; "pictures are not probative without any linkage between the pictures and the bills of lading." Review Det. at CR12512. ORR also explained that "it is illogical that scrap iron and steel would be imported under the label of steel *pipe*." *Id.* (emphasis in original). Moreover, this argument does not explain where or how any [█] {soil pipe} Phoenix entered into the United States was manufactured." *Id.*

(emphasis in original).

In conclusion, Phoenix does not support its challenge to CBP's finding of a failure to cooperate with anything other than excuses, insufficient explanations, and invitation for the Court to reweigh the evidence.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny Phoenix's motion for judgment on the agency record, sustain CBP's evasion determination, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Franklin E. White, Jr.
FRANKLIN E. WHITE, JR.
Assistant Director

s/Liridona Sinani
LIRIDONA SINANI

OF COUNSEL:                         Trial Attorneys
                                    Commercial Litigation Branch
NICOLAS A. MORALES                  Civil Division
CHELSEA A. REYES                    U.S. Department of Justice
Attorneys                           P.O. Box 480
Office of Chief Counsel             Ben Franklin Station
U.S. Customs and Border Protection  Washington, DC 20044
                                    Telephone:    (202) 353-2188
                                    Facsimile:    (202) 307-0972
                                    Email:        Liridona.Sinani@usdoj.gov

February 16, 2024                   *Attorneys for Defendant*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE GARY S. KATZMANN, JUDGE

_____
                                        )
PHOENIX METAL CO., LTD.,                )
                                        )
                       Plaintiff,       )
          v.                            )
                                        )
UNITED STATES,                          )
                                        )    Court No. 23-00048
                       Defendant,       )
          and                           )
                                        )
THE CAST IRON SOIL PIPE INSTITUTE,      )
                                        )
                       Defendant-Intervenor.  )
_____  )

## ORDER

Upon consideration of plaintiff's motion for judgment on the agency record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is denied, and it is further

ORDERED that the final determination of the U.S. Customs and Border Protection is sustained in its entirety, and it is further

ORDERED that judgment is entered in favor of the United States.


Dated _____        _____
       New York, N.Y.                              Judge

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that this brief contains 13,893 words.  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

*/s/Liridona Sinani*
LIRIDONA SINANI