**Slip Op. 24-68**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| PHOENIX METAL CO., LTD., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Jane A. Restani, Judge |
| Defendant, | Court No. 23-00048 |
| and | |
| CAST IRON SOIL PIPE INSTITUTE, | |
| Defendant-Intervenor. | |

**<u>OPINION</u>**

[The court sustains Customs' final determination and final administrative decision pursuant to the Enforce and Protect Act finding evasion of duties on Cast Iron Soil Pipe.]

Dated: June 10, 2024

<u>Gregory S. Menegaz</u> and <u>Vivien Jinghui Wang</u>, deKieffer & Horgan, PLLC, of Washington, DC, argued for the plaintiff, Phoenix Metal Co., LTD. With them on the brief were <u>Alexandra H. Salzman</u> and <u>Judith L. Holdsworth</u>.

<u>Liridona Sinani</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Franklin E. White, Jr.</u>, Assistant Director. Of counsel on the brief were <u>Nicolas A. Morales</u> and <u>Chelsea A. Reyes</u>, Office of Chief Counsel, U.S. Customs and Border Protection.

<u>Nicholas J. Birch</u>, Schagrin Associates, of Washington, DC, argued for the Defendant-Intervenor, the Cast Iron Soil Pipe Institute. With him on the brief was <u>Roger B. Schagrin</u>.

Restani, Judge: Importer of cast iron soil pipe ("CISP") Phoenix Metal Co., LTD.

("Phoenix") challenges the final determination and final administrative decision made by the

United States Customs and Border Protection ("CBP"). Phoenix asserts that CBP's evasion

determination was not supported by substantial evidence, that CBP's verification procedures were arbitrary and capricious, that CBP's application of adverse inferences to Phoenix was arbitrary and capricious, and that CBP violated Phoenix's due process rights at several stages of the investigation. Pl.'s Rule 56.2 Mem. in Supp. of Mot. J. Upon the Agency R. at 1–2, ECF No. 31 (Aug. 9, 2023) ("Phoenix MSJ Brief"); Compl. at 9, 14–15, ECF No. 5 (Mar. 2, 2023) ("Compl.").[1] The United States ("Government") refutes these claims and asks the court to sustain CBP's evasion determination. Def.'s Resp. in Opp. to Pl.'s Mot. for J. on the Agency R. at 1, ECF No. 44 (Feb. 20, 2024) ("Gov. Brief").

## I.    **Background**

On February 15, 2022, the Cast Iron Soil Pipe Institute ("CISPI"), a trade association of domestic producers of soil pipe, filed an Enforce and Protect Act ("EAPA")[2] duty evasion allegation asserting that Phoenix was transshipping CISP from China through Cambodia to the United States. Notice of Investigation and Interim Measures re Phoenix Metals at 2, C.R. 57, P.R. 73 (Mar. 28, 2022) ("NOI"). On February 28, 2022, CBP initiated a formal EAPA investigation of Phoenix. EAPA Consolidated Case: 7621, Re: Notice of Determination as to Evasion at 5, C.R. 129, P.R. 155 (Sept. 6, 2022) ("TRLED Determination"). On March 28, 2022, CBP followed this initiation with a formal notice of investigation of Phoenix. NOI at 1. This notice informed Phoenix that, based on the information on the record, CBP had determined that reasonable suspicion existed

---

[1] In the Complaint, Phoenix additionally alleges that CBP failed to comply with EAPA when it did not notify the Department of Commerce of its determination of evasion and did not request that Commerce calculate an anti-dumping or countervailing duty rate for Phoenix's goods, and asserts that TRLED's initiation of an investigation in this case was unlawful. Compl. at 9, 18. In briefing, Phoenix offered no argument in support of either of these claims, and indicated to the court that it considers these claims to have been waived. Pl.'s Reply Br. in Supp. of Rule 56.2 Mot. for J. Upon the Agency R. at 19–20, ECF No. 48 (Mar. 15, 2024) ("Phoenix Reply Brief"). Accordingly, the court will not specifically address either of these claims and considers them waived.
[2] See 19 U.S.C. § 1517(e) (2018).

that Phoenix was transshipping CISP and therefore CBP was instituting interim measures against Phoenix. NOI at 1. CBP instituted the following interim measures against Phoenix: it suspended liquidation for all entries of covered merchandise entered on or after February 28, 2022, extended the period for liquidating any unliquidated entry entered before that date, required that Phoenix refile any entry summaries submitted within the summary rejection period,[3] required live entries,[4] and required cash deposits of antidumping ("AD") and countervailing ("CVD") duties amounting to 250.62 percent ad valorem. Phoenix MSJ Brief at 6; NOI at 9; TRLED Determination at 35 n. 300. CBP also notified Phoenix that it was combining Phoenix's case with a case already initiated against another company owned by Ms. Li, the owner of Phoenix, that had also been accused of transshipping CISP. NOI at 9. The other company is not party to this case.

After the notice of investigation, Phoenix received and responded to a request for additional information from CBP's Trade Remedy Law Enforcement Directorate ("TRLED"). TRLED Determination at 6. After a supplemental request for information, with which Phoenix also complied, TRLED informed Phoenix that it would visit Phoenix's Cambodian facilities to do in-person verification of the information submitted. Phoenix Metal Engagement Letter, C.R. 109,

---

[3] The summary rejection period could be a period of up to 300 days. U.S. Customs and Border Protection, Directive 3550-067A, Subject: Entry Summary Acceptance and Rejection Policy (2011), https://www.cbp.gov/sites/default/files/documents/3550-067_3.pdf (last modified Feb. 28, 2020); see also U.S. Customs and Border Protection, Article Number 000001260, CBP – Entry Summary Rejection Process, (2023), https://www.help.cbp.gov/s/article/Article-1114?language=en_US (last modified Jun. 21, 2023).

[4] A "live entry" means that an importer must supply all entry documents and associated duties prior to the release of its cargo from Customs into the United States. See Vietnam Finewood Co. Ltd. v. United States, 466 F. Supp. 3d 1273, 1279 (Ct. Int'l Trade 2020); 19 C.F.R. § 142.13; see NOI at 9. Normally, an importer may file Customs Form (CF) 7501 with estimated duties attached up to 10 days after goods are entered into the economy. See U.S. Customs and Border Protection, EO13891-OT-036, What Every Member of the Trade Community Should Know About: Entry at 10–11 (2004), https://www.cbp.gov/sites/default/files/assets/documents/2020- Feb/icp 073_3_0.pdf (last modified Feb. 26, 2020).

P.R. 124 (June 3, 2022) ("Phoenix Metal Engagement Letter").   The notice of verification

informed Phoenix that it should be prepared to provide copies of production records during the

visit, and should expect up to eight CBP officials.  Id.  At verification, Ms. Li informed CBP that

the production they were witnessing was set-up only for verification purposes, accused the agents

of being spies, shouted at them, refused to turn over requested paperwork, and tried to interfere

with CBP's interviews of employees.  EAPA Case 7621 On-Site Verification Report at 4–6, C.R.

125, P.R. 145 (Jul. 22, 2022) ("Verification Report").  Phoenix does not substantially dispute these

facts, but asserts that Ms. Li's behavior occurred because she was overwhelmed by an abnormal

number of agents, including one agent who was listed as a member of the Homeland Security

Investigative Services.  Phoenix MSJ Brief at 26–30.   Regardless, the verification team left

without a number of production related documents that it had requested.  TRLED Determination

at 31–32.  Phoenix later tried to place those documents on the record.  Regulations and Rulings,

Office of Trade, Re: Enforce and Protect Act ("EAPA") Consolidated Case Number 7621 at 12,

C.R. 132, P.R. 165 (Jan. 18, 2023) ("ORR Final Decision").  CBP rejected them as untimely.  Id.

On September 6, 2022, TRLED concluded that substantial evidence demonstrated that

Phoenix had transshipped Chinese-origin CISP into the United States.  TRLED Determination at

35.  In doing so, TRLED drew adverse inferences against Phoenix because of Ms. Li's non-

cooperation during verification, but noted that it believed substantial evidence supported its

determination even without the adverse inferences.  TRLED Determination at 32.  Phoenix

requested administrative review on October 19, 2022.  ORR Final Decision at 3.  On January 18,

2023, the Office of Trade, Regulations and Rulings Directorate ("ORR") reviewed TRLED's

decision de novo and determined that substantial evidence reasonably supported the determination

that Phoenix had evaded AD/CVD duties.  ORR Final Decision at 1, 17.  ORR also affirmed

TRLED's decision to draw adverse inferences, while explaining that it did not find it necessary to draw adverse inferences in order to support the evasion determination as a whole. <u>ORR Final Decision</u> at 15–16. Phoenix then filed an action requesting review in this court. Compl. at 1.

## II.    **Jurisdiction and Standard of Review**

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1517(g). EAPA requires that the court determine whether a determination issued pursuant to 19 U.S.C. § 1517(c) or a review pursuant to 19 U.S.C. § 1517(f) was conducted "in accordance with those subsections" by examining whether CBP "fully complied with all procedures under subsections (c) and (f)" and "whether any determination, finding, or conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. §§ 1517(g)(2)(A)–(B). While the agency bases its determination and decision on substantial evidence and the court reviews the agency's actions to assess whether they are arbitrary and capricious, "both standards require an assessment based on a reasonableness standard." <u>Ad Hoc Shrimp Trade Enf't Comm. v. United States</u>, 632 F. Supp. 3d 1369, 1374 (CIT 2023) (citing <u>Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. Of Governors of Fed. Rsrv. Sys.</u>, 745 F.2d 677 683–84 (D.C. Cir. 1984)). "The court's review of Customs' determination as to evasion may encompass interim decisions subsumed into the final determination." <u>Vietnam Firewood Co. Ltd. v. United States</u>, 466 F. Supp. 3d 1273, 1284 (CIT 2020) (citations omitted).

## III.   **Discussion**

A. <u>When considered as a whole, both the TRLED and ORR decisions are reasonable and substantially supported (Counts II, III, IV, VI)</u>

Phoenix alleges that both TRLED and ORR's decisions are unreasonable and not supported by substantial evidence. Compl. at 10–14. Phoenix argues that CBP relied too heavily on the

ownership structure of Phoenix in determining that evasion occurred in this case,[5] failed to properly consider the full production of pipe,[6] and generally cherry picked the evidence.[7] Phoenix further alleges that TRLED and ORR over relied on Phoenix's refusal to turn over production records. Compl. at 11–12. Government counters that both the TRLED and the ORR decisions are reasonably supported by substantial evidence. Gov. Brief at 1.

Substantial evidence is "more than a mere scintilla." Biestek v. Berryhill, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id.

As the court touched on briefly in the background for this case, this particular determination is one in a series of allegations of transshipping that have all involved Phoenix's owner, Ms. Li. TRLED Determination at 2–8. Specifically, Ms. Li is suspected of running what TRLED designates as "the Lino group," a series of companies that are connected to Ms. Li either by her

---

[5] Compl. at 13–14.

[6] Specifically, Phoenix alleged in the Complaint that TRLED ignored that the factory production it observed was set up only for verification purposes, that the process was producing pipe, and that some factory equipment was "moved to a new location set up by Phoenix." Compl. at 10.

[7] Additionally, Phoenix alleges that TRLED and ORR improperly discounted evidence from the Ministry of Cambodia. Compl. at 11–12. Phoenix characterizes this evidence as evidence of a Ministry of Cambodia visit to Phoenix and certain certificates of origin provided by Cambodia to the verification team. Compl. at 12; Phoenix MSJ at 33. Government's response focuses on CBP's visit to the Ministry of Cambodia and on the paperwork that Cambodia supplied. Gov. Brief at 11; Verification Report at 16. TRLED cites to documentation that Phoenix supplied to the Ministry of Cambodia throughout its Determination. TRLED Determination at 7, 20–22, 27, 29–30, 32. ORR explained that the Ministry of Cambodia did not provide enough details on how it reached its conclusions for CBP to assess its conclusions, and noted that some information contained within the document supplied by the Ministry of Cambodia actually created additional concerns for the verification team as it revealed information regarding shipments that Ms. Li had reported to Cambodia but had not reported to CBP. ORR Final Decision at 11. Given the above, it is clear that CBP considered this evidence, and simply did not come to the conclusion that Phoenix desired. Specifically, CBP came to the conclusion that Phoenix had likely lied to the Cambodian government. See TRLED Determination at 30–31.

own ownership or control or by relatives or other business relationships.  <u>TRLED Determination</u> at 8.  In a previous EAPA case, TRLED found that two of the companies which Ms. Li founded, DLNL Trading Inc. ("DLNL") and Lino had engaged in transshipment of Chinese-origin soil pipe. <u>TRLED Determination</u> at 5.  Lino had previously imported through a company called HiCreek, which was shut down as a result of an EAPA investigation that found that it was transshipping Chinese-origin soil pipe.  <u>TRLED Determination</u> at 8.  All of these allegations and determinations predate the current EAPA case.  <u>Id.</u>  Other companies mentioned below are related to Ms. Li as follows: Ms. Li is the owner of Phoenix, Ms. Li's employee Mr. Zhang owns Little Fireflies International Co. ("Little Fireflies"),[8] and Camellia Casting, LLC ("Camellia Casting") was founded by Ms. Li's relative and former intern.

On July 14, 2021, previous to this investigation, the CISPI submitted an allegation to CBP that two companies called Granite Plumbing Products LLC ("Granite Plumbing") and Little Fireflies were transshipping Chinese-origin soil pipe into the United States.  <u>TRLED Determination</u> at 2.  Both companies were issued CBP Form 28 ("CF-28") questionnaires requesting additional information on the imports that CISPI alleged were evading AD/CVD duties. <u>Id.</u>  After some back and forth between CBP and the two companies, CBP issued a notice of initiation of investigation and interim measures to both.  <u>Id.</u> at 4.  A few months after the notice of investigation was issued, CISPI submitted another allegation to CBP, asserting that Phoenix was transshipping Chinese-origin soil pipe through Cambodia.  <u>Id.</u>  Because Phoenix listed another company's Cambodian facility as its shipping address and CBP had previously determined that this other company, HiCreek, utilized that exact facility to transship in the earlier EAPA case, and

---

[8] Mr. Zhang is employed by Ms. Li through Dalian Metal, which Ms. Li owns and which is an exporter of Chinese-origin soil pipe.  <u>TRLED Determination</u> at 8.

because Ms. Li was listed as Phoenix's owner, CBP determined that reasonable suspicion of evasion existed and issued a notice of investigation and interim measures in this case without issuing a CF-28 seeking additional information first. <u>Id.</u> at 5. In the Notice of Investigation and Interim Measures, CBP additionally combined Phoenix's case with the already ongoing investigation into Granite Plumbing and Little Fireflies. <u>Id.</u> CBP followed this consolidation by issuing requests for information to Granite Plumbing, Little Fireflies, Phoenix, Lino, HiCreek, and several other related individuals and companies. <u>Id.</u> at 6.

The results of these requests demonstrated that these companies were within the so-called "Lino Group" and were interrelated. <u>Id.</u> at 8–9. The information received further highlighted and expanded on HiCreek's role as a vehicle for transshipment of Chinese-origin soil pipe. <u>Id.</u> Narrowing in on the details of these relationships that are most relevant to this case, records indicated that Ms. Li's DLNL company transshipped through HiCreek but was then replaced as importer of record by Little Fireflies, most likely in order to avoid interim measures that CBP had implemented against DLNL.[9] <u>Id.</u> at 9–14. Prior to this, DLNL had replaced Lino as importer, presumably to evade interim measures placed on Lino's imports. <u>Id.</u> at 9–14, 17. TRLED determined that Phoenix similarly replaced Little Fireflies in this scheme, taking over for Little Fireflies imports in order to evade the interim measures against Little Fireflies. <u>Id.</u> at 18–19. Little Fireflies made this change after it was issued a CF-28. <u>Id.</u> at 19. Continuing this pattern, after CBP issued the Notice of Investigation and Interim Measures to Phoenix, Phoenix's imports were passed on to yet another company, Camellia Casting. <u>Id.</u> at 19–21. Phoenix concealed its

---

[9] Unlike Phoenix, Little Fireflies has not appealed this determination to this court, and no contrary facts have been presented, so the court accepts as fact TRLED's determinations of evasion by Little Fireflies.

relationship to Camellia Casting entirely in its responses to CBP's requests for additional information on its business affiliates. Id. at 21.

Phoenix does not point to any evidence to counter any facts set forth earlier.[10] See Compl.; Phoenix MSJ Brief; Phoenix Reply Brief. Rather, it argues, among other things; that CBP has failed to supply any evidence connecting the above to the allegation of transshipping, and has committed a number of procedural errors. Compl. at 13; Phoenix MSJ Brief at 11–43. In her own communications with CBP, Ms. Li implicitly admitted to at least some part of the scheme that CBP describes, stating that:

> CBP claims that Ms. Li's actions were intended to evade CBP revenue collection measures. Yet, CBP had no right to such revenue because its measures to collect AD/CVD duties violated basic principles of due process. If CBP had given Ms. Li and her companies proper and timely notice of its EAPA investigations, Ms. Li would have had time to protect her business interests before Phoenix shipped further CISP produced in Cambodia to the United States.

Re: EAPA Case No. 7621 – Phoenix Request for Administrative Review at 9, C.R. 130, P.R. 156 (Oct. 19, 2022). The court reads Ms. Li's basic argument as this: she may be "evading" AD/CVD duties, but is only doing so because CBP keeps determining that she is transshipping, and the transshipping determinations are wrong. Id. Her evasion actions are therefore justified, because they are an attempt to avoid incorrect legal determinations. Id. But Ms. Li has not, as far as this court has been able to determine, ever contested an evasion determination outside of this case. See Phoenix MSJ Brief; see Phoenix Reply Brief; see TRLED Determination; see ORR Final Decision; see Public Administrative Record, ECF No. 19 (Apr. 11, 2023). The evasion determinations made

---

[10] Phoenix does assert, of course, that it produced pipes, and claims that it utilized HiCreek's facilities to do so because Ms. Li thought that the closed factory represented a good business opportunity. Phoenix MSJ Brief at 4–7; Phoenix Reply Brief at 13–14. This assertion, however, does not counter the interrelated owner structure described above, nor the paper records indicating that some imports left Cambodia assigned to one company and entered the United States assigned to a different exporter. See e.g. TRLED Determination at 19 n. 160.

outside of this particular case are settled; the earlier companies were found to be transshipping. Thus, if Ms. Li is, as CBP alleges and Ms. Li appears to concede, moving shipments from the earlier companies to the later ones—including the one company whose imports are contested here—then those later companies may also be found to be engaged in transshipping in violation of law.

The question properly before the court is whether TRLED and ORR were arbitrary or capricious in finding that substantial evidence supported that Phoenix was engaged in transshipping. In its arguments to the court, Phoenix picks out a series of facts that it asserts TRLED and ORR ignored or, alternatively, overly relied on.[11] Compl. at 10–11; Phoenix Reply Brief at 13–16. But Phoenix does not undercut either TRLED or ORR's overarching assessment of Phoenix's operations, outlined above, and none of the evidentiary pieces that Phoenix complains of are the sole basis of either TRLED or ORR's determination or decision in this case. Predominately, Phoenix's arguments focus on the Verification Report and the conduct of the verification team, arguing that because the report demonstrated some ability to produce pipe, the rest of TRLED's Determination and ORR's Final Decision are unreasonable, and that the verification team generally ignored Phoenix's production capacity. Phoenix MSJ Brief at 44–45.

---

[11] The Complaint cites to a few specific pieces of evidence, including ORR and TRLED's alleged overreliance on a single bill of lading, and ORR and TRLED's alleged failure to give enough weight to evidence from the Ministry of Cambodia. Compl. at 11–12. ORR and TRLED both support their decision to rely on the bill of lading that appears to show import of "finished soil pipe" from China into Cambodia by Phoenix. ORR Final Decision at 10; TRLED Determination at 24, 27. Further, in assessing the bill of lading, TRLED cites to documentation that Phoenix supplied to the Ministry of Cambodia. TRLED Determination at 27, 29. TRLED and ORR both concluded that the evidence from the Ministry of Cambodia supports that Phoenix likely transshipped Chinese-origin pipe. See supra note 7.

But, as both TRLED and ORR note, a demonstration of some production capacity, particularly during a period of production set up solely for the purposes of verification,[12] does not prove that transshipment did not occur. See ORR Final Decision at 17; TRLED Determination at 25–27. In deciding that Phoenix did engage in evasion, both TRLED and ORR relied on the record as a whole, drawing upon the facts Phoenix cites, and a host of information that Phoenix ignores.

The Verification Report for this case described discrepancies in Phoenix's ledgers,[13] missing bills of lading,[14] missing records of electricity use,[15] mingling between Phoenix's accounts and Ms. Li's personal banking,[16] and material omissions in Ms. Li's communications with the verifiers.[17] In its Notice of Determination as to Evasion, TRLED does discuss Phoenix's ownership structure and it does highlight the timing of Phoenix's activation as an exporter to the United States.[18] In addition to that, however, TRLED indicates that it relied on the fact that Phoenix has no domestic sales,[19] on Phoenix's omissions in communicating with CBP,[20] on the absence of records of financial transactions,[21] on a materially false statement Ms. Li made to CBP,[22] and on Ms. Li's non-cooperation at verification.[23] TRLED also highlights that it relied on Phoenix's refusal to provide bank statements to verify its transactions,[24] Phoenix's inability to

---

[12] See Verification Report at 5 ("Ms. Li told us on separate occasions that the production process was set up just 'for us.'").
[13] See Verification Report at 15; TRLED Determination at 29; ORR Final Decision at 12.
[14] See Verification Report at 14.
[15] See Verification Report at 9.
[16] See Verification Report at 8.
[17] See Verification Report at 2.
[18] TRLED Determination at 19–22.
[19] TRLED Determination at 18.
[20] TRLED Determination at 23, 26.
[21] TRLED Determination at 26–27, 29–30.
[22] TRLED Determination at 22, 28, 33, 35.
[23] TRLED Determination at 32–33.
[24] TRLED Determination at 26 –27.

provide evidence of transactions for raw materials purchases,[25] and, finally, adverse inferences drawn because of Phoenix's noncooperation during the verification process.[26]

In ORR's Final Decision, while ORR does discuss specific connections between Phoenix, Camelia Casting, and HiCreek, the "Lino Group" is never mentioned and the overall structure of Ms. Li's business activities is not heavily relied on.[27] Instead, ORR highlighted that, at verification, Phoenix lacked the machinery necessary to produce the kind of pipe it shipped into the United States.[28] ORR additionally noted the existence of bills of lading that appear to show the import of Chinese steel pipe into Cambodia,[29] and that Ms. Li's refusal to supply the verifiers with either her production records or electric bills led to their inability to verify the company's

---

[25] TRLED Determination at 26– 29.

[26] TRLED Determination at 33–34.

[27] Lino is referred to throughout summaries of Phoenix's arguments and the CISPI's arguments. See ORR Final Decision at 5–8. Ms. Li's connection to Dalian Metal is noted because it is a company that Ms. Li owned which produced Chinese-origin soil pipe. Id. at 15. Little Fireflies decision not to appeal the Notice of Determination is mentioned. Id. at note 15. Because Phoenix's verification proceedings took place at HiCreek's facilities and utilizing some machinery that Phoenix alleges came from HiCreek, it is mentioned somewhat more extensively. Id. at 5, 9, 14.

[28] ORR Final Decision at 9–10.

[29] ORR Final Decision at 10. Phoenix disputes ORR's characterization of this import as "finished pipe;" in reviewing the ORR Final Decision, however, the court finds that ORR's explanation (that importing scraps under "steel pipe" does not make sense) is reasonable and addresses Phoenix's arguments on this issue.

production capacity.[30]  ORR further highlighted the unreliability of Phoenix's general ledgers,[31] the fact that Phoenix refused to hand over any bank statements that the verifiers could have used in verification,[32] Phoenix's relationship with and failure to disclose its relationship with Camelia Casting,[33] and Ms. Li's connections to and ownership of companies that produce Chinese-origin soil pipe.[34]  Based on all the above, ORR decided that, while it was possible Phoenix might have made some of the pipe it shipped, it was likely predominantly engaged in transshipping Chinese-origin pipe.

Phoenix has not refuted or disputed the vast majority of evidence in this case.  Rather, it has noted a few bits of the evidence that TRLED and ORR relied on, and argued that that evidence

---

[30] ORR Final Decision at 11.  Phoenix alleges that at least some of the documents that Ms. Li refused to supply verifiers Phoenix later tried to supply to TRLED as part of a post-verification submission and they were rejected as untimely.  ORR Final Decision at 12.  The Government argues that Phoenix failed to challenge this rejection and the basis thereof at the administrative level.  Gov. Brief at 34.  Phoenix fails to adequately respond to this argument and does not offer any exception to general exhaustion requirements.  See Phoenix MSJ Brief at 36–37; Phoenix Reply Brief at 16–19.  Failure to exhaust, therefore, may be sufficient to settle this issue.  Nonetheless assuming arguendo that there is any need to address the merits of TRLED's decision to reject these documents, ORR explains that the documents were rejected because Phoenix missed TRLED's deadline to submit additional information.  ORR Final Decision at 12.  Given that the only reason that Phoenix needed to supplement the record out of time was its own noncooperation, TRLED's enforcement of that deadline was reasonable.  Further, additionally reviewing the original written arguments that Phoenix asserts should have been accepted in full, it is clear to the court that none of the new information TRLED requested Phoenix redact would have affected the substantial evidence analysis.  See supra Part A; see Gov. Brief, Ex. B.  The court is unable to review the production records that Ms. Li claims to have offered, but given the agency's commentary about the unreliability of Phoenix's record keeping, it also appears highly unlikely that, even if accepted, these documents would have changed any of either TRLED or ORR's analysis of this case.
[31] ORR Final Decision at 13.  ORR notes that the record indicates Ms. Li is in control of what information is entered into Phoenix's records, and that that in itself makes Phoenix's records less reliable.  Id.  Given that the record in this case is replete with evidence of prevarication, this conclusion seems reasonable.
[32] ORR Final Decision at 13.
[33] ORR Final Decision at 14.
[34] ORR Final Decision at 15.

should be given a different meaning.  Both TRLED and ORR have addressed Phoenix's arguments.[35]  Neither TRLED nor ORR were arbitrary and capricious in deciding that substantial evidence supports evasion in this case.

    B.  <u>Phoenix raises several other objections that do not change the outcome of this case</u>

Phoenix argues that its due process rights were violated and that adverse inferences were improperly drawn.  Compl. at 14–18.  The Government denies both.  Gov. Brief at 13–14, 16, 42.

    i.  <u>Phoenix's claim that CBP violated due process when it did not supply it with unredacted copies of certain business confidential filings is moot (Counts IX and XI of the Complaint)</u>

Phoenix originally asserted that CBP violated its due process rights when CBP failed to provide it with unredacted versions of all information used in the decision making process.  Compl. at 16–18.  Since this case was initiated, the Federal Circuit issued its opinion in <u>Royal Brush Mfg., Inc. v. United States</u>, 75 F.4th 1250 (Fed. Cir. 2023), which clarified that due process requires the release under a protective order of any confidential business information that is utilized in the decision making process.  <u>Id.</u> at 1259–60.  After this decision was issued, the Government submitted a request for remand in this case, so that it could comply with this new guidance and could supply Phoenix with all confidential business information utilized in this case.  Def.'s Partial Consent Mot. for a Voluntary Remand at 3, ECF No. 32 (Oct. 31, 2023).  Phoenix opposed that request, stating, in part, that remand was unnecessary as "parties to this litigation have already

---

[35] As indicated, in the Complaint, Phoenix alleged that TRLED ignored that the factory was producing pipe, and that some equipment was "moved to a new location set up by Phoenix." Compl. at 10.  Phoenix further alleged that TRLED and ORR overly relied on a translation of a single bill of lading as evidence that Phoenix imported soil pipe into Cambodia.  Compl. at 11. Phoenix alleges that TRLED and ORR over rely on Phoenix's refusal to turn over production records and that both TRLED and ORR discount the Ministry of Cambodia's visit to the factory. Compl. at 11–12.

gained access to the confidential information under the Judicial Protective Order."  Pl.'s Resp. to

Def.'s Mot. for a Voluntary Remand at 2, ECF No. 35 (Nov. 21, 2023).  While <u>Royal Brush</u> makes

clear that parties are entitled to this information, as Phoenix concedes that it no longer suffers any

harm from this error, this issue is no longer appropriate for review.  Counts IX and XI of the

Complaint are moot.

      ii.    <u>Phoenix's claim that CBP's verification process was an abuse of discretion fails</u>

               <u>(Count V)</u>

In its Complaint, Phoenix argues that CBP's decision to send seven agents to conduct

verification represents an abuse of the agency's discretion.  Compl. at 12–13.  In briefing, Phoenix

covers in detail why it argues that this decision produced "chaos" and "overwhelmed and

frustrated" Ms. Li.  Phoenix MSJ Brief at 9, 29.  It does not, however, cite to any law restricting

the number of investigators or employees that CBP may send to conduct verification.  <u>See</u> Phoenix

MSJ Brief; Phoenix Reply Brief at 18–20.  Even reviewing the record before the court in the light

most favorable to Phoenix, the evidence indicates that CBP gave notice to Phoenix to expect eight

agents,[36] CBP sent seven,[37] and the seven agents appear to have engaged in the normal actions of

a verification team.[38]  If there is a circumstance in which the number of verifiers or means of

verification represents an arbitrary and capricious decision, abuse of discretion, or other violation

of a party's rights, this case is not that case.  Count V of Phoenix's Complaint fails.

---

[36] <u>Phoenix Metal Engagement Letter</u>.
[37] <u>Verification Report</u> at Attachment 1.
[38] <u>See</u> <u>Verification Report</u>.

     iii.    <u>Phoenix's claim that adverse inferences were improperly drawn in this case also</u>

            <u>fails (Count VII)</u>

Phoenix argues that TRLED and ORR's decision to draw adverse inferences as to Phoenix was arbitrary and capricious. Compl. at 14. The Government argues that, given Phoenix's non-cooperation, drawing adverse inferences was appropriate in this case. Gov. Brief at 42. At the outset, the court observes that while ORR affirmed TRLED's drawing of adverse inferences, ORR itself noted that it was unnecessary to use adverse inferences and therefore did not use them to support its decision. <u>ORR Final Decision</u> at 9, 15–16. Additionally, while TRLED drew adverse inferences in its determination, it also found that substantial evidence supported evasion even without the use of adverse inferences. <u>TRLED Determination</u> at 32. Therefore, whether adverse inferences were properly or improperly drawn at the TRLED level makes no difference to the outcome of this case, as both TRLED and ORR found they could base their decisions on substantial evidence alone and the court has already determined that neither TRLED nor ORR's determination that substantial evidence supports evasion here was arbitrary or capricious. <u>See</u> <u>supra</u> Part A.

Assuming arguendo that use of adverse inferences was necessary to find evasion in this case, adverse inferences may be used wherever a party "has failed to cooperate by not acting to the best of the party or person's ability to comply with a request for information . . . ." 19 U.S.C. § 1517(c)(3)(A). Additionally, adverse inferences may be used "without regard to whether another person involved in the same transaction or transactions under examination has provided the information sought." <u>See</u> <u>id.</u> § 1517(c)(3)(B); <u>see also</u> <u>All One God Faith, Inc. v. United States</u>, 589 F. Supp. 3d 1238, 1250–51 (CIT 2022), <u>appeal docketed</u>, No. 23-1081 (Fed. Cir. Oct. 25, 2022). Whether a gap in the record exists is not determinative to whether adverse inferences may

be applied in the EAPA context.  CEK Grp. LLC v. United States, 633 F. Supp. 3d 1369, 1379 (CIT 2023).[39]

Phoenix was noncooperative.  TRLED relied upon Phoenix's material omission of its relationship to Camellia Casting and false declaration of certain Phoenix imports as Camellia Casting imports in finding that Phoenix failed to cooperate to the best of its ability in the investigative process.  TRLED Determination at 32.  ORR, in affirming TRLED's decision to use adverse inferences, highlighted that Phoenix refused to provide requested production and bank documents, as well as reiterating its failure to disclose its relationship to Camellia Casting.[40]  ORR Final Decision at 15.  Therefore, to the extent it is relevant, the drawing of adverse inferences here was reasonable and Count VII of the Complaint fails.

---

[39] Of course, as stated in CEK Grp. LLC, if other information in the record so undermines the adverse inference that the determination is rendered arbitrary, the determination cannot stand. CEK Grp. LLC v. United States, 633 F. Supp. 3d 1369, 1379 (CIT 2023).  There is no such contradictory evidence here.

[40] ORR additionally found that Phoenix's claim that the metal it imported as "finished soil pipe" was not the same product it imported into the United States was a false statement supporting adverse inferences.  ORR Final Decision at 15.  While the court agrees that in this case substantial evidence supports evasion and the inference that this statement was likely a lie, it is also conscious that affirming Phoenix's denial of the transshipment charge as a reason in itself to apply adverse inference risks encouraging the agency to punish importers simply for the act of denying that they are guilty of violating the law.  This reasoning could become extremely circular—adverse inferences support a finding of evasion because the importer has denied evasion.  As substantial evidence supports evasion here without the use of adverse inferences the risk here is low, but the court nonetheless notes that absent highly unusual circumstances, the mere denial of a charge of transshipping is not in itself a reasonable basis for adverse inferences.

     iv.    <u>Phoenix's claim that it has a 5th Amendment due process right to notice and an opportunity to be heard prior to the imposition of interim measures fails (Counts VIII and X)</u>[41]

Phoenix argues that it has a 5th amendment right to notice of an evasion allegation and "an opportunity to be heard at a meaningful time before CBP imposed punitive measures."  Phoenix Reply Brief at 9–10.  The Government contends that this claim fails because "Phoenix does not establish that a legitimate property interest exists in the context of interim measures."  Gov. Brief at 16.

EAPA generally allows for the imposition of interim measures prior to notice and opportunity to rebut an allegation.[42]  19 U.S.C. § 1517(b)(1), (e); 19 U.S.C. § 1517(c)(4).  The statute provides for an extremely efficient timeline: at 15 days after allegation, an investigation will be initiated; within 90 days, if there is "a reasonable suspicion" that evasion has occurred, CBP will impose interim measures.  19 U.S.C. § 1517(b)(1), (e).  Interim measures "shall" minimally involve suspended liquidation and extension of liquidation deadlines, but may involve "such additional measures as the Commissioner determines necessary to protect the revenue of the

---

[41] Phoenix additionally alleges that the EAPA regulations themselves violate 5 U.S.C. § 553 ("the APA") because CBP issued them without a proper notice and comment period.  Phoenix MSJ Brief at 19–22. The substance of the interim measure provision of the regulations is the same as the statute.  Thus what particular aspects of the regulation required notice and comment under the APA has not been made clear.  Phoenix's real claim seems to be that the statute itself is deficient because it does not require notice and an opportunity to be heard prior to the imposition of interim remedies. This aspect of the Complaint is a constitutional lack of due process claim addressed <u>infra</u>.

[42] Phoenix challenges the constitutionality of EAPA because EAPA does not require CBP to give importers the kind of notice it argues for in this case.  Compl. at 16–17.  The interim measures CBP imposed here, apparently of most concern to plaintiff, were not required by statute but rather were discretionary.  <u>See</u> 19 U.S.C. § 1517(e)(3).  The statute's silence on what procedures apply to measures that Customs might take does not seem to give rise to a facial challenge to the statute.  Accordingly, the court reads Phoenix's claim to be to the statute as applied.

United States . . . ." 19 U.S.C. § 1517(e)(3). Notice is required by statute "not later than 5 business days after making a determination under paragraph (1) . . . ." 19 U.S.C. § 157(c)(4). A "determination" under paragraph (1) may occur up to 300 days after initiation of investigation,[43] and it is considered a final determination. 19 U.S.C. § (c)(1)(A). Earlier notice is only required when the Commissioner is "unable to determine whether the merchandise at issue is covered merchandise." Id.

CBP notifies parties when interim measures are imposed. See, e.g., NOI. Frequently, however, it issues a CF-28 prior to notice of investigation and imposition of interim measures. 19 C.F.R. § 151.11. CBP utilizes this form to gather additional information from the importer prior to deciding whether "reasonable suspicion" exists and imposing interim measures. Id. There is no statutory requirement for this form. See EAPA; see also 19 C.F.R. § 151.11. This form was, however, issued in the other evasion cases to which Ms. Li was connected. See TRLED Determination at 19. Although plaintiff agrees that this form does not always provide notice of an EAPA investigation as other issues may be of concern to CBP, it appears that the absence of this form in advance of interim measures may have triggered Phoenix's complaint here. In any case, plaintiff alleges that proper notice did not occur before the measures were imposed.

The Federal Circuit has previously held that importers are entitled to due process rights in an evasion proceeding, specifically the right to know what evidence is being used against one. Royal Brush, 75 F.4th at 1258. One "relatively immutable" principle of due process is that "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the [g]overnment's case must be disclosed to the

---

[43] Although this is the default, the statute additionally allows for some extension of this deadline. 19 U.S.C. § 1517(c)(1)(B).

individual so that he has an opportunity to show that it is untrue." Greene v. McElroy, 360 U.S. 474 (1959). "Due process is flexible and calls for such procedural protections as the particular situation demands." Mathews v. Eldridge, 424 U.S. 319, 334 (1976) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). Broadly, determining whether administrative procedures are constitutionally sufficient requires "analysis of the governmental and private interests that are affected." Mathews v. Eldridge, 424 U.S. at 334 (citations omitted).[44] Consideration of due process first requires a determination that some "private interest" is at issue. Mathews v. Eldridge, 424 U.S. at 334–35. Without a constitutionally cognizable interest in either "liberty" or "property," the due process inquiry ends. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999).

A protected interest is more than a "unilateral expectation." Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States, 751 F.2d 1239, 1250 (Fed. Cir. 1985) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 571 (1972)). While there is not a protected interest that attaches to future imports, importers may have a protected interest in the proper assessment of duties on goods already imported.[45] See Diamond Tools Tech. LLC v. United States, 545 F. Supp. 3d 1324, 1340–41 (CIT 2021) (citing Noreida Trading Co., Inc. v. United States, 34 CIT 241, 248, 683 F. Supp. 2d 1348, 1355 (2010)); Am. Pac. Plywood, Inc. v. United States, Slip. Op. 23-93, 2023 WL

---

[44] The Supreme Court recently decided a case involving civil forfeiture in which it determined that Petitioners had incorrectly argued the Mathews v. Eldridge standard. See Culley v. Marshall, 601 U.S. __, 144 S.Ct. 1142 (2024). This specific issue, as the Supreme Court pointed out, had already led to the establishment of appropriate tests. Id. Here, no court, including this one, has determined what proper constitutional due process might be at this stage within the kind of statutory scheme that EAPA presents. Addressing this question properly would require facts more specific than those Phoenix has alleged. See infra p. 22–23. Absent these facts, the court need not answer this hypothetical. See United States v. Von Neumann, 474 U.S. 242, 250 (1986).

[45] Where in the importing process goods are considered "imported" for these purposes is not resolved here because Phoenix fails to point the court to sufficient facts to support review of this question. See Phoenix MSJ Brief 14–15; Phoenix Reply Brief at 10–12.

4288346, at *7 (CIT June 22, 2023); Aspects Furniture Int'l, Inc. v. United States, 607 F. Supp.

3d 1246, 1271 (CIT 2022).  "The mere subjective expectation of a future business transaction does

not rise to the level of an interest worthy of constitutional protection," and "[n]o one has a

protectable interest to engage in international trade." Am. Ass'n of Exp. & Imp.-Textile & Apparel

Grp. v. United States, 751 F.2d 1239, 1250 (Fed. Cir. 1985) (citations omitted).

        While an importer may have a property interest in the actual import duties due, the duties

from these goods are no longer at issue here, as the evasion determination has been upheld and so

Phoenix owes the duties that CBP sought.  Nonetheless, the court is mindful that if Phoenix

suffered business harm stemming directly from the lack of notice and opportunity to be heard prior

to the sudden imposition of interim measures on goods already imported, that might also be an

interest that could trigger due process rights.  See NEC Corp. v. United States, 151 F.3d 1361,

1369 (Fed. Cir. 1998) ("[T]he case is not moot if other consequences of the defendants' actions

remain.").[46]  It is feasible that a plaintiff could present facts that show that the kind of interim

measures imposed here have caused it lasting economic harm.  The combination of cash deposits

for AD/CVD duties with the live entry requirement requires the importer to suddenly deposit a

large amount of cash with CBP before it can even complete the sale for which it is importing the

goods.  Live entries are so onerous that they have previously been compared to sanctions.  See

Ford Motor Co. v. United States, 44 F. Supp. 3d 1330, n.16 (CIT 2015).  It is possible to imagine

a scenario under which a plaintiff might allege specific enough harm coming from this economic

burden for a serious due process issue to be raised.

---

[46] In Aspects Furniture Int'l, Inc. v. United States, 607 F. Supp. 3d 1246, 1273 (CIT 2022), the
court found no deprivation of due process in the imposition of interim measures.  As immediate
harm to the importer was not discussed, this opinion does not provide much guidance for the case
at hand.

Here, in contrast, Phoenix vaguely asserts that because it lacked notice it was "unable to mitigate its injury," rendered liable for breach of contract damages, and, crucially, that it was "forced to fundamentally alter [its] business operations."[47]  Phoenix Reply Brief at 10–12; Phoenix MSJ Brief 14–15.  Phoenix, however, does not explain what cognizable injury it suffered from its asserted inability to negotiate better loans or renegotiate contracts,[48] does not allege any actual damages stemming from a breach of contract or other source of liability, and certainly does not tie any of this alleged harm to the imports already entered into the country as opposed to those that Phoenix had yet to ship.[49]  Phoenix primarily argues that it was "forced to fundamentally alter [its]

---

[47] Phoenix makes these assertions in briefing; in the Complaint for standing Phoenix merely alleges that it "has been adversely affected and aggrieved by TRLED's affirmative evasion . . . and ORR's affirmation of TRLED's determination."  Compl. at 2.  Although it does mention interim measures in Count VIII, without linking them to specific harm, given Phoenix's vague description of alleged harm in this case, assuming standing is established, the due process claim of the Complaint is likely insufficiently plead to survive analysis under Bell Atl. Corp. v. Twombly or Ashcroft v. Iqbal.  See Iqbal, 556 U.S. 662, 678 (2009) ("[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.")(internal quotation marks omitted); see also Twombly, 550 U.S. 544, 555, (2007)("Factual allegations must be enough to raise a right to relief above the speculative level.").  An amended complaint here would be futile, however, as this claim fails on other grounds.

[48] Further, in briefing, Phoenix's only response to CISPI's argument that there is no evidence that Phoenix would have taken any of these additional steps, and therefore no evidence it suffered any real injury, is to assert whether or not it would have actually mitigated its damages is irrelevant to its claim.  Resp. Br. of Def.-Intervenor Cast Iron Soil Pipe Institute at 28–31, ECF No. 46 (Feb. 20, 2024) ("CISPI Brief"); see Phoenix MSJ Brief 14–15; see Phoenix Reply Brief at 12, 14, 16.  As far as Phoenix asserts it would have mitigated damages by ceasing shipping, the evidence on the record does not support this claim.  See supra Part A.

[49] If entries made between the imposition interim measures and notice thereof resulted in a particular harm, apart from duties owed and not yet paid, it has not been set forth with specificity.  Tying alleged economic harm to the imports already entered is particularly crucial when an importer alleges that the harm it suffered comes from the effect of the interim measures, rather than the measures themselves, because without specific facts that illustrate the connection, the harm alleged looks a good deal like an assertion of a right "to engage in international trade," which, as the court has already addressed, does not exist.  See Am. Ass'n of Exp. & Imp.-Textile & Apparel Grp. v. United States, 751 F.2d 1239, 1250 (Fed. Cir. 1985) (citing Norwegian Nitrogen Prods. Co. v. United States, 288 U.S. 294 (1933)).

business operations in order to comply with CBP's demands,"[50] and was denied the ability to

mitigate its future losses by "cancelling orders" and "immediately halt[ing] all shipments."[51]

Phoenix MSJ Brief at 13–16; Phoenix Reply Brief at 11.

Because Phoenix has failed to show that there was a sufficient cognizable property interest

and redressable harm present at the interim stage to trigger the kind of due process right it requests,

the court need not decide whether due process was or was not provided.  See Diamond Tools Tech.

LLC v. United States, 545 F. Supp. 3d 1324, 1341 (CIT 2021) ("The court does not exclude the

possibility that a protected interest may exist; rather, DTT USA has failed to establish what any

such interest may be in this specific context . . . ." (citing Home Prods. Int'l, Inc. v. United States,

36 CIT 665, 673, 837 F. Supp. 2d 1294, 1301 (2012))).  Assuming arguendo, however, that 1) a

property interest does exist, 2) sufficient harm is alleged, and 3) the issue is not mooted by the

final decision, here, due process has been met.  Due process is concerned with lowering the "risk

of an erroneous deprivation." See Mathews, 424 U.S. at 335.[52]  In this case, that risk was extremely

---

[50] To some extent, of course, forcing a business to alter its business operations might be said to be
the point of EAPA.  Given the existence of regulatory law in the United States, it is hard to see how
forcing a private party to alter its behavior alone is sufficient harm to give rise to a due process
violation.  Further, given the full facts of this case, the court is not even sure that business
operations on the whole were altered very much here.  See supra Part A.

[51] Of course, as both the Government and CISPI point out, Phoenix did not immediately halt all
shipments.  Gov. Brief at 23; CISPI Brief at 29–30; TRLED Determination at 20.  Rather, it
transferred shipments to Camellia Casting.  TRLED Determination at 20; see supra Part A.

[52] As discussed supra note 44, the Supreme Court recently declined to rely heavily on Mathews,
pointing instead toward the court's decisions in United States v. Von Neumann and U.S. v. Eight
Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency.  See Culley v. Marshall, 601
U.S. __ 144 S.Ct. 1142 (2024); United States v. Eight Thousand Eight Hundred & Fifty Dollars
($8,850) in U.S. Currency, 461 U.S. 555, 562 (1983); United States v. Von Neumann, 474 U.S.
242, 250 (1986).  Given that all of these cases dealt with civil forfeiture, the court declines to
narrow its due process discussion to only that test here as it is uncertain that the civil forfeiture
case law would be the right line of due process related case law to apply if there were some
protectable right at issue at the interim measures stage.  Nonetheless, the court notes that if, as in
$8,850, the court determined that the due process interests at issue here were most like the right to

low.  Phoenix's owner, Ms. Li, was on notice of all of the information CBP used to reach its

conclusion, except for the fact that a new allegation had been made against this particular named

company.[53]  Further, all of the information on the record that CBP relied on, save the fact that a

new allegation existed, constituted information that Phoenix's owner, Ms. Li, had already had an

opportunity to rebut through the earlier EAPA processes.  Given the particular facts of this case—

that all of the information on the record was information that Phoenix would have had access to,

that Phoenix's owner, Ms. Li, had already had multiple companies go through EAPA

investigations, and that evidence indicated that Ms. Li was actively evading Government's

determinations in the earlier cases and potentially utilizing the CF-28s as a warning system—the

risk of error here was low.  "Due process is flexible and calls for such procedural protections as

the particular situation demands."  Mathews, 424 U.S. at 334.  In this situation, due process

required no more than what occurred.

---

a speedy resolution, and decided to apply the Barker test as in $8,850, that test would further
support the court's assessment that due process was met here.  See $8,850, 461 U.S. 555, 564
(1983) (discussing the Barker test); see also Barker v. Wingo, 407 U.S. 514, 530 (1972).  The
$8,850 test focuses on the length of the delay, the harm caused by the delay, and the "reason the
Government assigns to justify the delay."  $8,850, 461 U.S. at 565.  Here, it could be argued that
Ms. Li had the relevant information prior to the imposition of interim measures due to her
connection to the other companies.  Thus, the length of the delay in this case could be zero.
Additionally, $8,850 noted that the government could seize the property at issue without any notice
or hearing at all, and held that, in that case, an 18-month delay between the seizure and civil
forfeiture proceedings was not unconstitutional.  See $8,850, 461 U.S. 555, 564 (1983).
[53] EAPA allows CBP to delay notifying an importer of the existence of allegation.  See supra p. 18–
19.  Given Ms. Li's alleged history of new company creation following the issuance of a CF-28,
if there were ever a case that presented the facts under which CBP might wish to delay notification
of an allegation, it is this one.  CBP's concern is, as Government points out, born out by the fact
that, as soon as Ms. Li was notified of the investigation of Phoenix, Camellia Casting took over as
importer of record for the imports that had previously been assigned to Phoenix.  TRLED
Determination at 19; ORR Final Decision at 14.

## CONCLUSION

For the foregoing reasons, the court sustains CBP's final determination of evasion. Judgment will enter accordingly.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: June 10, 2024
New York, New York